# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

CASE NO.  1:21-cv-21044-JLK

RYDER TRUCK RENTAL, INC.,

      Plaintiff,

v.

CHANJE ENERGY, INC. and
FDG ELECTRIC VEHICLES
LIMITED,

      Defendants.

_____/

**DECLARATION OF RYDER TRUCK RENTAL, INC. IN SUPPORT OF MOTION FOR**
**DEFAULT JUDGMENT AGAINST CHANJE ENERGY, INC.**

      I, Isabel M. Marini, pursuant to 28 U.S.C. § 1746 and Section 92.525, Fla. Stat., declare under penalty of perjury that the following is true and correct:

      1.     I am over the age of eighteen (18) and make this declaration in support of Ryder Truck Rental, Inc.'s Motion for Default Judgment against Defendant Chanje Energy, Inc. ("Chanje").  The facts in this declaration are based on my own personal knowledge and if called as a witness I could, and would, testify competently thereto.

      2.     I serve as the Chief Financial Officer for Ryder Truck rental, Inc. ("Ryder").

      3.     As part of my job duties, I am familiar with Ryder's business relationship with Chanje and Chanje's failure to fulfill numerous obligations spanning multiple agreements between the parties.

      4.     On March 17, 2017, Ryder and Chanje entered into a Vehicle Service and Parts

Distribution Agreement (the "Vehicle Agreement"), attached hereto as Exhibit A.

5.      Through the Vehicle Agreement, Ryder and Chanje contracted to exchange services and payment, and the Agreement details Ryder's Chanje-related services and operations, including parts distribution services, repair services, authorized uses of new Chanje vehicles purchased from Chanje, sales facilitation services, use of trademarks, and additional terms and conditions.  *See* Ex. A at 1.

**A.      The Overpayment of the 2017 Purchase Order**

6.      The first Purchase Order connected to the Vehicle Agreement was dated June 26, 2017.  *See* Purchase Order (June 26, 2017, referred to herein as the "2017 Purchase Order"), attached hereto as Exhibit B.

7.      Via the 2017 Purchase Order, Ryder agreed to purchase a total of 125 vehicles from Chanje.

8.      Specifically, the 2017 Purchase Order required Ryder to pay Chanje an initial deposit of $35,000 per vehicle (the "initial deposit") upon execution of the Purchase Order and a remaining balance of $10,000 per vehicle upon delivery (the "remaining balance payment").  *See* Ex. B at 1.

9.      On June 26, 2017, Ryder made an initial deposit in the amount of $4,375,000 for all 125 Chanje vehicles ordered in the Purchase Order.  This amount included the $35,000 initial deposit per vehicle, as described in the Purchase Order.  *See id.*

10.     By December 2017, only 22 Chanje vehicles had been delivered.  Pursuant to the Purchase Order, Ryder was required to remit the remaining $10,000 balance payment for those 22 vehicles.

11.     On December 7, 2017, Ryder made a payment to Chanje for the 22 vehicles that

had been delivered, but did so in the mistaken amount of $45,000 per vehicle (the entire cost of the vehicle), rather than the remaining balance due of $10,000 per vehicle for the 22 vehicles actually delivered, as set out in the Purchase Order.

12.     This mistake resulted in an overpayment of $35,000 per vehicle for the 22 vehicles that had been delivered, amounting in **a total overpayment of $770,000** (the "Overpayment Amount").  Chanje acknowledged the mistake and overpayment and agreed to return the excess but deposited the funds and has not returned the overpayment.

13.     Chanje has not delivered the remaining 100 vehicles ordered and for which Ryder paid the $35,000 deposit for each.

14.     At all times, Chanje acknowledged that the Overpayment Amount demanded by Ryder was an overpayment for the 22 vehicles, and must be reimbursed.

**B.     Failure to Deliver the Remaining 100 Vehicles on the 2017 Purchase Order And Refund for the Initial Deposit for Those 100 Vehicles**

15.     After the delivery of the 22 vehicles, for which Ryder overpaid, Chanje only delivered 3 more vehicles.

16.     That is, out of the 125 vehicles that Ryder ordered and paid a deposit for according to the Purchase Order, Ryder only received 25 out of the 125 vehicles it submitted a deposit for in the 2017 Purchase Order; 100 vehicles have not been delivered.

17.     Chanje advised that it could not meet its obligation to deliver the remaining 100 vehicles that Ryder paid a deposit for.

18.     Following Chanje's failure to perform, Ryder terminated the 2017 Purchase Order with respect to the remaining 100 vehicles that had not been delivered.

19.     However, because Ryder had already paid the initial deposit of $35,000/vehicle, totaling $4,375,000 for ***all 125*** of the vehicles ordered, Chanje agreed that the deposit for the 100

undelivered vehicles should have been returned to Ryder.

20.     The deposit for those 100 undelivered vehicles was $3,500,000.  Therefore, Ryder is entitled to a full refund of $3,500,000 for the 100 undelivered vehicles (the "$3.5M Termination Reimbursement Amount").

21.     Ryder has repeatedly demanded the return of the $3.5M Termination Reimbursement Amount, and Chanje has acknowledged the necessity of that reimbursement through e-mails and phone conversations, but has not refunded Ryder.

**C.      Two Promissory Notes and an Accompanying Side Letter Have Been Breached**

22.     In recognition of Chanje's indebtedness to Ryder of approximately $4,270,000 (the $770,000 Overpayment Amount and $3.5M Termination Reimbursement Amount), Chanje entered into two promissory notes.

i.      The Overpayment Promissory Note (Note #1)

23.     On February 28, 2019, Chanje executed a Promissory Note unconditionally promising to pay Ryder the principal amount of $770,000.  *See* Promissory Note (Feb. 28, 2019), attached hereto as Exhibit C (the "Overpayment Promissory Note").

24.     Since then, Chanje has paid $500,000 towards the Overpayment Promissory Note, leaving Chanje with an outstanding balance of $270,000 on the $770,000 note.

25.     Chanje has made no more payments that were due and missed the last payment date on the Overpayment Promissory Note.

ii.     The $3.5M Promissory Note (Note #2) and Side Letter Agreement

26.     Subsequently, on November 13, 2019, Chanje executed a second Promissory Note unconditionally promising to pay Ryder the principal amount of $3,500,000 for the return of the remainder of the deposit (the $3.5M Termination Reimbursement Amount), as a result of vehicles

not being delivered under the Agreement.  *See* Promissory Note (Nov. 13, 2019), attached hereto as Exhibit D (the "$3.5M Promissory Note," and together with the Overpayment Promissory Note, the "Two Promissory Notes").

27.     Chanje has not paid anything towards the $3.5M Promissory Note and has not satisfied its obligations under the Vehicle Service and Parts Distribution Agreement.

28.     In conjunction with the $3.5M Promissory Note, Chanje signed a contemporaneous Side Letter Agreement, which imposed the conditions of payment for the Note.  *See* Side Letter Agreement to $3.5 Million Promissory Note (Nov. 13, 2019), attached hereto as Exhibit E (the "Side Letter Agreement").

29.     The Side Letter Agreement specifically incorporated each of the agreements between the parties up until that time, including the Vehicle Agreement, the 2017 Purchase Order, and the $3.5M Promissory Note.  *See id.*

30.     The Side Letter Agreement also served as the termination of the 2017 Purchase Order for the remaining 100 vehicles that were not delivered.  *See id.*

31.     In the Side Letter Agreement, the parties agreed that Ryder is entitled to a full refund of $3,500,000, and further agreed that the refund should be made in the form of a credit deducted from the purchase price of vehicles ordered in a separate purchase order involving leases to FedEx (note that the FedEx purchase order was for the purchase of 900 vehicles that would be leased by FedEx).[1]

32.     The Side Letter Agreement stated that in the event that Chanje failed to deliver at least 700 vehicles under the FedEx purchase order by December 1, 2020, then Ryder "shall be entitled to declare the balance of the principal amount under the Promissory Note (less any Vehicle

---

[1]     The FedEx purchase order was entered into in November 2018.

Credits) as immediately due and payable." *Id.*

33.     Chanje did not meet its obligations and deliver the 700 vehicles under the FedEx purchase order, therefore the $3.5M Purchase Order became immediately due and recoverable.

34.     Chanje has accordingly breached its obligations under the Side Letter Agreement and $3.5M Promissory Note, and are in default under that Note.

35.     Chanje has failed to pay the principal amounts of the Two Promissory Notes upon their coming due.

36.     Ryder has demanded payment and has attempted to collect the outstanding principal balance from Chanje in the amount of $3,770,000.  Chanje has acknowledged its debt to Ryder but has not paid these amounts.

37.     Chanje even committed to pay some of the outstanding balance by the end of January 2021, but that promise was not fulfilled either.

**D.     Sum Certain Due Upon Default Judgment Against Chanje**

38.     Chanje owes $270,000 on the Overpayment Promissory Note and $3,500,000 on the $3.5M Promissory Note, totaling a sum certain indebtedness of $3,770,000 in damages.

39.     In addition to the foregoing damages, Ryder also incurred a filing fee cost of $402 to file its Complaint.  *See* "Pay.gov Payment Confirmation: FLORIDA SOUTHERN DISTRICT COURT," attached hereto as Exhibit F.

40.     The total amount due upon default judgment against Chanje is the sum certain of **$3,770,402.00**.

41.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 2, 2021

By: _Isabel M. Marini_
Isabel M. Marini (Jul 2, 2021 17:08 EDT)

ISABEL M. MARINI
CHIEF FINANCIAL OFFICER,
RYDER TRUCK RENTAL, INC.

# EXHIBIT A

# VEHICLE SERVICE AND PARTS DISTRIBUTION AGREEMENT

This **Vehicle Service and Parts Distribution Agreement** ("Agreement") is made and entered into as of March 17, 2017 ("Effective Date") by and between **Ryder Truck Rental, Inc.**, a Florida corporation with an address of 11690 NW 105th Street, Miami, Florida 33178 ("Ryder"), and **Chanje Energy, Inc.**, a Delaware Corporation with an address of 1025 Rollins Road, Burlingame, California 94010 ("Chanje"). In this Agreement, each of Ryder and Chanje may be individually referred to as a "Party" or collectively as the "Parties."

## Recitals

A. Chanje manufactures, sells, and distributes electric vehicles together with the parts, accessories, and components for such vehicles.

B. Ryder leases trucks and other commercial vehicles to third parties; provides vehicle maintenance, and repair services to fleets of trucks and other commercial vehicles through its network of vehicle maintenance and repair service centers; and distributes vehicle parts through its parts distribution network.

C. Through this Agreement, (a) Chanje will sell to Ryder Chanje Vehicles for lease or rental by Ryder; (b) Ryder will assist Chanje in the facilitation of the sale or lease of Chanje Vehicles by Chanje to third parties; (c) Chanje will sell Chanje Vehicle Parts to Ryder and Ryder will inventory and distribute Chanje Vehicle Parts for use in Chanje Vehicles; and (d) Ryder will perform Repair Services on Chanje Vehicles.

D. The Parties agree that this Agreement does not establish a franchise relationship of any kind between the Parties. This conclusion constitutes an essential and mutual understanding of each of the Parties in entering into this Agreement.

E. This Agreement does not constitute the appointment of Ryder as an authorized dealer, reseller or distributor of new Chanje motor vehicles.

## Terms of Agreement

1. Definitions.

   1.1 **"Change of Control"** means (a) any person or group of persons within the meaning of Section 13(d)(3) of the Securities Act of 1934 becomes the beneficial owner, directly or indirectly, of 51% or more of the outstanding equity interests of a Party; (b) the current equity holders of a Party shall cease to own or control, of record and beneficially, at least a majority of the outstanding equity interests of the Party; (c) the current equity holders of the parent company of a Party shall cease to own at least a majority of the outstanding equity interests of such company including as a result of merger, consolidation or similar transaction;

90090030 10 0059994-00001

(d) any merger, consolidation or similar transaction involving a Party (other than a reincorporation merger solely to change the jurisdiction of the formation or incorporation or a merger or consolidation with an affiliate or the Party) where the Party is not the surviving entity; or (e) any sale of all or substantially all of the assets of a Party.

1.2 **"Chanje IP"** means all IP owned by or licensed to Chanje by third parties as of the Effective Date or at any time during the Term.

1.3 "Chanje Service IP" has the meaning set forth in Section 5.6.(b).

1.4 **"Chanje Trademarks"** refers to all trademarks, service marks, logos, and other source indicators owned by or licensed to Chanje as of the Effective Date or at any time during the Term for use in connection with the Chanje Vehicles, the Chanje Vehicle Parts, and any products or services offered in connection therewith by Chanje or its affiliates and its and their licensees (other than Ryder). The Parties understand that Chanje may transition its branding to different trademarks than those currently in use and any such future branding will be viewed as part of Chanje's Trademark.

1.5 **"Chanje Vehicles"** means those new vehicles listed on Exhibit A attached to this Agreement. Exhibit A may be modified from time to time upon written agreement of the Parties.

1.6 **"Chanje Vehicle Parts"** means all Proprietary Parts (defined below) for the Chanje Vehicles.

1.7 **"Confidential Information"** shall mean all financial (including non-public pricing information), business, marketing, drawings, specifications, scientific, technical, economic or engineering information, prototypes, know-how, computer software (source and object code), and inventions, regardless of how that information is received, accessed or viewed by the Party receiving such Confidential Information, that are trade secrets, including all originals, copies, analyses and summaries prepared by either Party in any form, which is disclosed by either Party to the other in relation to this Agreement, and is either (a) disclosed in writing and marked as confidential at the time of disclosure, or (b) disclosed in any manner such that a reasonable person would understand the confidential or proprietary nature of the information. For the sake of clarity, the identity of customers or pricing of Chanje Vehicles (defined above) or Chanje Vehicle Parts (defined above) is not Confidential Information, but Chanje will not, except as required by law or as authorized by Ryder, provide the identity of Ryder customers or Ryder non-public pricing to third parties.

1.8 **"Delivery Date"** means the date the Chanje Vehicle is delivered from Chanje's U.S. facility, currently 1025 Rollins Road, Burlingame, CA 94010, to the address set forth in the purchase order.

1.9     **"Exclusive Accounts"** means those customers that may be designated from time to time by Chanje as its exclusive accounts for sale or leasing of Chanje Vehicles with the agreement of Ryder or if they meet the criteria set forth in (a) below.

    (a)     The list of Exclusive Accounts will be maintained as <u>Exhibit D</u> to this Agreement. It is the intention of the Parties that all leads shall be channeled through Ryder. However, Chanje may designate any customer an Exclusive Account at any time if the customer meets the following criteria: the potential customer independently initiates contact with Chanje without Chanje's direct solicitation and wishes to consummate one or more transactions directly through Chanje and not through Ryder and Chanje wishes to designate that customer as an Exclusive Account. Once the preceding criteria are satisfied, Chanje shall notify Ryder of Chanje's decision to add the customer as an Exclusive Account. Notwithstanding the foregoing, no Exclusive Account may be added within one hundred eighty (180) days after the Effective Date of this Agreement.

    (b)     Except as set forth above, Chanje may transact with any customer for which notice has been given to Ryder as provided under <u>Section 1.8(a)</u> for the customer's addition as an Exclusive Account, but any order or direct purchase with Chanje that is accepted or signed by Chanje with any Ryder customer within one hundred eighty (180) days of the notice to Ryder as required under <u>Section 1.8(a)</u> will be commissionable to Ryder in accordance with the Parties' agreed commission structure then in effect. Chanje will not proceed with such a transaction prior to giving notice to Ryder.

1.10    **"Exclusivity Period"** means the earlier of (a) the first 50,000 Chanje Vehicles delivered to anyone in the U.S. market or (b) five (5) years from Agreement execution date, unless this Agreement is earlier terminated.

1.11    **"Introductory Period"** means the earlier of (a) the first 2,000 Chanje Vehicles delivered into the U.S. market or (b) two (2) years from Agreement execution date, unless this Agreement is earlier terminated. The purpose of the Introductory Period is to, among other things, (a) develop and assess U.S. market demand for Chanje products, (b) develop appropriate Performance Standards (as defined in <u>Section 5.4</u>), (c) establish standard times for Repair Services, and (d) develop an appropriate parts management and inventory system at Chanje and Ryder.

1.12    **"IP"** means all forms of intellectual property rights, including Patents, trademarks, service marks, trade names, copyrights, software, and trade secrets, including technical and diagnostic information, data, know-how, and any other information subject to trade secret protection.

1.13    **"Material Adverse Effect"** means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the

CHANJE - RYDER AGREEMENT -- 3

aggregate, materially adverse to (a) the business, prospects, results of operations, condition (financial, reputational or otherwise) or assets of Chanje, its parent or their successors or affiliates, (b) the ability for Chanje to manufacture and distribute  the Chanje Vehicle effectively throughout the Territory or compete in the marketplace or (c) the ability of Chanje to consummate the transactions contemplated hereby on a timely basis.

1.14   **"Parts Distribution Services"** means Ryder's authorized marketing and distribution of Chanje Vehicle Parts sourced by Ryder from Chanje or its designee as described in Exhibit B, which is attached to this Agreement and incorporated herein by reference.

1.15   **"Patents"** means any patents and patent applications, together with renewals, divisions, continuations or continuations-in-part of any such patents and applications, and all patents issuing thereon, and any and all reissues, reexaminations, extensions, divisions, renewals of or to any of the foregoing, and any international counterparts of any of the foregoing.

1.16   **"Proprietary Parts"** means parts and supplies for Chanje Vehicles that are manufactured by or for, or sourced by, Chanje or any of its affiliates.  However, Proprietary Parts do not include parts such as brake pads, tires or wiper blades, or any "generic" consumable part identified by agreement of the Parties as not being included as a Proprietary Part.  Chanje will provide Ryder with a list of parts and supplies as well as associated costs that are Proprietary Parts after consultation with Ryder no later than April 1, 2017.  Only Chanje-approved Proprietary Parts may be used by Ryder for warranty Repair Services unless otherwise agreed to by the Parties.

1.17   **"Repair Services"** means the maintenance and repair of the Chanje Vehicles and Chanje Vehicle Parts, including, but not limited to, warranty maintenance and repair, recall services, emergency break down services, delivery inspections, vehicle modifications, and other after-sales services performed by Ryder pursuant to Exhibit C, which is attached to this Agreement and incorporated herein by reference.

1.18   **"Ryder IP"** means Ryder IP owned by or licensed to Ryder by third parties as of the Effective Date or at any time during the Term.

1.19   **"Ryder Service IP"** has the meaning set forth in Section 5.6(d).

1.20   **"Sales Facilitation Services"** means the services performed by Ryder to promote the market acceptance of Chanje Vehicles and to facilitate the direct sale or lease of such vehicles by Chanje to customers as permitted under this Agreement.

90090030 10 0059994-00001

1.21 **"Self-Service Account"** means a customer that is authorized by Chanje under the terms of this Agreement to perform certain Repair Services on some or all of the customer's fleet of Chanje Vehicles.

1.22 **"Services"** means the Repair Service, Parts Distribution Services and Sales Facilitation Services performed by Ryder pursuant to this Agreement.

1.23 **"Service IP"** has the meaning set forth in Section 5.6.

1.24 **"Term"** means the term of this Agreement as provided in Section 6.1.

1.25 **"Territory"** means the 50 states of the United States of America.

1.26 **"Warranty Period"** means the applicable warranty period for each component as set forth in Exhibit F.

2. Ryder's Chanje-Related Services and Operations.

2.1 Parts Distribution Services. During the Exclusivity Period, Ryder will serve as the sole and exclusive distributor of Chanje Vehicle Parts in the Territory and Chanje will not, directly or indirectly, authorize any person or entity other than Ryder to perform Parts Distribution Services in the Territory.

2.2 Repair Services.

    (a) During the Exclusivity Period, Ryder will serve as the sole and exclusive provider of Repair Services in the Territory. Chanje will not, directly or indirectly, authorize any person or entity other than Ryder to perform the Repair Services in the Territory. Prior to the expiration of the Introductory Period, no Self-Service Accounts will be permitted to perform any Repair Services.

    (b) Notwithstanding the foregoing, after the Introductory Period, in its sole discretion, Chanje may authorize Self-Service Accounts to perform Repair Services on Chanje Vehicles operated by the Self-Service Account. However, only customers with substantial in-house technical capabilities will be authorized by Chanje as Self-Service Accounts to perform "Major Repairs" on their Chanje Vehicles. The services constituting Major Repairs include any repairs or maintenance on the electric drivetrain or the battery system and any other repairs jointly agreed to by the Parties.

2.3 Ryder's Authorized Uses of New Chanje Vehicles Purchased from Chanje.

    (a) Rental of Chanje Vehicles from Ryder's Rental Fleet. Ryder may purchase new Chanje Vehicles for inclusion in Ryder's rental fleet for rental to Ryder's customers. In such transactions, Ryder will retain title to the Chanje Vehicle.

CHANJE - RYDER AGREEMENT -- 5

(b) <u>Turnkey Leasing</u>. Ryder may purchase new Chanje Vehicles to lease to customers under a leasing arrangement that includes maintenance terms as determined in Ryder's sole discretion. Ryder hereby warrants and represents that for any Chanje Vehicle sold to Ryder where Ryder leases such Chanje Vehicle to a third party, no such lease will be considered to be, or result in, a transaction that would establish Ryder as a motor vehicle dealer or distributor.

(c) Should Ryder become aware that it has engaged in a transaction which would entitle or cause Ryder to be covered by any state motor vehicle or other franchise law, Ryder will refrain from continuing such conduct in the affected state or states.

(d) <u>Ryder's Purchases of Chanje Vehicles</u>. The terms governing Ryder's purchase of new Chanje Vehicles for authorized rental or lease as described above are set out in <u>Exhibit E</u>, which is attached to this Agreement and incorporated herein by reference.

2.4 <u>Sales Facilitation Services</u>.

(a) Ryder will actively assist Chanje in promoting the market acceptance of Chanje Vehicles and, under appropriate circumstances, will facilitate potential purchases or financed leases of such vehicles directly between customers and Chanje (or Chanje's designated financing entities). During the Exclusivity Period, and subject to the terms of this Agreement and the exception noted in the following paragraph within this <u>Section 2.4</u>, Chanje will not appoint any third-party sales facilitator, agent, dealer, distributor or broker other than Ryder. Ryder is not authorized to act or hold itself out as an agent of Chanje regarding any potential sale or lease of a Chanje Vehicle by Chanje to a customer, and Ryder is not authorized to bind Chanje to any sales or lease agreement with a customer. Ryder may identify itself as a facilitator or broker of any potential sale or lease of a Chanje Vehicle by Chanje (or its designee) to a customer.

(b) Chanje is currently in discussion with REV Group concerning a potential relationship involving the assembly, development and distribution of non-package commercial cargo transport vehicles (shuttles, cab chassis, transit and school buses) for the U.S. market. Chanje is free to enter into such a relationship with REV Group for the U.S. market notwithstanding anything to the contrary in this Agreement. Nothing in this paragraph (b) limits the rights granted to Ryder under this Agreement.

(c) Chanje represents that during the Exclusivity Period it will not enter into a franchise arrangement or relationship with any OEM or other service provider that will be providing the same or substantially similar Services

CHANJE - RYDER AGREEMENT -- 6

as those covered under this Agreement that will entitle or cause Chanje to be covered under any state motor vehicle or other franchise law.

3.    Use of Trademarks.

3.1    Ryder only may use the Chanje Trademarks to fairly and accurately describe the Chanje products and related Services offered by Ryder. Ryder may, for example, advise the public that it is an "Authorized Chanje Service Center" or an "Authorized Chanje Parts Distributor." Ryder is not authorized to use any of the Chanje Trademarks other than in a nominative manner.

3.2    Ryder will not alter or remove any Chanje Trademark from any Chanje products, manuals or marketing materials, and will not alter or remove any Chanje identity plates, numbers, marks or operating instruction labels from any Chanje products, without Chanje's prior written consent.

3.3    Ryder will not label, identify or mark Chanje products or packaging with any Ryder or third-party trademark. However, Ryder is free to label Chanje products or packaging with barcodes or other Ryder inventory management labels and parts numbers so long as any such labeling does not obscure any Chanje Trademark or product identification number or barcode.

3.4    All goodwill associated with the Chanje Trademarks, now or hereafter acquired by Ryder, belongs exclusively to Chanje, and Ryder will not assert otherwise. Ryder hereby assigns to Chanje any and all rights that Ryder may acquire in any Chanje Trademark and associated goodwill.

3.5    Ryder will not register or maintain, directly or indirectly, any Internet domain name that utilizes any Chanje Trademark.

3.6    Relationship of the Parties. Notwithstanding anything to the contrary herein, the Parties acknowledge and agree that the relationship created by this Agreement is one of independent contractors and nothing in this Agreement shall: (a) give either Party the power to direct and control the day-to-day activities of the other Party; (b) deem the Parties to be acting as employer/employee, franchisor/franchisee, partners, joint venturers, co-owners, or other participants in a joint undertaking; and (c) permit either Party to create or assume any obligation on behalf of the other Party, except as otherwise expressly set forth in this Agreement.

3.7    Demand Creation. It is the goal of the Parties to create demand for the Chanje commercial electric vehicles. It is understood that both Parties will make investments to create this demand. The Parties intend to embark on a national campaign to jointly promote Chanje electric vehicles. This could include joint marketing, promotional materials, fleet visits, and cooperative efforts at trade

shows.  The Parties agree to cooperate in such efforts on a commercially reasonable efforts basis as jointly agreed upon by the Parties.

3.8     Sales Launch.  Chanje and Ryder will determine jointly, on a commercially reasonable basis, which markets to enter based on the capabilities of the Parties.  The Services will be launched jointly on a coordinated basis market by market.

4.     Warranty on Chanje Vehicles, Chanje Vehicle Parts.

4.1     Chanje shall warrant the Chanje Vehicles and Chanje Vehicle Parts to Ryder and customers.  The warranty that Chanje anticipates offering is substantially in the form set out in Exhibit F, but the Parties understand that this warranty has not yet been finalized by Chanje and its supplier and is subject to adjustment from time to time by Chanje, in good faith, based on market demands.  Ryder does not assume any obligation or liability in connection with any breach of warranty by Chanje applicable to the Chanje Vehicle Parts or Chanje Vehicles.  Every Ryder transaction document with a customer for the authorized lease or rental of a Chanje Vehicle or for the sale of a Chanje Vehicle Part shall contain the following disclaimer printed in capital letters:

IN THE EVENT THE CHANJE VEHICLE OR CHANJE VEHICLE PARTS ARE SUBJECT TO A CHANJE WARRANTY, RYDER EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS AND IMPLIED (INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE), ON THE CHANJE VEHICLE OR CHANJE VEHICLE PARTS.  FURTHER, RYDER NEITHER MAKES NOR AUTHORIZES ANY OTHER PERSON TO MAKE ON RYDER'S BEHALF ANY WARRANTY IN CONJUNCTION WITH THE SALE OF THE CHANJE VEHICLE OR CHANJE VEHICLE PART.  AS TO ANY MANUFACTURER'S WARRANTY EXTENDED TO THE END USER BY CHANJE, RYDER SPECIFICALLY DISCLAIMS ANY LIABILITY THEREUNDER, SUCH MANUFACTURER'S WARRANTY BEING BETWEEN THE END USER AND CHANJE ONLY.

In order to ensure Chanje meets its warranty reimbursement obligations, Chanje will provide a warranty/performance bond in favor of Ryder.  As an alternative to a warranty/performance bond, Ryder may allow Chanje to provide a letter of credit or cash escrow deposit in Ryder's favor, upon the terms determined by Ryder in its sole discretion.  Prior to the earlier of (a) the first 1,000 Chanje Vehicles delivered into the U.S. market or (b) one (1) year from the Agreement execution date Chanje and Ryder shall evaluate the service and warranty performance requirements of the Chanje Vehicles and jointly determine the expected warranty reimbursement obligations over the Warranty Period.  If Ryder determines that a warranty performance bond is required, the warranty/performance bond shall be in an amount based on the projected warranty expense over the Warranty Period and will be calculated based on industry

CHANJE - RYDER AGREEMENT  --  8

standards and the estimated cost of the warranty repairs of the Chanje Vehicles during the Warranty Period. As an example, the industry benchmark for obtaining a surety bond to guarantee maintenance and/or warranty obligations is 10-50% of the total warranty contract value. The percentage typically depends on whether the bond is meant to cover defective design, poor or substandard workmanship (i.e., warranty obligations) or maintenance requirements of the underlying asset. The bond amount will be adjusted annually as mutually agreed between the Parties based on the vehicle fleet covered by warranty provisions sold, leased or distributed pursuant to this Agreement and actual warranty costs incurred. The Parties agree to review and discuss the potential adjustment (including the potential cancellation) of the warranty/performance bond once Chanje has proven to have a record of product performance in the market.

5.    Services.

5.1    Parts Distribution Services. Ryder will perform the Parts Distribution Services as set forth in Exhibit B.

5.2    Repair Services. Ryder will perform the Repair Services as set forth in Exhibit C. Notwithstanding anything to the contrary herein, Ryder reserves the right to enter into different types of extended warranty or maintenance agreements with Chanje Vehicle owners/lessees after the applicable Warranty Period on terms and conditions determined in Ryder's sole discretion. Ryder will share the extended warranty terms and/or terms of any such maintenance agreements with Chanje. Ryder represents and warrants that the warranty service maintenance will be carried out with commercially reasonable care and skill and performed in a timely, workmanlike, and cost-effective manner using properly trained staff familiar with the functions and operation of the Chanje Vehicles and the Chanje Vehicle Parts.

5.3    Sales Facilitation Services.

Ryder will perform the Sales Facilitation Services described in Section 2.4(a). The initial commission or fee for facilitating certain sales or leasing transactions of Chanje Vehicles directly between Chanje (or Chanje's designee) and third-party customers will be 2.5% of the total purchase price of each Chanje Vehicle sold and 2.5% of the transaction value (total lease payments) for each Chanje Vehicle lease. For sales and leasing transactions Ryder will be paid within thirty (30) days of the execution or consummation of the transaction subject to Ryder's standard commission clawback provisions. This initial commission rate will be subject to quarterly review and modification by the Parties as the Parties gain experience with the market so that the commission rate(s) will more accurately reflect the value of the Facilitation Services and the economics and market demand associated with the Chanje Vehicles. In instances where Ryder is the purchaser of the Chanje Vehicle, 2.5% will be discounted from the Chanje Vehicle purchase price.

CHANJE - RYDER AGREEMENT -- 9

Each customer that signs a lease for a Chanje Vehicle for a period of less than one (1) year will be considered a rental customer. Chanje and Ryder will jointly determine, and Chanje will receive, a rental fee ("Rental Fee") from customers based upon a daily Rental Fee rate and assessed each day the vehicle was on an active agreement. Ryder will set the rate charged to end users ("Market Rate") and keep the difference between the Rental Fee paid to Chanje and the Market Rate as the Ryder transaction management fee. The Rental Fee and Market Rate will be determined by the Parties prior to the delivery of the first Chanje Vehicle to the United States for entry into the market. If the Parties cannot agree on the Rental Fee and Market Rate, Ryder will not be obligated to engage in any Sales Facilitation Services with respect to rental services for rental customers.

5.4 Performance Standards. Ryder agrees that, from time to time, Chanje may adopt commercially reasonable standards and measurements by which to assess Ryder's performance of the warranty service maintenance ("Performance Standards"). Chanje will only adopt such Performance Standards after consultation with Ryder and due consideration of Ryder's comments and suggestions. Ryder agrees to perform the warranty service maintenance in accordance with any such Performance Standards.

5.5 Personnel and Staff. Ryder has sole responsibility for its activities and the activities of its personnel and staff. Ryder shall have the right to appoint and authorize qualified subcontractors to perform the Services and exercise the rights granted to it under this Agreement; provided, however, that (a) Ryder flows down its obligations under this Agreement to its subcontractors; and (b) Ryder will remain fully liable to Chanje, including obligations of indemnity, for the negligence or willful misconduct of Ryder's subcontractors that if performed by Ryder would amount to a breach by Ryder of the terms of this Agreement.

5.6 Development of Training, Manuals, Specifications and Information in Furtherance of Agreement.

(a) Chanje will provide to Ryder, and/or work cooperatively with Ryder to develop, training, assistance, and materials, including instruction manuals, operations manuals, user guides, product and equipment specifications, marketing and advertising materials and content, repair or service processes and methods, and other documentation or information reasonably necessary or appropriate for Ryder to market and perform the Services and to exercise the rights granted to it under this Agreement, including all related intellectual property rights ("Service IP"). Service IP does not include any trademarks owned by the respective Parties, each of which shall retain all right, title and interest to its respective marks.

(b) All Service IP developed by or on behalf of Chanje independently or jointly with Ryder during the Term of this Agreement, and the intellectual property rights related thereto, will be owned exclusively by Chanje (the

CHANJE - RYDER AGREEMENT -- 10

"Chanje Service IP"), and Ryder shall have the right to use and duplicate the Chanje Service IP in the performance of the Services. Ryder hereby assigns to Chanje all of its right, title and interest and intellectual property rights to any and all such jointly created Service IP.

(c)     Chanje hereby grants to Ryder a fully paid up, perpetual, world-wide, irrevocable license to make, have made, use, duplicate, make derivative works from, sublicense and distribute that portion of the Chanje Service IP that is jointly developed by Chanje and Ryder.

(d)     All Service IP developed by or on behalf of Ryder independently, and the intellectual property rights related thereto, will be owned exclusively by Ryder (the "Ryder Service IP").

(e)     Ryder grants to Chanje a fully paid up, perpetual, world-wide, irrevocable license to make, have made, use, duplicate, make derivative works from, sublicense and distribute any Ryder Service IP that is specifically and exclusively related to the service of Chanje Vehicles. However, such license does not cover any Ryder Service IP for which Ryder is under a contractual obligation to a third party precluding Ryder from granting a license to a third party such as Chanje due to the use or incorporation of the third party's intellectual property or confidential information into the applicable Ryder Service IP.

(f)     Each Party shall reasonably assist and cooperate with the other Party, as reasonably requested by the other Party, to verify and acknowledge the owner Party's ownership of or rights in the Service IP pursuant to this Agreement, including to enable the other Party to acquire, transfer, maintain, perfect, and enforce its intellectual property rights and other legal protections in and to that Service IP.

(g)     A technician training program will be developed by Chanje, or the Parties jointly, that Ryder will deliver at its expense to all Ryder technicians authorized to work on Chanje Vehicles. Should Chanje request, Ryder will provide training, at a reasonable charge determined by Ryder, to technicians at Exclusive Accounts that have been authorized by Chanje to service the Exclusive Account's Chanje Vehicles.

(h)     Ryder reserves the right to establish reasonable training cost charges for Self-Service Accounts.

5.7     Taxes and Duties. Chanje shall be responsible for payment of all applicable taxes assessed on its delivery of the Chanje Vehicles and Chanje Vehicle Parts to Ryder under this Agreement; provided that Ryder shall be responsible for payment of all sales and use taxes applicable to its purchase or lease of Chanje Vehicle Parts and/or Chanje Vehicles. Ryder shall also be responsible for all point-of-sale sales

CHANJE - RYDER AGREEMENT -- 11

and use tax withholding and remittance obligations for Ryder's sales of Chanje products or services to end users, and for any and all service tax withholding and remittance obligations for the Repair Services that Ryder performs.

5.8   <u>Books and Records</u>.  Ryder will keep complete and accurate books and records in sufficient detail to permit Chanje to confirm the payments due hereunder and compliance with this Agreement.  Upon at least thirty (30) days' prior written notice by Chanje and by agreement with Ryder as to a suitable time, which agreement shall not be unreasonably withheld, Ryder shall permit (not more than once in any calendar year, during normal business hours and in a manner that does not disrupt normal business operations), at Chanje's cost, an independent accounting firm to access Ryder's books and records for the purpose of conducting an audit to verify compliance with cost reimbursement provisions of this Agreement related to Ryder's warranty and recall Repair Services to Chanje and, as necessary, to verify warranty claims.  The audit will not review any records older than two (2) full calendar years plus the portion of the year in which the audit is conducted.  Prior to conducting the audit, the auditor shall meet with Ryder to describe the plan for conducting the audit, including limiting access to those books and records reasonably related to the subject of the audit.

6.   <u>Term and Termination</u>.

6.1   <u>Term</u>.  The initial term of this Agreement will commence on the Effective Date and, unless earlier terminated as provided herein, will continue through March __, 2022.  The Parties may extend the Term by mutual agreement in a writing signed by authorized representatives of the Parties.  For the avoidance of doubt, irrespective of any termination or expiration of this Agreement, Ryder shall retain the right to perform Repair Services on Chanje Vehicles in Ryder's rental inventory or for the term of any lease or maintenance agreement Ryder may have with a Chanje Vehicle customer.

6.2   <u>Termination for Cause</u>.  Either Party may, by written notice to other Party, terminate this Agreement, in whole or in part, if the other Party:  (a) materially breaches this Agreement and such breach is incapable of cure, including breaches of confidentiality; (b) with respect to a material breach of this Agreement or any persistent material breach of a Performance Standard capable of cure, does not cure the breach within ninety (90) calendar days of receiving written notice of that breach (the cure period for failure to pay undisputed sums due shall be ten (10) business days); (c) becomes insolvent or admits its inability to pay its debts generally as they become due; (d) becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law, which is not fully stayed within seven (7) business days or is not dismissed or vacated within thirty (30) calendar days after filing; (e) is dissolved or liquidated or takes any corporate action for such purpose; (f) makes a general assignment for the benefit of creditors; (g) has a receiver, trustee, custodian or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell

CHANJE - RYDER AGREEMENT -- 12

any material portion of its property or business; (h) fails to comply with Applicable Laws, which causes a Material Adverse Effect (any act of fraud or any criminal felony by either Party shall be deemed a Material Adverse Effect); or (i) operates in a manner or manufactures a product that is not safe, or the performance or quality of such product is below general industry standards, and such operation or product will cause the terminating Party material reputational harm (should it continue to operate under this Agreement). In lieu of termination of the entire Agreement, if Ryder is in material breach of this Agreement and such breach is incapable of being cured or if the material breach is not cured within the cure period provided above, and without prejudice to any other rights Chanje may have, Chanje may elect to terminate Ryder's exclusive rights under this Agreement with all other aspects of the Agreement continuing in full force and effect. Furthermore, either Party may, by written notice to the other, terminate this Agreement, in whole or in part, if the other Party experiences a Change of Control and the acquiring or controlling person, or persons, is a competitor of the notifying Party or is viewed by the notifying Party, in good faith, as having reputational, safety or credit concerns.

6.3   Effect of Termination.

(a)   Within thirty (30) days following termination or expiration of this Agreement for any reason, Ryder shall submit to Chanje a list of all the Chanje Vehicles and Chanje Vehicle Parts in Ryder's inventory and Ryder shall indicate the condition (new in original packaging, used, refurbished, etc.) and physical location of such vehicles and parts. Chanje shall have the right to inspect such Chanje Vehicles and Chanje Vehicle Parts before any disposition by Ryder. Chanje shall have up to thirty (30) calendar days following receipt of the list provided by Ryder in which to inspect the identified Chanje Vehicles and Chanje Vehicle Parts, and to notify Ryder of Chanje's election as to whether Chanje wishes to repurchase all, any or none of the Chanje Vehicles or the Chanje Vehicle Parts. Chanje may make the election at any time before the expiration of the election period. If Chanje does not elect to repurchase some or all of the identified Chanje Vehicles or Chanje Vehicle Parts within such period, and if Ryder otherwise has fulfilled all of its obligations under this Section 6.3(a), Ryder may sell or otherwise dispose of or utilize the remaining Chanje Vehicles and Chanje Vehicle Parts that Chanje has not elected to purchase in accordance with this Agreement.

Should Ryder wish to retain any Chanje Vehicle Parts in its inventory, then it shall exclude such parts from the initial list it provides Chanje.

(b)   If Chanje elects to repurchase any Chanje Vehicle from Ryder upon termination or expiration of this Agreement, Chanje may repurchase such Chanje Vehicles at the following prices: (i) if a new vehicle, the original price Ryder paid inclusive of any transportation costs; or (ii) if a used

CHANJE - RYDER AGREEMENT -- 13

vehicle, the fair market value on the date of the exercise of Chanje's repurchase option. Should Chanje elect to exercise its option, Chanje shall be responsible for all costs of transporting the Chanje Vehicles from the Ryder location at which they are located to the location designated by Chanje. Ryder agrees to cooperate with and assist Chanje in making all necessary arrangements for such transportation.

(c)    If Chanje elects to repurchase any new Chanje Vehicle Parts from Ryder upon termination or expiration of this Agreement, it will pay for such parts at the lesser of (a) fair market value or (b) the price paid by Ryder. Any other parts that Chanje elects to purchase will be at fair market value. Notwithstanding anything in this Section 6.3 to the contrary, if Ryder requests, Chanje must repurchase all new and undamaged Proprietary Parts that are in their original packaging.

(d)    Upon expiration or termination of this Agreement for any reason whatsoever, each Party shall return, upon request, to the other any and all Confidential Information.

6.4    Loss of Exclusive Rights. In addition to Chanje's option to terminate Ryder's exclusive rights under this Agreement as provided under Section 6.2 above, if during the Exclusivity Period, Ryder enters into an agreement to become, or becomes, an exclusive distributor of a total electric commercial vehicle model competitive with any Chanje Vehicle ("Competitor Vehicle"), Ryder's exclusive rights to provide Sales Facilitation Services may be terminated by Chanje without penalty or liability. "Competitor Vehicle" shall not include any commercial vehicle that is not a total electric drivetrain vehicle, and will exclude those electric vehicles that have a secondary fuel source that is not electric. Ryder's provision of warranty repairs, maintenance and/or parts distribution services for a Competitor Vehicle shall not be grounds for termination as exclusive Sales Facilitation Services provider. For avoidance of doubt, in the event Ryder becomes an exclusive distributor of a Competitive Vehicle and Chanje exercises its right to terminate Sales Facilitation Services, Ryder will continue to provide Repair Services and Parts Distribution Services pursuant to the terms of this Agreement.

6.5    Force Majeure. Notwithstanding anything to the contrary in this Agreement, except for each Party's obligations to pay amounts due under this Agreement, neither Party will be deemed to be in default of any provision of this Agreement for any delay, error, failure, or interruption of performance due to any act of God, terrorism, war, insurrection, riot, boycott, strike, or other labor or civil disturbance, interruption of power service, interruption of communications services, disruption of regular transportation providers or routes, problems with the Internet, epidemic, act of any other person not under the control of such Party, or other similar cause. The Party subject to any of the foregoing events shall give

CHANJE - RYDER AGREEMENT -- 14

the other Party reasonable written notification of any resulting material or indefinite delay.

6.6    Survival.  The following provisions of this Agreement will survive expiration or termination of this Agreement:  Sections 1, 4,  5.6(c), 5.6(e), 5.6(f), 6.3, 6.4, 6.5, 6.6, 6.7, 7, 8.3, 8.4(a), 8.4(b), 8.5, 8.6, 9, 11, 13, 14, 16.2, 16.3 and 16.6.  All payment obligations of the Parties survive termination.

6.7    Chanje IP.  Chanje represents and warrants that: (a) it is the sole owner of the Chanje IP and has the full legal right and authority to convey the rights and licenses that it conveys under this Agreement; (b) it is under no obligation or restriction, nor will it assume any such obligation or restriction, that does or would in any way interfere or conflict with the rights granted by it under this Agreement; and (c) neither the Chanje IP, the Chanje Vehicles, nor the Chanje Vehicle Parts, nor the use of any of the foregoing by Ryder or its agents or representatives as permitted under this Agreement, including in the performance of the Services, does or will misappropriate, infringe, violate, or interfere with any Patent, trademark, copyright, trade secret, or other intellectual property or proprietary right of any person or entity.

7.    Representations and Warranties.

Each Party represents and warrants that the Party's execution, delivery, and performance of this Agreement: (a) have been authorized by all necessary corporate action; (b) do not violate the terms of any law, regulation, or court order to which such Party is subject or the terms of any agreement to which the Party or any of its assets may be subject; and (c) are not subject to the consent or approval of any third party.

8.    Intellectual Property.

8.1    Background IP.  Subject to the terms of this Agreement, each Party shall retain sole and exclusive ownership of all IP discovered, produced, conceived, created, or reduced to practice by it before the Effective Date, and all IP made after the Effective Date made or conceived by it independently from any non-public IP disclosed by the other Party.

8.2    Chanje IP.  Subject to Section 5.6, Chanje reserves all right, title, and interest in and to the Chanje IP.

Ryder IP.  Subject to Section 5.6, Ryder reserves all right, title and interest in and to the Ryder IP.

8.3    Chanje Developments.  Subject to the terms of this Agreement, Chanje shall have sole and exclusive ownership of all IP conceived solely by it or its agents and representatives after the Effective Date that arises from the performance of its activities under this Agreement.  Chanje hereby grants to Ryder a fully paid up, perpetual, world-wide, irrevocable license to make, have made, use, duplicate,

CHANJE - RYDER AGREEMENT -- 15

make derivative works from, sublicense and distribute any Chanje IP that arises from the performance by Chanje of its activities under this Agreement except that Ryder may not use any such materials or processes in a manner competitive to Chanje's development, design and manufacturing of electric vehicles.

8.4    Ryder Developments.

(a)    Subject to the terms of this Agreement, Ryder shall have sole and exclusive ownership of all IP conceived solely by it or its agents and representatives after the Effective Date that arises from the performance of the activities under this Agreement.  Ryder hereby grants to Chanje a fully paid up, perpetual, irrevocable license to make, have made, use, duplicate, make derivative works from, sublicense and distribute, anywhere in the world other than the United States, Mexico, Canada and the United Kingdom, Ryder IP that arises from the performance by Ryder of its activities under this Agreement, except that Chanje may not use any of such materials or processes in a manner competitive to Ryder's leasing, rental, dedicated contract carriage or supply chain services operations.

(b)    Notwithstanding Section 8.3 and Section 8.4(a), unless expressly authorized in this Agreement, Chanje may not use or disclose any Ryder IP or Ryder Confidential Information for the purpose of creating any Chanje IP, and may not use or disclose any Chanje IP based on or derived from independently created Ryder IP or Ryder Confidential Information, except in support of Chanje-related business activities authorized under this Agreement.  In the event of a breach of this Section 8.4(b), and without limitation on any other rights Ryder may have under this Agreement or governing law, Chanje hereby grants to Ryder a fully paid up, perpetual, world-wide, irrevocable license to make, have made, use, duplicate, make derivative works from, sublicense and distribute any such Chanje creative or inventive contribution or other rights or interest based on or derived from Ryder IP or Ryder Confidential Information for any purpose other than in connection with any activity competitive to Chanje's development, design and manufacturing of electric vehicles operations.

8.5    Joint Developments.  Except as may be otherwise provided in Section 5.6, which governs the Parties' rights related to Service IP, Chanje and Ryder shall jointly own all other IP and creative works conceived jointly or jointly created by the Parties during the Term (the "Joint Developments").  Chanje and Ryder are free to use, sublicense to their respective agents, distributors and contractors, make derivative works from and distribute such Joint Developments for the benefit of their own respective business and their respective distribution and service channels.  However, neither Party may grant any license or right in or to the Joint Developments to any motor vehicle manufacturer or vehicle service provider without the prior written consent of the other Party, which consent may be conditioned on the payment of a reasonable royalty to that other Party.  Without

CHANJE - RYDER AGREEMENT -- 16

limiting the foregoing, neither Party shall have any obligation of accounting to the other Party for any profits arising out of its authorized use of the Joint Developments. The Parties shall cooperate in good faith regarding the prosecution of any Patents covering the Joint Developments, and the Parties shall share equally in the costs of preparing, prosecuting, and maintaining any Patents covering the Joint Developments. If a Party decides not to pay such costs for a particular Patent or its maintenance, then that Party shall assign its interests in that Patent, and the underlying Joint Development, to the other Party.

8.6    Further Assistance and Infringement. Each Party shall reasonably assist and cooperate with the other Party, as reasonably requested by the other Party, to verify and acknowledge the other Party's ownership of or rights in its IP pursuant to this Agreement, including to enable the other Party to acquire, transfer, maintain, perfect, and enforce its intellectual property rights and other legal protections in and to that IP. Such assistance and cooperation include executing documents reasonably necessary for filing and prosecuting Patents and assigning rights in those Patents, as well as executing declarations and other papers necessary for prosecuting those Patents.

9.    Confidentiality.

9.1    Confidential Information. Each Party acknowledges the need to preserve Confidential Information that a Party discloses (the "Discloser") to the other Party (the "Recipient") in connection with this Agreement, regardless of the form or manner in which the information is disclosed or learned. The Parties' obligations under this Section 9 shall continue after the termination of this Agreement for any reason, and shall constitute independent and unconditional covenants of the Parties.

9.2    Limitations. Each of the Parties agrees and acknowledges that the other Party's Confidential Information is that Party's valuable property. Accordingly, the Recipient may use Confidential Information of the Discloser only for the purposes of exercising Recipient's rights and fulfilling Recipient's obligations under this Agreement. Recipient shall use the same degree of care, but no less than a reasonable degree of care, to protect against the unauthorized disclosure or use of Discloser's Confidential Information as it uses to protect its own Confidential Information of a similar type. Recipient shall disclose Confidential Information of Discloser only to its employees or independent contractors who have a need to know for the above-stated purpose, and who are bound by obligations of confidentiality no less restrictive than the terms of this Agreement. Any duplication, use, disclosure, or other act or omission by any person that obtains access to or possession of Confidential Information through Recipient that would be a breach of this Agreement if committed by Recipient is deemed a breach of this Agreement by Recipient for which Recipient shall be responsible.

9.3    Exceptions.  Recipient's obligation under this Agreement to treat information as Confidential Information does not apply to information that: (i) is already known to Recipient at the time of disclosure and was not obtained, directly or indirectly, from Discloser; (ii) is independently developed by Recipient without reference to or use of the Discloser's Confidential Information; (iii) is obtained by Recipient from another source without a breach of any obligation of confidentiality owed by that source to Discloser; or (iv) is or becomes part of the public domain through no wrongful act of Recipient or any party that obtained the information from Recipient.  If Recipient is served with a subpoena or other legal process, court, or governmental request or order requiring disclosure of, or is otherwise required by law or securities exchange requirement to disclose, any of Discloser's Confidential Information, Recipient shall, unless prohibited by law, promptly notify Discloser of that fact and cooperate fully (at Discloser's expense) with Discloser and its legal counsel in opposing, seeking a protective order, seeking to limit, or appealing the subpoena, legal process, request, order, or requirement to the extent deemed appropriate by Discloser.  Recipient may comply with the subpoena or other legal process or requirement after complying with the foregoing sentence, but only to the extent necessary for compliance.

9.4    Public Announcements - Marketing.

(a)    Other than as explicitly set forth in this Agreement, neither Party shall issue or release any initial announcement, statement, press release or other publicity announcing this Agreement without the prior written consent of the other Party.  In any event, the terms of this Agreement shall not be publicly disclosed by either Party except as authorized by this Agreement or by subsequent agreement of the Parties.  Notwithstanding the foregoing, disclosure of this Agreement may be made in a public announcement or filing with the Securities and Exchange Commission or any national securities exchange or governing agency if and to the extent, in the opinion of either Party's counsel, such disclosure is required.

(b)    The Parties will cooperate and coordinate on public announcements concerning the availability of Chanje Vehicles and Services in any U.S. market.  However, Chanje will have the sole discretion and control over any communication concerning the availability of new Chanje Vehicles in any market.  However, any press release or public announcement or communication that references the other Party or the relationship between the Parties must be approved in advance by such Party.

10.    The Parties anticipate that they will establish a joint marketing fund which will be used to invest in marketing efforts to promote the acceptance of the Chanje Vehicles in the marketplace through innovative initiatives.  At the end of each quarter, Ryder will set aside a sum equal to $100 from the commission received from Chanje on each Chanje Vehicle that is sold or leased by Chanje through Ryder's Facilitation Services.  Such

CHANJE - RYDER AGREEMENT -- 18

amount will be set aside and will be matched by Chanje at the end of each quarter. Decisions on how to allocate the funds in the joint account will be made by the Parties, in good faith, with the ultimate goal of promoting the acceptance of the Chanje Vehicles in the market. Each Party is expected to engage in marketing efforts individually outside of the joint marketing fund.

11.   Indemnification.

11.1   General.  To the fullest extent permitted by law, each Party shall defend, indemnify, and hold harmless the other Party and its members, directors, officers, employees, agents, representatives, and customers from and against all third party claims arising out of or resulting from:  (a) any actual or alleged breach by it of any of its obligations, representations or warranties under this Agreement; (b) its willful misconduct, negligence, or fraud; or (c) personal injury (including death) or property damage, loss, or destruction arising out of its negligence.  For purposes of this Agreement, "indemnify" and "hold harmless" mean to pay any settlement amount with a third party agreed to by the indemnifying Party, to pay the costs of any award or final judgment (including any damages or penalties awarded) and to otherwise satisfy any obligation owed to the claiming third party including any attorneys' fees awarded to the third party.  For purposes of this Agreement, "defend" means to hire, manage and pay legal counsel together with all court or administrative costs, expert and consulting fees, litigation expenses (such as document management, retention and duplication), alternative dispute resolution expenses, and similar costs associated with managing, handling or resolving claims.

11.2   Personnel and Staff.  Each Party shall defend, indemnify, and hold harmless the other Party and its members, directors, officers, employees, agents, and representatives from and against claims or liabilities arising out of or resulting from any failure by such Party to pay when due all federal, state and local taxes and contributions imposed or required under unemployment insurance, social security, and income tax laws, as well as any tariffs required to be paid with respect to the rights and obligations under this Agreement.

11.3   Chanje Vehicles and Chanje Vehicle Parts.  Chanje shall defend, indemnify, and hold harmless Ryder and its members, directors, officers, employees, agents, representatives, and customers from and against a third-party claim (a) arising out of any latent or patent defect in the Chanje Vehicles, or Chanje Vehicle Parts, in whole or in part, including, but not limited to, any product liability claim and all claims based on strict liability in tort or (b) arising by virtue of Chanje's business dealings or relationship with (i) REV Group or any third-party OEM involving Chanje Vehicles, or (ii) any third-party provider of Repair Services to Chanje Vehicles.

11.4   Infringement.  Each Party shall defend, indemnify, and hold harmless the other, and the indemnified Party's members, directors, officers, employees, agents,

CHANJE - RYDER AGREEMENT -- 19

representatives, and customers, from and against all third-party claims arising out of or resulting from any actual or alleged infringement, violation, or misappropriation of any Patent, copyright, trademark, trade secret, or other intellectual property right, under the laws of the countries where Ryder is authorized by Chanje to provide Services or distribute Chanje Vehicle Parts based on the indemnified Party's authorized use or distribution of the other Party's IP or performance of Services under this Agreement. In the case of Ryder as the indemnified Party, Chanje's obligations under this <u>Section 11.4</u> include third-party IP infringement claims directed to Chanje Vehicles or Chanje Vehicle Parts.

11.5   <u>Procedure and Limitations</u>. A Party shall promptly notify the other Party in writing of any claims, suits, actions, hearings, or proceedings for which it may seek indemnification under this <u>Section 11</u>. The Party seeking indemnification shall permit the indemnifying Party to assume and control the defense of any action; provided, however, the indemnifying Party shall not enter into any settlement or compromise, or consent to the entry of any judgment admitting any liability, without the prior written consent of the other Party, which consent shall not be unreasonably withheld. The Party seeking indemnification shall have the right to participate in the defense of any such claims, suits, hearings, actions, or proceedings with counsel of its own choosing, at its own expense.

12.   <u>Insurance</u>.

12.1   Prior to the delivery of the first Chanje Vehicle into the United States, each Party will obtain and keep in force during the Term: (a) Commercial General Liability insurance (including bodily injury, property damage, personal injury and broad form contractual liability) in the following amounts: each occurrence - $1,000,000; general aggregate - $2,000,000; products and completed operations aggregate - $2,000,000; and personal and advertising injury - $1,000,000, and (b) Workers' Compensation insurance subject to statutory limits under the Applicable Laws of the state in which the Party operates. Ryder's insurer will be responsible for the Workers' Compensation benefits due to its injured employee, and Chanje's insurer will be responsible for the Workers' Compensation benefits due to its injured employee. Unless prohibited by law, Ryder may self-insure or utilize the Texas non-subscriber program, if applicable, for the required Workers' Compensation coverage set forth above.

12.2   <u>Chanje Obligations</u>. Chanje will obtain and keep in force during the Term and for one (1) year thereafter products liability insurance to cover the Chanje Vehicles, Chanje Vehicle Parts, and Chanje's obligations in connection with those materials in the following amounts: (a) each occurrence - $25,000,000 and (b) aggregate per year - $25,000,000. Ryder will be named as an additional insured to the foregoing General Liability policy with respect to the obligations set forth in this Agreement. Upon Ryder's request, Chanje shall provide Ryder with proof of all such insurance, redacted for proprietary information such as premiums, copies of all such policies, and evidence of the payment of the premiums therefor.

CHANJE - RYDER AGREEMENT -- 20

12.3 <u>Ryder Obligations</u>.  Ryder will obtain and keep in force during the Term Business Automobile Liability, Garage Liability, and Garagekeepers Legal Liability insurance to cover liability with respect to Ryder's obligations under this Agreement in the following amounts: (a) each occurrence - $5,000,000 and (b) aggregate per year - $5,000,000.  The foregoing insurance policy shall identify Chanje as an additional insured.  Upon Chanje's request, Ryder shall provide Chanje with proof of all such insurance, with copies of all such policies redacted for proprietary information, such as premiums, and evidence of the payment of the premiums therefor.

12.4 Parties shall waive, and require their insurers to waive, any and all subrogation recovery rights to which any insurer of the other Party may have against the other Party by virtue of the payment of any loss under any insurance.

12.5 Upon request, each Party will provide the other with proof that is has obtained and is maintaining any insurance required of the Party pursuant to this <u>Section 12</u>.

13. <u>Limitations of Liability</u>.

EXCEPT FOR CLAIMS OF INDEMNITY OR BREACH OF OBLIGATIONS REGARDING CONFIDENTIAL INFORMATION, IN NO EVENT SHALL EITHER PARTY OR ITS RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ADVISERS, REPRESENTATIVES, AFFILIATES, OR SUCCESSOR OR ASSIGNS BE LIABLE TO THE OTHER PARTY FOR INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES, WHETHER FORESEEABLE OR UNFORESEEABLE, OF ANY KIND WHATSOEVER (INCLUDING LOST PROFITS, LOSS OF GOODWILL, AND BUSINESS INTERRUPTION) ARISING FROM OR RELATING TO THIS AGREEMENT.  Each Party acknowledges and agrees that the warranty disclaimers and liability and remedy limitations in this Agreement are material, bargained for provisions of this Agreement, and that fees and consideration payable hereunder reflect these disclaimers and limitations.

14. <u>Notices</u>.

All notices given or required to be given hereunder shall be deemed to be given and received as of the date sent, if sent by express courier, email, or facsimile, as follows or to such other address as shall have been provided pursuant to notice under this <u>Section 14</u>:

> *If to Ryder:*
> Ryder System, Inc.
> 11690 NW 105th Street
> Miami, FL 33178
> United States of America
> Attn:  Legal Department

CHANJE - RYDER AGREEMENT -- 21

*If to Chanje:*

> Chanje Energy, Inc.
> 1025 Rollins Road
> Burlingame, CA 94010
> United States of America
> Attn: Legal Department

15.  <u>Compliance</u>. Each Party shall comply in all material respects with all Applicable Laws, legislation, rules, regulations, treaties, governmental requirements and orders, including those regarding the export and import of products or technical data or information in any form whatsoever as such laws currently exist and as they may from time to time be amended, of any U.S. or foreign government agency or authority, with respect to the Services and its performance hereunder ("<u>Applicable Laws</u>"), including, but not limited to, the U.S. Department of State International Traffic in Arms Regulations, the U.S. Department of Commerce Export Administration Regulations and the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State. The Chanje Vehicles and Chanje Vehicle Parts and the materials and components thereof will not, to the knowledge of Chanje, after due inquiry, contain tin, tantalum, tungsten or gold from sources that contribute to conflict. The Chanje Vehicles and the Chanje Vehicle Parts and the materials and components thereof will not, to the knowledge of Chanje, after due inquiry, be produced using forced, compulsory or prison labor or labor that was the subject of modern slavery or human trafficking. Chanje shall adopt, implement and maintain such policies and procedures as shall be reasonably necessary for compliance with this covenant. Chanje shall promptly notify Ryder of any breach of this covenant.

16.  <u>Miscellaneous</u>.

16.1  <u>Entire Agreement; Modifications and Amendments</u>. This Agreement, together with all related Exhibits, schedules, and attachments, constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter. This Agreement may be amended, modified, or supplemented only by an agreement in writing signed by each Party.

16.2  <u>Construction</u>. The headings and captions in this Agreement are for reference purposes only and are not intended to affect the terms and conditions of this Agreement or the interpretation thereof. When from the context it appears appropriate, each term stated either in the singular or the plural shall include the singular and the plural and pronouns stated either in the masculine, the feminine or the neuter shall include the masculine, the feminine and the neuter. Furthermore, this Agreement has been mutually negotiated by the Parties hereto and represents their voluntary agreement. No presumption of interpretation shall be imposed against any Party in the construction of this Agreement. When used

CHANJE - RYDER AGREEMENT -- 22

herein, the words "includes" and "including" and their syntactical variations shall be deemed followed by the words "without limitation." If one or more of the provisions in this Agreement are deemed void or voidable under Applicable Law, then the remaining provisions will continue in full force and effect.

16.3   Successors and Assigns.  This Agreement is binding on the successors or assigns of Chanje.  Ryder may assign its rights or obligations under this Agreement to an affiliate of Ryder without consent of but with notice to Chanje.  Any other assignment by Ryder must be approved in advance in writing by an officer of Chanje.  This Agreement will be binding upon the Parties' permitted successors and their assigns.  Any assignment in breach of this Section 16.3 will be null and void.

16.4   Waiver.  Any waiver of any breach of any provision of this Agreement will not be construed as a continuing waiver of other breaches of the same or other provisions hereof.

16.5   No Third-Party Beneficiaries.  This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other party any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Agreement.

16.6   Governing Law; Jurisdiction; Waiver of Jury Trial.  For the convenience of the Parties, the Parties' respective contractual rights and obligations under this Agreement shall be governed by and construed in accordance with the internal laws of the Commonwealth of Massachusetts without giving effect to any choice or conflict of law provision or rule (whether of the Commonwealth of Massachusetts or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the Commonwealth of Massachusetts.  The United Nations Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.  Notwithstanding anything to the contrary that may be expressed or implied in the foregoing sentence, the Parties specifically agree that the laws of the Commonwealth of Massachusetts do not apply with respect to determining if any state franchise or other statutory scheme governs the Parties' business relationship or transactions, or what the Parties' respective rights and obligations would be as a consequence of such a determination.  Any legal suit, action, or proceeding arising out of or related to this Agreement or the Services provided hereunder shall be instituted exclusively in any state or federal court of competent jurisdiction in Boston, Massachusetts, and each Party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding.  If an action initially is filed in state court, the defending Party may remove the case to federal court under applicable removal jurisdiction rules. EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY

CHANJE - RYDER AGREEMENT  --  23

LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

16.7    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement. Each Party agrees to execute and deliver such additional agreements, certificates, and other documents as may be necessary or appropriate to carry out the intent and purposes of this Agreement.

IN WITNESS WHEREOF, and intending to be legally bound, the Parties each by its authorized officer or representative have executed this Agreement.

Ryder System, Inc.

_Authorized Signature_

   Scott Perry
_Printed Name_

   Chief Technology & Procurement Officer
_Title_

   March 17, 2017
_Date_

Chanje Energy, Inc.

_Authorized Signature_

Bryan Hansel
_Printed Name_

CEO
_Title_

3 - 22 - 2017
_Date_

_ATTACHMENTS FOLLOW:_

    Exhibit A  –  Chanje Vehicles
    Exhibit B  –  Parts Distribution Services
    Exhibit C  –  Repair Services
    Exhibit D  –  Exclusive Accounts - None listed at time of execution
    Exhibit E  –  Ryder's Acquisition of New Chanje Vehicles
    Exhibit F  –  Warranty

90090030.10 0059994-00001

# EXHIBIT A

## *Subject to Change*

## CHANJE VEHICLES

**Platform Specifications**

Table 1 below illustrates the primary specifications applicable to the entire Chanje model lineup:

*Table 1: Primary Vehicle Specifications*

| Performance Characteristics | |
|---|---|
| Maximum Speed [MPH] | 74 |
| Constant Speed Range [mi] | 120 – 140 |
| Maximum Gradeability | 30% |
| On-board Charge Time | 8-10 hours |
| DC Fast-Charge Time (MY2018) | 1 hour (80% SOC) |
| **Electric Drive and Electronic Control System** | |
| Vehicle Controller | 32-bit MCU with Electronic Differential Control |
| Motor Controller | Liquid Cooled |
| User Interface | 10.4-inch touch screen |
| Battery Capacity and Chemistry | 76 kWh (LiFePO4) |
| Electric Drivetrain | Integrated Rear Axle with Dual Wheel-Side Motors |
| Steering System | Rack & Pinion, High Voltage Electric Hydraulic Assist |
| Brake System | Hydraulic Disc Brake w/ ABS and Regenerative System |
| Air Conditioning | High Voltage Scroll Compressor |
| **Body and Suspension Structure** | |
| Vehicle Structure | Unibody Structure |
| Front Suspension | Independent Suspension |
| Rear Suspension | Leaf Spring or 4-Bag Air Suspension |
| Tire Specification | 215/75R17.5 |
| **Additional Vehicle Options** | |
| Electronic Stability Control | |
| Tire Pressure Monitoring System | |
| Heated Mirrors | |
| Various Body Colors and Interior Materials/Colors | |

**Intended operating conditions and expected longevity**

Nominal operating conditions for these heavy duty electric vehicles are:
- Altitude 1,570 meters or less.
- Ambient temperature:  -40°C to 50°C.
- Humidity range:  2% to 100%.
- Radiation and UV protection:  ISO3917:1999, GB/T 1865.
- On-road operation.
- Regular maintenance required.

If operated under more aggressive conditions such as off-road, over-loading, or in corrosive environments, some maintenance items are subject to change and must be addressed directly with Chanje.

**Technical description of vehicles and propulsion components**

All vehicles have a gross vehicle weight rating (GVWR) of 7,500 kg (16,535 pounds).
All vehicle models are designed from the ground up as electric commercial/passenger vehicles.
The vehicles chassis are of unibody construction.
The vehicle includes an on-board AC charger and is capable of DC fast charging (MY 2018+).
All charging is supported by the SAE J-1772 Combined Charging Standard (CCS).  The 76 kWh high voltage battery pack consists of (240) Sinopoly SP-LFP-100AHB cells configured in a 2P120S configuration.  The system carries a nominal voltage of 384 VDC with a range of 300-444 VDC.  The battery pack utilizes active thermal management and consists of cells utilizing LiFePO4 chemistry.
The vehicle propulsion system is an integrated rear axle consisting of dual permanent magnet motors.  Each motor has a rated power output of 37 kW constant and 74 kW peak with a maximum speed of 10,000 RPM and a 10.6 ratio, direct-coupled gear box.
In the long nose vehicles (V-Series, S-Series, C-Series), most of the power electronics and distribution modules are located in the front of the vehicle under the hood, while the B-Series utilizes a component stack at the rear of the vehicle.

**C-Series Cab-Chassis**

Table 2 below illustrates the characteristics unique to the C-Series vehicle models.

*Table 2:  C-Series Cab-Chassis Specifications*

| Vehicle Model | C5700 | C6700 | C7700 |
|---|---|---|---|
| Length [in] | 235.8 | 266.5 | 297.2 |
| Width [in] | 86.4 | 86.4 | 86.4 |
| Height [in] | 107.7 | 107.7 | 107.7 |
| Wheelbase [in] | 118.1 | 149.6 | 194.3 |
| Curb Weight [lbs] | 8,805 | 8,841 | 8,885 |
| Gross Vehicle Weight Rating [lbs] | 16,535 | 16,535 | 16,535 |
| Maximum Payload [lbs] | 7,730 | 7,694 | 7,650 |
| Min. Turning Radius [in] | 252 | 260 | 311 |



Dual Rear Traction Motors

Distribution Box and High Voltage

High Voltage Battery System

*Figure 1:  C-Series High Voltage Component Locations*

## V-Series Panel Van

Table 3 below illustrates the characteristics unique to the V-Series vehicle models.

*Table 3:  V-Series Panel Van Specifications*

| Vehicle Model | V5700 | V6700 | V7700 | V8700 | V9700 |
|---|---|---|---|---|---|
| Length [in] | 235.8 | 266.5 | 297.2 | 318.1 | 350.4 |
| Width [in] | 86.4 | 86.4 | 86.4 | 86.4 | 86.4 |
| Height [in] | 107.7 | 107.7 | 107.7 | 107.7 | 107.7 |
| Wheelbase [in] | 118.1 | 149.6 | 194.3 | 194.3 | 221.8 |
| Curb Weight [lbs] | 9,537 | 9,619 | 9,700 | 9,921 | 10,274 |
| Gross Vehicle Weight Rating [lbs] | 16,535 | 16,535 | 16,535 | 16,535 | 16,535 |
| Maximum Payload [lbs] | 6,998 | 6,917 | 6,835 | 6,614 | 6,261 |
| Min. Turning Radius [in] | 252 | 260 | 311 | 319 | 370 |



Dual Rear Traction Motors

Distribution Box and High Voltage

High Voltage Battery System

*Figure 2:  V-Series High Voltage Component Locations*

**S-Series Shuttle Van**

Table 4 below illustrates the characteristics unique to the S-Series vehicle models.

*Table 4:  S-Series Panel Van Specifications*

| Vehicle Model | S5700 | S6700 | S7700 | S8700 | S9700 |
|---|---|---|---|---|---|
| Length [in] | 235.8 | 266.5 | 297.2 | 318.1 | 350.4 |
| Width [in] | 86.4 | 86.4 | 86.4 | 86.4 | 86.4 |
| Height [in] | 107.7 | 107.7 | 107.7 | 107.7 | 107.7 |
| Wheelbase [in] | 118.1 | 149.6 | 194.3 | 194.3 | 221.8 |
| Seating Capacity | 13 | 16 | 19 | 20 | 23 |
| Curb Weight [lbs] | 10,163 | 11,354 | 11,574 | 11,519 | 11,905 |
| Gross Vehicle Weight Rating [lbs] | 16,535 | 16,535 | 16,535 | 16,535 | 16,535 |
| Min. Turning Radius [in] | 252 | 260 | 311 | 319 | 370 |



*Figure 3:  S-Series High Voltage Component Locations*

**B-Series Minibus**

Table 5 below illustrates the characteristics unique to the B-Series vehicle models.

*Table 5:  B-Series Minibus Specifications*

| Vehicle Model | B6700 | B7700 | B8700 |
|---|---|---|---|
| Length [in] | 268.1 | 294.9 | 327.2 |
| Width [in] | 86.4 | 86.4 | 86.4 |
| Height [in] | 107.7 | 107.7 | 107.7 |
| Wheelbase [in] | 136.0 | 162.8 | 162.8 |
| Seating Capacity | 19 | 22 | 25 |
| Curb Weight [lbs] | 11,310 | 11,645 | 12,192 |
| Gross Vehicle Weight Rating [lbs] | 16,535 | 16,535 | 16,535 |
| Min. Turning Radius [in] | 260 | 268 | 323 |



*Figure 4:  B-Series High Voltage Component Locations*

**Product Portfolio Timing**

| Series | Description | Model | US Market Introduction |
|---|---|---|---|
| C-Series | Cab-Chassis | C5700 | TBD |
| | | C6700 | MY 2018 |
| | | C7700 | TBD |
| V-Series | Panel Van | V5700 | TBD |
| | | V6700 | MY 2018 |
| | | V7700 | TBD |
| | | V8700 | MY 2017 |
| | | V9700 | TBD |
| S-Series | Shuttle Van | S5700 | TBD |
| | | S6700 | TBD |
| | | S7700 | TBD |
| | | S8700 | MY 2018 |
| | | S9700 | TBD |
| B-Series | Mini-Bus | B6700 | TBD |
| | | B7700 | TBD |
| | | B8700 | MY 2018 |

## EXHIBIT B

### *Parts Distribution Services*

1.      Purchasing Chanje Vehicle Parts.  Ryder is required to purchase all of its requirements for Proprietary Parts exclusively from Chanje unless otherwise agreed by Chanje.  To order Chanje Vehicle Parts, Ryder will submit a purchase order in a format or manner mutually agreed upon by the Parties (each, a "Purchase Order").  The Purchase Order will be for the convenience of the Parties in effecting and documenting orders, and the terms of the Purchase Order will neither supplement nor modify this Agreement.  Chanje will have ten (10) business days to accept or reject the Purchase Order or to make a counter-proposal.  If Chanje does not respond by the end of the ten (10) day period, then the Purchase Order will be deemed accepted by Chanje.  Chanje agrees it will use reasonable commercial efforts to meet the delivery date set forth in the Purchase Order (the "Delivery Date").

2.      Pricing of Chanje Vehicle Parts.  With respect to Chanje Vehicle Parts ordered by Ryder to fulfill Chanje's warranty obligations for a specific Chanje Vehicle, such parts typically will be provided to Ryder at no charge.  Ryder will be reimbursed for any parts in Ryder's inventory utilized to fulfill Chanje's warranty obligations.  For any Chanje Vehicle Parts ordered by Ryder for any purpose other than the warranty obligations described herein, Chanje will sell or lease (as may be applicable to the specific part) the Chanje Vehicle Parts to Ryder at prices to be mutually agreed upon by the Parties, but, in no case, at prices higher than those that Chanje charges other distributors of the Chanje Vehicle Parts.  Ryder will charge Chanje a 10% service fee on the value of the list price for each Proprietary Part provided by Chanje to Ryder not to exceed $200 per Proprietary Part, for warranty repair maintenance to cover distribution costs and inventory holding costs.  Such fee will be calculated based on parts delivered to Ryder shops from centralized distribution centers for warranty repairs, and will be billed to Chanje on a monthly basis and will be paid within thirty (30) days of the date of invoice.

3.      Shipment and Delivery.  All sales of Chanje Vehicle Parts under this Agreement shall be delivered Free Carrier (FCA) Chanje's designated shipping point.  Title to and risk of loss of Chanje Vehicle Parts shall be transferred to Ryder by Chanje when the Chanje Vehicle Parts are delivered by the carrier to the Ryder designated location.

4.      Chanje's Warranties.

   4.1.   Each Chanje Vehicle Part shall meet all applicable Chanje published specifications and, at time of delivery, shall be without damage, free of all defects and with all components in working order (a "Conforming Product").

   4.2.   Chanje further warrants that each Chanje Vehicle Part shall be manufactured and furnished in accordance with all Applicable Laws, including Federal Motor Vehicle Safety Standards in effect at the time of manufacture.

   4.3.   Chanje warrants that the Chanje Vehicle Parts will not interfere with any contractual rights or infringe upon any U.S. or foreign patents and/or copyrights

CHANJE - RYDER AGREEMENT  --  Exhibit B-1

and/or any U.S. federal, state or common law trademark, trade dress, trade name or similar property right.

4.4.    Chanje further represents and warrants that at the time of delivery, all Chanje Vehicle Parts that are being sold to Ryder shall be free and clear of all encumbrances, liens and debts of any nature whatsoever and, upon delivery thereof, Ryder shall have good and marketable title to each such Chanje Vehicle Part and Chanje agrees to defend such title.

4.5.    Chanje warrants that physical delivery of each Chanje Vehicle Part (i) shall be rightful and shall not be subject to any import quota, restriction or regulation preventing or forbidding the importation or sale of such Chanje Vehicle Part or any component part thereof, and (ii) shall not be subject to any unpaid duty, tariff or penalty.

4.6.    <u>Non-Conforming Chanje Vehicle Parts</u>.  In the event Ryder concludes that a Chanje Vehicle Part is not a Conforming Product or that Chanje has breached an applicable warranty, Ryder may within ten (10) business days of such determination return such Chanje Vehicle Part (in the manner that may be provided by Chanje for such returns), without penalty, liability or further obligation to Ryder, with a description of the alleged nonconformity or breach of warranty.  If Chanje confirms Ryder's determination, Chanje will reimburse or credit Ryder for any shipping costs incurred by Ryder associated with the delivery and return of the Chanje Vehicle Part and, in Chanje's sole discretion, either (i) provide a refund or credit or (ii) replace the Chanje Vehicle Part with an equivalent Conforming Product, within a reasonable amount of time.

5.    <u>Payment for Chanje Vehicle Parts</u>.  Upon acceptance of a Purchase Order and delivery of the applicable Chanje Vehicle Parts, Chanje will send Ryder an invoice covering the delivered Chanje Vehicle Parts with reference to the applicable Purchase Order(s) and Ryder will pay all amounts due under that invoice within thirty (30) days of receipt of the invoice without deduction or set-off.

6.    <u>Promotion of Chanje Vehicle Parts</u>.  In its promotion and marketing of Chanje Vehicle Parts, Ryder:

6.1.    May represent itself to the public and prospective customers as an authorized distributor of Chanje Vehicle Parts and, during the Exclusivity Period, may advise such customers that Ryder is the exclusive authorized distributor of such parts;

6.2.    Will utilize promotional materials provided or approved by Chanje, including brochures and point-of-sale materials, as reasonable;

6.3.    Will provide periodic reports concerning Ryder's promotion and sales of Chanje Vehicle Parts;

CHANJE - RYDER AGREEMENT -- Exhibit B-2

6.4.   Will provide Chanje technical access to relevant Ryder information concerning Ryder's distribution of Chanje Vehicle Parts and service of Chanje Vehicles, and the Parties will work together to enable such information to be accessed and integrated by Chanje into Chanje's software systems; and

6.5.   Meet with Chanje not less than annually regarding Ryder's plan for marketing and promotion of Chanje Vehicle Parts and for the delivery and performance of Repair Services.

7.   <u>Further Obligations of Chanje</u>.

7.1.   <u>Identification</u>.  At Ryder's request, during the Exclusivity Period, Chanje will identify Ryder as the exclusive authorized distributor of Chanje Vehicle Parts in all lists and other documentation in which Chanje identifies such distributors in the Territory.

7.2.   <u>Information and Materials</u>.  Chanje will deliver to Ryder, or assist Ryder in developing, marketing and promotional materials (in hard copy and/or electronic form) as necessary or appropriate to assist in the marketing and promotion of Chanje Vehicle Parts.

7.3.   <u>Regulatory Approvals</u>.  Chanje will acquire and obtain all regulatory approvals and licenses necessary for Chanje to be able to deliver all Chanje Vehicle Parts to Ryder in the Parts Distribution Services Territory for Ryder's use and resale. Ryder will reasonably cooperate with Chanje to the extent necessary to acquire those regulatory approvals and licenses that are necessary for either Party to perform their respective obligations under this Agreement. Notwithstanding the foregoing, Chanje has no obligation to do anything that would establish or give the impression that Ryder is operating pursuant to a franchise relationship with Chanje.

8.   <u>Prices</u>.  Ryder may establish the price of the Chanje Vehicle Parts to its customers or Exclusive Accounts in its sole discretion consistent with the terms and purpose of this Agreement and may retain the difference between the purchase price (to Ryder) and the sale or lease price (to customers).  Notwithstanding the foregoing, in order to maintain exclusivity regarding sales of Chanje Vehicle Parts to Exclusive Accounts, Chanje may require Ryder to reduce or cap its margins on sales of Proprietary Parts to Exclusive Accounts but in no event will Ryder be obliged to price Chanje Vehicle Parts at a price that reflects a mark-up of less than 10% above Ryder's cost as determined from  the Chanje invoice for the Chanje Vehicle Part.

## EXHIBIT C

### *Repair Services*

1. <u>Promotion of Repair Services</u>.  In its marketing and promotion of the Repair Services, Ryder, during the Exclusivity Period:

   1.1. May represent itself to the public and prospective customers as an "Authorized Chanje Vehicle Service Center" or equivalent statement;

   1.2. Will use reasonable efforts to promote the Repair Services through, among other things, systematic contacts with owners, users, and prospective owners and users of the Chanje Vehicles and Chanje Vehicle Parts;

   1.3. Will use reasonable commercial efforts to provide competent Repair Services consistent with the greater of the standards in the industry or the standard of service Ryder provides for other vehicles, and to promote a high level of customer satisfaction with the Repair Services;

   1.4. Will utilize promotional materials provided to Ryder by Chanje, including brochures and point-of-sale materials;

   1.5. Will provide Chanje reasonable access to relevant Ryder information concerning Repair Service as provided in <u>Section 6.4</u> of <u>Exhibit B</u> and will provide Chanje with reasonable access to facilities where Repair Services are being performed; and

   1.6. Will meet with Chanje not less than annually regarding Ryder's plan for marketing and promotion of Chanje Vehicle Parts and for the delivery and performance of Repair Services.

2. <u>Specific Services</u>.

   2.1. <u>Comprehensive Repair and Maintenance Services</u>.  Ryder will offer and provide comprehensive diagnostic, repair and maintenance services for Chanje Vehicles upon the request of Chanje or an owner, lessor or operator of a Chanje Vehicle ("<u>Owner/User</u>").  All such Services will be performed in accordance with the technical information and relevant documentation developed by Chanje or in cooperation between the Parties.

   2.2. <u>Warranty Service</u>.  For all authorized warranty repairs performed by Ryder on Chanje Vehicles or Chanje Vehicle Parts during the applicable Warranty Period Chanje will reimburse Ryder as set forth in <u>Section 4</u> below.  All other Chanje Vehicle Parts will be sold to Ryder at prices to be mutually agreed upon by the Parties, but, in no case, at prices higher than those that Chanje charges any other buyer or customer.  Ryder shall charge its customer (i.e., the Owner/User) its prevailing labor and parts rate for any non-warranty Repair Services.  Physical

CHANJE - RYDER AGREEMENT -- Exhibit C-1

damage repairs shall be charged to the Owner/User at Ryder's prevailing rates at all times (both during and after the Warranty Period expires).  As set forth in Section 4 below, in cases where Ryder subcontracts any authorized warranty services, Chanje will reimburse Ryder for such costs with a 10% mark-up.

2.3.     Rates for Non-Warranty Repair Services.  For non-warranty services, Ryder shall charge the Owner/User its prevailing labor and parts rate for such Repair Services.

2.4.     Recall Campaigns.  Ryder will, upon Chanje's request or the request of an Owner/User, perform recall inspections and services on the Chanje Vehicles, in strict accordance with the applicable policies and procedures provided to Ryder by Chanje, including all timetables and deadlines reasonably designated by Chanje.  Upon completion of any recall inspection or recall Services, Ryder will record the name, address and contact details of the Owner/User, a description of the work done, the Chanje Vehicle Parts installed or delivered and the date of service or delivery, and all other information reasonably requested by Chanje.  Ryder will retain these records for at least four (4) years from the date of service (or as long as may be required by governing law) and will charge Chanje for the parts and labor as provided in Section 4 below.  Any recall service or parts provided as requested by Chanje will be treated the same as warranty repairs for purposes of reimbursement.  Recall services will be at no charge to any third-party Owner/Lessee of the affected Chanje Vehicles.

2.5.     Emergency Services.  During the Warranty Period, Ryder will offer and provide roadside emergency breakdown services for Chanje Vehicles within reasonably acceptable response intervals, regardless of where, when, or by whom those Chanje Vehicles were purchased.  Ryder will ensure that these services are available on a twenty-four (24) hours a day, seven (7) days a week basis.  Upon receipt of a request for these services, by an Owner/User or by Chanje, Ryder will begin processing that request and performing the services as soon as is reasonably practicable.  While Chanje will not appoint any other emergency breakdown service provider other than Ryder during the Exclusivity Period, it is understood that any Owner/User may secure such emergency services from any source, and is not limited to securing those services from Ryder.

2.6.     Pre-Delivery Inspections.  Prior to delivering any new Chanje Vehicle to a third party, Ryder will, at Chanje's request, carry out receiving and pre-delivery inspections on the vehicle.  Chanje will provide Ryder with checklists, or help Ryder develop checklists, to assist Ryder in such inspections but Ryder may add additional steps to such checklists as it deems fit.  Ryder will be reimbursed according to the labor charges set forth herein.

2.7.     Product Modifications.  Ryder may make modifications (including bodywork and machinery installation) to a Chanje Vehicle or Chanje Vehicle Part (e.g., upfit), as requested by an Owner/User (and such cost to be paid by Owner/User); provided,

CHANJE - RYDER AGREEMENT  --  Exhibit C-2

however, that all such modifications must comply with the engineering specifications and guidelines provided to Ryder by Chanje, including all instructions manuals, service bulletins, and chassis drawings for the applicable Chanje Vehicle. Any modifications made by Ryder shall comply with all state and federal vehicle alteration requirements including but not limited to the Federal Motor Vehicle Safety Standards, specifically 49 CFR § 567.7. This service is not an exclusive service for the purposes of the Exclusivity Period. Chanje assumes no liability and makes no warranty with respect to any such Ryder modifications.

2.8.   Performance Evaluation. Chanje and Ryder will cooperate on a service quality assessment survey that periodically will be conducted by or for Chanje. Such cooperation will include discussing when, how many, to whom, and how the survey will be sent out. On a quarterly basis, Chanje and Ryder will review service results on both Ryder-specific and Chanje-requested data.

3.   Assistance by Chanje.

3.1.   Identification. During the Exclusivity Period, at the request of Ryder, Chanje will identify Ryder as the exclusive "Authorized Chanje Service Center" in all customer-facing lists and documentation in which Chanje identifies "Authorized Chanje Service Centers" in the Territory.

3.2.   Training. As provided in this Agreement, Chanje will provide the information necessary for Ryder to develop and deliver training to both Ryder technicians and Exclusive Account technicians. Such training programs will be mutually agreeable to the Parties.

3.3.   Technical Information and Tools. Chanje will deliver to Ryder all technical information, diagnostic and other equipment, tools, software, and other materials necessary or appropriate for Ryder to safely perform the Repair Services. To clarify this point:

a)   Ryder will be expected to have available at its own expense all standard and necessary equipment, tools, software, and other materials necessary and appropriate to be in the business of servicing and maintaining the Chanje Vehicles.

b)   If there are special equipment, tools, or software that are needed specifically for Chanje Vehicles and can only be provided by Chanje, then during the Exclusivity Period Chanje may provide these to Ryder for its use at no cost but Chanje shall retain title to such loaned equipment, tools, etc.

3.4.   Warranty and Recall Information. Chanje will deliver to Ryder all information and materials necessary or appropriate for Ryder to perform the warranty and recall services described above.

CHANJE - RYDER AGREEMENT -- Exhibit C-3

4.    Payment.

4.1.    Warranty Service Pricing.  Chanje shall reimburse Ryder for any such warranty or
recall repair services as follows:

a)  Hourly Labor Charge:  $100 which may be adjusted annually on January 1, at
Ryder's discretion, by providing thirty (30) days' notice to Chanje.  These
adjustments will be computed based on the percentage change in the Revised
Consumer Price Index for Urban Wage Earners and Clerical Workers (1967
base period) published by the U.S. Bureau of Labor Statistics (or any
successor index designated by Ryder) from the base index.

b)  Parts (other than parts received from Chanje without charge):  Ryder's cost
plus 20%.  Ryder will charge Chanje a 10% service fee on the value of the list
price of each Proprietary Part provided by Chanje to Ryder not to exceed $200
per Proprietary Part, for warranty repair maintenance to cover distribution
costs and inventory holding costs.  Such fee will be calculated when parts are
shipped from centralized distribution centers to Ryder shops for warranty
repairs and will be billed to Chanje on a monthly basis and will be paid within
thirty (30) days of the date of invoice.

c)  Outside Repairs:  Ryder's cost plus 10%.

4.2.    Standard Repair Times.  On a monthly basis during the first (1st) year or one
thousand (1,000) vehicles (whichever is longer), and quarterly thereafter, Chanje
and Ryder agree to meet to determine Standard Repair Times ("SRT") on all
known repairs.  Ryder will bring forth data to support the effort, and to understand
the likely time savings to be achieved via further familiarity, and will work with
Chanje to create an SRT and rate for that work so that type of repair or service
can be removed from the Hourly Labor Charge and be billed instead as an event.

4.3.    Continuous Improvement.  Ryder will measure and track vehicle delivery, vehicle
uptime, customer satisfaction and repair times for standard tasks performed
during the Term.  Repair times will be communicated to Chanje as part of the
standard reporting package.  Quarterly, Ryder and Chanje will meet and review
data related to vehicle delivery times, vehicle uptime, customer satisfaction and
repair times for standard tasks to discuss ways to improve efficiencies, to develop
continuous improvement initiatives and to determine a set of SRTs for common
tasks and task strings for warrantable and non-warrantable repairs.

4.4.    Charges for All Repairs Will Be Billed After the Repair Is Performed.  Chanje
shall pay Ryder for all charges properly due from Chanje under this Exhibit C
within thirty (30) days of the date of Ryder's invoice without deduction or set-off.

## EXHIBIT D

*Exclusive Accounts*

NONE LISTED AT TIME OF EXECUTION.

## EXHIBIT E

### RYDER'S ACQUISITION OF NEW CHANJE VEHICLES

1.  Acquiring Chanje Vehicles.

    1.1   In order to acquire Chanje Vehicles from Chanje for the rental or leasing transactions that Ryder is authorized to engage in under this Agreement, Ryder will submit a purchase order in a format mutually agreed upon by the Parties (each, a "Purchase Order"). Chanje will have ten (10) business days to accept the Purchase Order or make changes. If Chanje does not respond by the end of the ten (10) day period, then the Purchase Order will be deemed accepted by Chanje. Chanje agrees it will use commercially reasonable efforts to meet the delivery date set forth in the Purchase Order (the "Delivery Date").

    1.2   Ryder will have the right to cancel any order for any Chanje Vehicle so long as a cancellation notice is received in writing by Chanje not less than sixty (60) days prior to the commencement of the manufacturing of that vehicle. Such date for the commencement of manufacturing will be communicated to Ryder in writing upon acceptance of the Purchase Order.

2.  Pricing of Chanje Vehicles. Chanje will sell the Chanje Vehicles to or through Ryder at prices and terms to be mutually agreed upon by the Parties, but, in no case, at prices higher than those that Chanje charges its other distributors of Chanje Vehicles.

3.  Shipment and Delivery. All Chanje Vehicles purchased or leased under this Agreement shall be delivered Free Carrier (FCA) Chanje's shipping point. Title to (as may be applicable) and risk of loss of Chanje Vehicles shall be transferred to Ryder by Chanje when the Chanje Vehicles are delivered by the carrier to the Ryder designated locations.

4.  Chanje's Warranties.

    4.1   Each Chanje Vehicle shall meet all product specifications (color, equipment, configuration, etc.) contained in the applicable Purchase Order and shall be delivered to Ryder without damage, free of all defects and with all components in working order.

    4.2   Chanje further warrants that each Chanje Vehicle shall be manufactured and furnished in accordance with all Applicable Laws, including Federal Motor Vehicle Safety Standards in effect at the time of manufacture.

    4.3   Chanje warrants that the Chanje Vehicle will not interfere with any contractual rights or infringe upon any patents and/or copyrights and/or any federal, state or common law trademark, trade dress, trade name or similar property right.

    4.4   Chanje further represents and warrants that at the time of delivery, all Chanje Vehicles sold to Ryder shall be free and clear of all encumbrances, liens and debts

CHANJE - RYDER AGREEMENT -- Exhibit E-1

of any nature whatsoever and, upon delivery thereof, Ryder shall have good and marketable title to each such Chanje Vehicle and Chanje agrees to defend such title forever.

4.5 Chanje warrants that physical delivery of each Chanje Vehicle (i) shall be rightful and shall not be subject to any import quota, restriction or regulation preventing or forbidding the importation or sale of such Chanje Vehicle or any component part thereof, and (ii) shall not be subject to any unpaid duty, tariff or penalty.

4.6 <u>Non-Conforming Chanje Vehicle</u>.  In the event a new Chanje Vehicle is determined  to be a Defective Vehicle (as defined below), and Ryder  notifies Chanje in writing that the Vehicle is a Defective Vehicle within one (1) year of Ryder's  purchase, then Ryder  shall be entitled to return such Chanje Vehicle, without penalty, liability or further obligation, and at Chanje's sole option, after taking into account Ryder's and the customer's preference, Chanje will either: (i) pay Ryder the fair market value of an equivalent non-defective Chanje Vehicle; or (ii) at Chanje's sole cost and expense, exchange such Defective Vehicle for an equivalent Chanje Vehicle of the same type that meets the standards in <u>Section 4.1</u> of this <u>Exhibit E</u> within a reasonable amount of time.  A "Defective Vehicle" means a Chanje Vehicle in which the same defect that substantially impairs the value of the vehicle and has not been repaired after five (5) attempts, including consultation with Chanje on the final two (2) attempts, or a vehicle that is out of service for thirty (30) or more consecutive days for repairs of material defects within the one (1) year following purchase.

5. <u>Payment for Chanje Vehicles</u>.  Upon acceptance of a Purchase Order and delivery of the applicable Chanje Vehicle, Chanje will send Ryder an invoice covering the delivered Chanje Vehicle with reference to the applicable Purchase Order(s) and Ryder will pay all amounts due under that invoice within thirty (30) calendar days of receipt of the invoice without deduction or set-off.

6. <u>Information and Materials</u>.  Chanje will deliver to Ryder, or assist Ryder in developing, marketing and promotional materials (in hard copy and/or electronic form) to assist in the marketing and promotion of Chanje Vehicles.

7. <u>Pricing</u>.  Ryder may establish the rental and lease terms for the Chanje Vehicles it offers to its third-party customers in its sole discretion and may retain any margin between the price it pays Chanje for the Chanje Vehicles and the economic return it receives from the rental or lease of those vehicles.

8. <u>Title to Environmental Attributes</u>.  As between the Parties, all Environmental Attributes (defined below) relating to the manufacture of the Chanje Vehicles including, but not limited to, HVIP, LCFS and eRIN credits, shall remain the property of Chanje.  To the extent ownership and operation of the Chanje Vehicles remain with a lease company owned and operated by Chanje, or jointly with Ryder, such Environmental Attributes related to the use or operation of the Chanje Vehicles shall remain with Chanje unless

otherwise specified in writing.  Ryder shall not have any right, title or interest in or to any such Environmental Attributes.  "Environmental Attributes" means any and all credits, benefits, emissions reductions, offsets and allowances, howsoever entitled, that have tax benefits, credits or monetizeable benefits attributable to the manufacture, ownership or operation of Chanje Vehicles.  These Environmental Attributes include economic or monetizeable credits in connection with the manufacturing process associated with (a) avoided emissions of pollutants to the air, soil or water such as sulfur oxides (SOx), nitrogen oxides (NOx), carbon monoxide (CO) and other pollutants; and (b) any avoided emissions of carbon dioxide (CO2), methane (CH4) nitrous oxide, hydrofluorocarbons, perfluorocarbons, sulfur hexafluoride and other greenhouse gases (GHGs) that have been determined by the United Nations Intergovernmental Panel on Climate Change, or otherwise by law, to contribute to the actual or potential threat of altering the Earth's climate by trapping heat in the atmosphere.

Environmental Attributes shall not include, and Ryder shall be entitled to, any non-monetizeable benefits.  These may include the reporting rights to avoided emissions, including, but not limited to, Green Tag Reporting Rights as well as any other reputational benefits.  Environmental Attributes shall not include and Ryder shall be entitled to any nonmonetizeable financial, reporting or reputational incentives in the form of credits, reductions, or allowances associated with or any products or software included in such Chanje Vehicles, or any services related to such Chanje Vehicles.  In cases where a monetizeable credit or benefit not herein described can be claimed by either Party, the Parties will jointly determine which Party will claim such credit and how such credit or benefit will be applied to the cost of the Chanje Vehicle or any other products or services in connection with such Chanje Vehicles.  In the event that Chanje sells or leases vehicles to other parties and the purchasing party desires, and is capable of, monetizing Environmental Attributes, then Chanje shall negotiate in good faith to include the value of the monetizeable Environmental Attributes in the purchase price.  In no event will Ryder, as purchaser of Chanje Vehicles, be treated less favorably than any other third party customer with respect to monetizeable Environmental Attributes.

9.   EVSE.  Chanje, at its sole cost, shall install, maintain, pay for and manage the electric vehicle charging apparatus at Ryder and customer locations where vehicles are located.  Notwithstanding anything to the contrary in this Agreement, Chanje shall not be responsible for any charges associated with upgrading or installing the site infrastructure or utility connectivity infrastructure that may be required to enable the charging of Chanje Vehicles.  Ryder or the customer will be solely responsible for any infrastructure installation or upgrades other than as set forth above.

**Facility Energy Management:**

**Baseline Demand Charges:**  Chanje intends to utilize the capabilities of its vehicle charging apparatus to select economically preferable times for vehicle charging, when and where available, and manage the monthly Demand Charge for the sites where Chanje Vehicles are being charged.  Prior to the installation of any electric vehicle charging apparatus, Chanje shall compute the Baseline Demand Charges incurred by the customer

CHANJE - RYDER AGREEMENT  --  Exhibit E-3

or Ryder at each of its Electric Vehicle charging facilities for each month during the prior calendar year "Baseline Demand Charge." The "Demand Charge" is the electricity charge based on the highest demand, during any fifteen (15) to thirty (30) minute interval that is measured by the electric utility during a billing period.

**Monthly Grid Service Revenues**: Each month, Chanje shall calculate the difference between the current Demand Charges assessed by the electric utility for each charging facility using the vehicle charging apparatus during the previous month and the Baseline Demand Charges for that charging facility prior to the installation of the vehicle charging apparatus. The sum of the calculations for each facility shall constitute each month's "Grid Service Revenues" and shall be subject to a sharing agreement to be negotiated by the Parties and reviewed annually. At no time will the Grid Services Revenues exceed the actual Chanje Vehicle energy consumption for each given month.

As additional grid services are developed and become commercialized and Vehicle to Grid ("V2G") interconnection and interoperability becomes commercially feasible, then Chanje shall, in its sole discretion, commercialize, monitor and monetize the V2G services.

## EXHIBIT F

## STANDARD WARRANTY (Tentative)

| STANDARD WARRANTY | Chanje |
|---|---|
| Bumper to Bumper | 36 MO / 60k miles |
| **Standard Warranty Exclusions** | |
| Loose Fasteners / Components | 3 MO / 3k miles |
| Adjustments (Alignment Excluded) | 3 MO / 3k miles |
| Light Bulbs | 12 MO / 15k miles |
| Bright Metal Finishes | 12 MO / Unlimited |
| Paint and Finish | 12 MO / Unlimited |
| Battery (12VDC System) | 6 MO / 6k miles |
| **DRIVE TRAIN** | |
| Engine | |
| Transmission / Gearbox | |
| **CHANJE EXTENDED SERVICE COVERAGE** | |
| HV Battery | 60 MO / Unlimited |
| HV Charger | 60 MO / Unlimited |
| Traction Motors | 60 MO / Unlimited |
| Traction Motor Controller | 60 MO / Unlimited |
| Other HV Components (???) | ??? |
| **TOWING COVERAGES** | |
| Standard Towing Coverage | 36 MO / Unlimited |

# EXHIBIT B



Date 6/26/2017

Chanje Energy, Inc.
1025 Rollins Road
Burlingame, CA 94010
Bryan.hansel@chanje.us

TO  Scott Perry
Ryder Truck Rental,
Inc.

11690 NW 105 Street
Miami, FL 33178

| | Job | Shipping Method | Shipping Terms | Delivery Date | Payment Terms | Due Date |
|---|---|---|---|---|---|---|
| | | | FOB Ryder | TBD | 35% deposit, Net 30** | |

| Qty | | Description | Unit Price | Discount | Sale Price |
|---|---|---|---|---|---|
| 125 | V8070 | 16,500 GVWR, Panel Van | $145,000.00 | $45,000 | $100,000.00 |
| | | Each of the vehicles will qualify | | | |
| | | for California HVIP or New York, | | | |
| | | Chicago ZVIP funds. Specific to | | | |
| | | HVIP the minimum funding per | | | |
| | | Vehicle that will be distributed to | | | |
| | | Ryder will be $50,000.00 and targeted credit amount of $55,000.*** | | | |
| | | The Deposit of $35,000 is due with PO. | | | |

| | | |
|---|---|---|
| Minimum HVIP Reimbursement* | | $55,000.00 |
| Net Price | | $45,000.00 |
| Total Price Due to Chanje | | $100,000.00 |
| Total | | $12,500,000.00 |

* Minimum HVIP Reimbursement is for illustration purposes only. Depending on the placement of vehicle the figures may vary. For example, if the vehicle is placed in a ZVIP market, the reimbursement number could decrease or if placed in a disadvantaged market, would receive an additional incentive of $10,000 per vehicle. Final Ryder Net Price will depend on final vehicle placement.
** By the time the final payment is due net 30 from delivery for vehicles listed in this Purchase Order, all vehicles will qualify for HVIP or ZVIP funds and be recorded as such by respective state authorities or their designees, where applicable. For California placed vehicles, the vehicles will be listed as HVIP eligible by the California Air Resources Board (CARB) or its designated agent, Calstart. In addition, the

specific VIN numbers will have been submitted and accepted by Calstart for HVIP funds before the final payment due date.  If the vehicles are not listed as HVIP eligible and Calstart has not accepted the VIN numbers for delivered vehicles by the final payment due date, only the Net Price will be payable to Chanje.  Should Ryder be required to pay only Net Price due to the foregoing condition, the HVIP reimbursement amount listed in this Purchase Order will be retained by Chanje when paid by CARB or Calstart. Upon delivery, Ryder and Chanje will calculate final amounts due based upon HVIP Reimbursement received by Chanje and Ryder will pay all funds due once HVIP Reimbursement is deducted within 30 days.

*** Ryder shall receive a minimum credit of $50,000 and targeted credit amount of $55,000 per vehicle towards the purchase of each vehicle simultaneously with the delivery of such vehicle for a total minimum credit amount of $6,250,000 and targeted total credit amount of $6,875,000.

IN WITNESS WHEREOF, and intending to be legally bound, the Parties each by its authorized officer or representative have executed this Agreement.

Ryder Truck Rental, Inc.

Chanje Energy, Inc.

*Authorized Signature*

*Authorized Signature*

Scott Perry

Bryan Hansel

*Printed Name*

*Printed Name*

Chief Technology & Procurement Officer

CEO

*Title*

*Title*

6/26/17

6/26/17

*Date*

*Date*

# Terms and Conditions

1. The terms and conditions of the Vehicle Service and Parts Distribution Agreement dated March 17, 2017 by and between Ryder Truck Rental, Inc. and Chanje Energy, Inc. (the "Agreement") shall govern the purchase of vehicles pursuant to the attached PO. In case of direct conflict between the terms of the Agreement and terms herein, the terms herein shall govern. In all other cases, the terms of the Agreement shall govern.

2. Orders: Orders may be placed with Chanje Energy, Inc. ("Chanje") only.

3. Prices: Chanje reserves the right to change prices without notice; however, prices in effect at the time of order acceptance will prevail. Written quotations are valid for thirty (30) days unless otherwise noted. All applicable taxes and shipping charges will be added to each invoice and shall be payable by Customer.

4. Terms Unless otherwise noted, thirty percent (35%) of invoice total is due and payable upon receipt, the balance is due upon delivery

5. Inspection            and
    Acceptance

5.1 Product Changes and Substitutions: Chanje reserves the right (a) to make changes in products without notice, and without any obligation to incorporate those changes in any products previously delivered to Customer and (b) to ship to Customer the most current product regardless of catalog description, if applicable.

6. Change Orders; Cancellation; Returns; Repair/Exchange

6.1 Change Orders: Customer may by written notice to Chanje, request changes to the purchase orders (which terms shall not supersede the terms contained herein). If, in its sole and absolute discretion, Chanje accepts such request, Customer agrees to pay Chanje's change order fees as well as any additional costs incurred by Chanje and associated with the change in the purchase order.

6.2 Cancellation: Customer may cancel its order only with written consent of Chanje and only upon payment of Chanje's cancellation fees and all outstanding invoices. If orders are cancelled before being completed, Customer is liable to Chanje for the contract price of all products completed prior to such termination, Chanje's cost of material or work in progress, as shown on Chanje's books, plus a reasonable profit thereon, but in no event more than the contract price.





# EXHIBIT C

## PROMISSORY NOTE AND GUARANTY

FOR VALUE RECEIVED, and subject to the terms and conditions set forth herein, Chanje Energy, Inc., a Delaware corporation (the "**Borrower**"), hereby unconditionally promises to pay to the order of Ryder Truck Rental, Inc., a Florida corporation, or its assigns (the "**Noteholder**") the principal amount of $770,000 (the "**Loan**") as provided in this Promissory Note and Guaranty (the "**Note**"). Furthermore, FDG Electric Vehicles Limited, a limited liability company incorporated in Bermuda (the "**Guarantor**" and together with the Borrower and the Noteholder, the "**Parties**") has agreed to guarantee the obligations of Borrower hereunder, on the terms and conditions specified herein.

1.    <u>Definitions</u>. Capitalized terms used herein shall have the meanings set forth in this Section 1.

"**Borrower**" has the meaning set forth in the introductory paragraph.

"**Event of Default**" has the meaning set forth in Section 6.

"**Governmental Authority**" means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, municipal, or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank, or other entity exercising executive, legislative, judicial, taxing, regulatory, or administrative powers or functions of, or pertaining to, government.

"**Guaranteed Obligations**" has the meaning set forth in Section 5.

"**Guarantor**" means FDG Electric Vehicles Limited, a limited liability company incorporated in Bermuda.

"**Law**" as to any Person, means the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law (including common law), statute, ordinance, treaty, rule, regulation, order, decree, judgment, writ, injunction, settlement agreement, requirement or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Loan**" has the meaning set forth in the introductory paragraph.

"**Maturity Date**" means the earlier of (a) May 1, 2020 and (b) the date on which all amounts under this Note shall become due and payable pursuant to Section 7.

"**Note**" has the meaning set forth in the introductory paragraph.

"**Noteholder**" has the meaning set forth in the introductory paragraph.

"**Order**" as to any Person, means any order, decree, judgment, writ, injunction, settlement agreement, requirement, or determination of an arbitrator or a court or other Governmental Authority, in each case, applicable to or binding on such Person or any of its properties or to which such Person or any of its properties is subject.

"**Parties**" has the meaning set forth in the introductory paragraph.

"**Person**" means any individual, corporation, limited liability company, trust, joint venture, association, company, limited or general partnership, unincorporated organization, Governmental Authority, or other entity.

2.     Payment Dates; Optional Prepayments; Interest.

2.1     Payment Dates. The Loan shall be payable as follows: (a) a lum sum payment of $200,000 on March 6, 2020; a lum sum payment of $100,000 on April 1, 2020; and a lump sum payment of $470,000 on May 1, 2020; provided that all amounts outstanding under this Note shall be due and payable by the Maturity Date.

2.2     Optional Prepayments. The Borrower may prepay the Loan in whole or in part at any time or from time to time without penalty or premium by paying the principal amount. No prepaid amount may be reborrowed.

2.3     Interest.  The Loan shall be non-interest bearing.

3.     Payment Mechanics. All payments of principal shall be made no later than 12:00 PM EST on the date on which such payment is due by wire transfer of immediately available funds to the Noteholder's account at a bank specified by the Noteholder in writing to the Borrower from time to time.

4.     Representations and Warranties. The Borrower hereby represents and warrants to the Noteholder on the date hereof as follows:

4.1     Power and Authority. The Borrower has the power and authority, and the legal right, to execute and deliver this Note and to perform its obligations hereunder.

4.2     Authorization; Execution and Delivery. The execution and delivery of this Note by the Borrower and the performance of its obligations hereunder have been duly authorized by all necessary corporate action in accordance with all applicable Laws. The Borrower has duly executed and delivered this Note.

4.3     No Violations. The execution and delivery of this Note and the consummation by the Borrower of the transactions contemplated hereby do not and will not (a) violate any provision of the Borrower's organizational documents; (b) violate any Law or Order applicable to the Borrower or by which any of its properties or assets may be bound; or (c) constitute a default under any material agreement or contract by which the Borrower may be bound.

5.     Guaranty.

5.1     Guarantor hereby irrevocably guarantees to the Noteholder the full and punctual payment when due (whether at stated maturity, by acceleration or otherwise) of all of the obligations of the Borrower under this Note (all such obligations of the Borrower being referred to herein as the "**Guaranteed Obligations**"). This guaranty is an absolute, unconditional and continuing guaranty of the full and punctual payment of all of the Guaranteed Obligations and not of their collectability only and is in no way conditioned upon any requirement that the Noteholder first attempt to collect any of the Guaranteed Obligations from the Borrower or any other Person or resort to other means of obtaining payment.  Should an Event of Default occur, the Obligations of Guarantor hereunder with respect to such Guaranteed Obligations in default shall, upon demand by the Noteholder, become immediately due and payable to the Noteholder, without demand or notice of any nature, all of which are expressly waived by Guarantor.  Payments by Guarantor hereunder may be required by the

Noteholder on any number of occasions. All payments by Guarantor hereunder shall be made to the Noteholder, in the manner specified therefor in Section 3 hereof, for the account of the Noteholder.

5.2     Until the final payment in full in cash of all of the Guaranteed Obligations: Guarantor shall not exercise and hereby waives any rights against the Borrower arising as a result of payment by Guarantor hereunder, by way of subrogation, reimbursement, restitution, contribution or otherwise, and will not prove any claim in competition with the Noteholder in respect of any payment hereunder in any bankruptcy, insolvency or reorganization case or proceedings of any nature; and Guarantor will not claim any setoff, recoupment or counterclaim against the Borrower in respect of any liability of the Borrower. The payment of any amounts due with respect to any indebtedness of the Borrower for money borrowed or credit received now or hereafter owed to Guarantor is hereby subordinated to the prior final payment in full in cash of all of the Guaranteed Obligations; provided that, so long as no Event of Default has occurred and is continuing, the Borrower may pay, and Guarantor may receive, such payment. Guarantor agrees that, after the occurrence of any Event of Default, Guarantor will not demand, sue for or otherwise attempt to collect any such indebtedness of the Borrower to Guarantor until all of the Guaranteed Obligations shall have been irrevocably paid in full in cash. If, notwithstanding the foregoing sentence, Guarantor shall collect, enforce or receive any amounts in respect of such indebtedness while any Guaranteed Obligations are still outstanding, such amounts shall be collected, enforced and received by Guarantor as trustee for the Noteholder and be paid over to the Noteholder on account of the Guaranteed Obligations without affecting in any manner the liability of Guarantor under the other provisions hereof.

6.     Events of Default. The occurrence and continuance of any of the following shall constitute an Event of Default hereunder:

6.1     Failure to Pay. The Borrower fails to pay any principal amount of the Loan when due.

6.2     Breach of Representations and Warranties. Any representation or warranty made or deemed made by the Borrower to the Noteholder herein is incorrect in any material respect on the date as of which such representation or warranty was made or deemed made.

6.3     Breach of Covenants. The Borrower fails to observe or perform any covenant, obligation, condition, or agreement contained in this Note.

6.4     Bankruptcy.

(a)     the Borrower commences any case, proceeding, or other action (i) under any existing or future Law relating to bankruptcy, insolvency, reorganization, or other relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition, or other relief with respect to it or its debts or (ii) seeking appointment of a receiver, trustee, custodian, conservator, or other similar official for it or for all or any substantial part of its assets, or the Borrower makes a general assignment for the benefit of its creditors; or

(b)     the Borrower is generally not, or shall be unable to, or admits in writing its inability to, pay its debts as they become due.

7.     Remedies. Upon the occurrence of any Event of Default and at any time thereafter during the continuance of such Event of Default, the Noteholder may, at its option, by written notice to the Borrower

(a) declare the entire principal amount of this Note immediately due and payable; and (b) exercise any or all of its rights, powers or remedies under applicable Law.

8.   Miscellaneous.

8.1   Notices.

(a)   All notices, requests, or other communications required or permitted to be delivered hereunder shall be delivered in writing, in each case to the address specified below or to such other address as such Party may from time to time specify in writing in compliance with this provision:

(i)   If to the Borrower:

Chanje Energy, Inc.
12824 Cerise Avenue
Hawthorne, CA 90250
Attn: Legal Department
Telephone: 913-940-8353
Email: bryan.hansel@chanjeus.com

(ii)   If to the Noteholder:

Ryder Truck Rental, Inc.
Attn: Legal Department
11690 NW 105th Street
Miami, FL 33178
Telephone: 305.500.4946
Email: alena_brenner@ryder.com

(iii)   If to the Guarantor:

FDG Electric Vehicles Limited
Attn: Jaime Che
China Resources Building
26 Harbour Road
Wanchai, Hong Kong
Telephone: 852-3104-2803
Email: jche@fdgev.com

(b)   Notices if (i) mailed by certified or registered mail or sent by hand or overnight courier service shall be deemed to have been given when received; and (ii) sent by email shall be deemed received on the date delivered.

8.2   Expenses. The Borrower shall reimburse the Noteholder on demand for all reasonable out-of-pocket costs, expenses, and fees (including reasonable expenses and fees of its counsel) incurred by the Noteholder in connection with the enforcement of the Noteholder's rights hereunder.

8.3     Governing Law. This Note and any claim, controversy, dispute, or cause of action (whether in contract or tort or otherwise) based upon, arising out of, or relating to this Note, and the transactions contemplated hereby shall be governed by the laws of the State of Florida.

8.4     Submission to Jurisdiction.

(a)     The Borrower hereby irrevocably and unconditionally (i) agrees that any legal action, suit, or proceeding arising out of or relating to this Note may be brought in the courts of the State of Florida and (ii) submits to the exclusive jurisdiction of any such court in any such action, suit, or proceeding. Final judgment against the Borrower in any action, suit, or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment.

(b)     Nothing in this Section 8.4 shall affect the right of the Noteholder to (i) commence legal proceedings or otherwise sue the Borrower in any other court having jurisdiction over the Borrower or (ii) serve process upon the Borrower in any manner authorized by the laws of any such jurisdiction.

8.5     Waiver of Jury Trial. THE BORROWER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY, WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY.

8.6     Counterparts; Effectiveness. This Note and any amendments, waivers, consents, or supplements hereto may be executed in counterparts, each of which shall constitute an original, but all taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Note in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Note.

8.7     Successors and Assigns. This Note may be assigned or transferred by the Noteholder to any Person. Neither the Borrower nor the Guarantor may not assign or transfer this Note or any of its rights hereunder without the prior written consent of the Noteholder. This Note shall inure to the benefit of, and be binding upon, the Parties and their permitted assigns.

8.8     Waiver of Notice. The Borrower hereby waives demand for payment, presentment for payment, protest, notice of payment, notice of dishonor, notice of nonpayment, notice of acceleration of maturity, and diligence in taking any action to collect sums owing hereunder.

8.9     Amendments and Waivers. No term of this Note may be waived, modified, or amended except by an instrument in writing signed by all Parties hereto. Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.

8.10    No Waiver; Cumulative Remedies. No failure to exercise, and no delay in exercising on the part of the Noteholder, of any right, remedy, power, or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege. The rights, remedies, powers, and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers, and privileges provided by law.

8.11     Severability. If any term or provision of this Note is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Note or invalidate or render unenforceable such term or provision in any other jurisdiction.

[*SIGNATURE PAGE FOLLOWS*]

IN WITNESS WHEREOF, the Borrower and Guarantor have executed this Note as of  Feb. 28  , 2019.

CHANGE ENERGY, INC.

By:_____

Name:

Title:   Bryan Hansel
         CEO

FDG ELECTRIC VEHICLES LIMITED

By:_____

Name:  JAIME CHE

Title:  EXECATIVE  DIRECTOR

# EXHIBIT D

## PROMISSORY NOTE

FOR VALUE RECEIVED, and subject to the terms and conditions set forth herein, Chanje Energy, Inc., a Delaware corporation (the "**Borrower**"), hereby unconditionally promises to pay to the order of Ryder Truck Rental, Inc., a Florida corporation, or its assigns (the "**Noteholder**") the principal amount of $3,500,000 (the "**Loan**") as provided in this Promissory Note (the "**Note**").  The Borrower and the Noteholder shall be collectively referred to herein as the "**Parties**".

1.　　Definitions. Capitalized terms used herein shall have the meanings set forth in this Section 1.

"**Borrower**" has the meaning set forth in the introductory paragraph.

"**Debt**" of the Borrower, means all (a) indebtedness for borrowed money; (b) obligations for the deferred purchase price of property or services, except trade payables arising in the ordinary course of business; (c) obligations evidenced by notes, bonds, debentures, or other similar instruments; (d) obligations as lessee under capital leases; (e) obligations under acceptance facilities and letters of credit; and (f) indebtedness set out in clauses (a) through (e) of any Person other than Borrower secured by any lien on any asset of the Borrower, whether or not such indebtedness has been assumed by the Borrower.

"**Event of Default**" has the meaning set forth in Section 5.

"**Governmental Authority**" means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, municipal, or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank, or other entity exercising executive, legislative, judicial, taxing, regulatory, or administrative powers or functions of, or pertaining to, government.

"**Law**" as to any Person, means the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law (including common law), statute, ordinance, treaty, rule, regulation, order, decree, judgment, writ, injunction, settlement agreement, requirement or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Lien**" means any mortgage, pledge, hypothecation, encumbrance, lien (statutory or other), charge, or other security interest.

"**Loan**" has the meaning set forth in the introductory paragraph.

"**Note**" has the meaning set forth in the introductory paragraph.

"**Noteholder**" has the meaning set forth in the introductory paragraph.

"**Order**" as to any Person, means any order, decree, judgment, writ, injunction, settlement agreement, requirement, or determination of an arbitrator or a court or other Governmental Authority, in each case, applicable to or binding on such Person or any of its properties or to which such Person or any of its properties is subject.

"**Parties**" has the meaning set forth in the introductory paragraph.

"**Person**" means any individual, corporation, limited liability company, trust, joint venture, association, company, limited or general partnership, unincorporated organization, Governmental Authority, or other entity.

"**Side Letter**" has the meaning set forth in Section 2.

2.    Payment; Deduction of Principal Balance; Interest.

2.1    Payment. The full amount of the Loan shall become immediately due and payable upon the Noteholder demanding payment thereof in accordance with the terms and conditions of that certain Letter Agreement, dated November 13, 2019 ("**Side Letter**"), by and between the Borrower and the Noteholder.

2.2    Deduction of Principal Balance. The Parties hereby acknowledge and agree that pursuant to the terms of the Side Letter, upon Noteholder's demand for payment as set forth in Section 2.1 hereof, the principal amount of the Loan payable by Borrower shall be reduced by any amounts previously paid by Borrower to Noteholder under the Side Letter in the form of Vehicle Credits (as defined in the Side Letter).

2.3    Interest. The Loan shall be non-interest bearing.

3.    Payment Mechanics. Payment of the principal shall be made no later than 12:00 PM EST on the date on which such payment is due by wire transfer of immediately available funds to the Noteholder's account at a bank specified by the Noteholder in writing to the Borrower from time to time.

4.    Representations and Warranties. The Borrower hereby represents and warrants to the Noteholder on the date hereof as follows:

4.1    Power and Authority. The Borrower has the power and authority, and the legal right, to execute and deliver this Note and to perform its obligations hereunder.

4.2    Authorization; Execution and Delivery. The execution and delivery of this Note by the Borrower and the performance of its obligations hereunder have been duly authorized by all necessary corporate action in accordance with all applicable Laws. The Borrower has duly executed and delivered this Note.

4.3    No Violations. The execution and delivery of this Note and the consummation by the Borrower of the transactions contemplated hereby do not and will not (a) violate any provision of the Borrower's organizational documents; (b) violate any Law or Order applicable to the Borrower or by which any of its properties or assets may be bound; or (c) constitute a default under any material agreement or contract by which the Borrower may be bound.

5.    Events of Default. The occurrence and continuance of any of the following shall constitute an Event of Default hereunder:

5.1    Breach of Representations and Warranties. Any representation or warranty made or deemed made by the Borrower to the Noteholder herein is incorrect in any material respect on the date as of which such representation or warranty was made or deemed made.

5.2    Breach of Covenants. The Borrower fails to observe or perform any covenant, obligation, condition, or agreement contained in this Note.

5.3 <u>Bankruptcy</u>.

(a)     the Borrower commences any case, proceeding, or other action (i) under any existing or future Law relating to bankruptcy, insolvency, reorganization, or other relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition, or other relief with respect to it or its debts or (ii) seeking appointment of a receiver, trustee, custodian, conservator, or other similar official for it or for all or any substantial part of its assets, or the Borrower makes a general assignment for the benefit of its creditors; or

(b)     the Borrower is generally not, or shall be unable to, or admits in writing its inability to, pay its debts as they become due.

6.     <u>Remedies</u>. Upon the occurrence of any Event of Default and at any time thereafter during the continuance of such Event of Default, the Noteholder may, at its option, by written notice to the Borrower (a) declare the entire principal amount of this Note immediately due and payable; and (b) exercise any or all of its rights, powers or remedies under applicable Law.

7.     <u>Miscellaneous</u>.

7.1     <u>Notices</u>.

(a)     All notices, requests, or other communications required or permitted to be delivered hereunder shall be delivered in writing, in each case to the address specified below or to such other address as such Party may from time to time specify in writing in compliance with this provision:

(i)     If to the Borrower:

Chanje Energy, Inc.
12824 Cerise Avenue
Hawthorne, CA 90250
Attn: Legal Department
Telephone: 913-940-8353
Email: bryan.hansel@chanje.com

(ii)     If to the Noteholder:

Ryder Truck Rental, Inc.
Attn: Legal Department
11690 NW 105th Street
Miami, FL 33178
Telephone: 305.500.4946
Email: alena_brenner@ryder.com

(b)     Notices if (i) mailed by certified or registered mail or sent by hand or overnight courier service shall be deemed to have been given when received; and (ii) sent by email shall be deemed received on the date delivered.

7.2     Expenses. The Borrower shall reimburse the Noteholder on demand for all reasonable out-of-pocket costs, expenses, and fees (including reasonable expenses and fees of its counsel) incurred by the Noteholder in connection with the transactions contemplated hereby including and the enforcement of the Noteholder's rights hereunder.

7.3     Governing Law. This Note and any claim, controversy, dispute, or cause of action (whether in contract or tort or otherwise) based upon, arising out of, or relating to this Note, and the transactions contemplated hereby shall be governed by the laws of the State of Florida.

7.4     Submission to Jurisdiction.

(a)     The Borrower hereby irrevocably and unconditionally (i) agrees that any legal action, suit, or proceeding arising out of or relating to this Note may be brought in the courts of the State of Florida and (ii) submits to the exclusive jurisdiction of any such court in any such action, suit, or proceeding. Final judgment against the Borrower in any action, suit, or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment.

(b)     Nothing in this Section 7.4 shall affect the right of the Noteholder to (i) commence legal proceedings or otherwise sue the Borrower in any other court having jurisdiction over the Borrower or (ii) serve process upon the Borrower in any manner authorized by the laws of any such jurisdiction.

7.5     Waiver of Jury Trial. THE BORROWER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY, WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY.

7.6     Counterparts; Effectiveness. This Note and any amendments, waivers, consents, or supplements hereto may be executed in counterparts, each of which shall constitute an original, but all taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Note in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Note.

7.7     Successors and Assigns. This Note may be assigned or transferred by the Noteholder to any Person. The Borrower may not assign or transfer this Note or any of its rights hereunder without the prior written consent of the Noteholder. This Note shall inure to the benefit of, and be binding upon, the Parties and their permitted assigns.

7.8     Waiver of Notice. The Borrower hereby waives demand for payment, presentment for payment, protest, notice of payment, notice of dishonor, notice of nonpayment, notice of acceleration of maturity, and diligence in taking any action to collect sums owing hereunder.

7.9     Amendments and Waivers. No term of this Note may be waived, modified, or amended except by an instrument in writing signed by all Parties hereto. Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.

7.10     No Waiver; Cumulative Remedies. No failure to exercise, and no delay in exercising on the part of the Noteholder, of any right, remedy, power, or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege

hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege. The rights, remedies, powers, and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers, and privileges provided by law.

     7.11    <u>Severability</u>. If any term or provision of this Note is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Note or invalidate or render unenforceable such term or provision in any other jurisdiction.

[*SIGNATURE PAGE FOLLOWS*]

IN WITNESS WHEREOF, the Borrower has executed this Note as of November 13, 2019.

CHANGE ENERGY, INC.

By: _____

Name: Scott Griffin

Title: General Counsel

# EXHIBIT E

November 13, 2019

Chanje Energy, Inc.
12824 Cerise Avenue
Hawthorne, CA 90250
Attention: Legal Department
Email: bryan.hansel@chanje.com

Ladies and Gentlemen:

Reference is made to the (i) Vehicle Service and Parts Distribution Agreement, dated March 17, 2017 (the "**Agreement**"), by and between Ryder Truck Rental, Inc. ("**RTR**") and Chanje Energy, Inc. ("**Chanje**"); (ii) Purchase Order, dated June 26, 2017 (the "**Ryder PO**"), by and between RTR and Chanje pursuant to which RTR agreed to purchase a total of 125 vehicles from Chanje of which 25 have been delivered as of the date hereof; (iii) Purchase Order, dated November 13, 2019 (the "**FedEx PO**") by and between Ryder Vehicle Purchasing, LLC ("**RVP**" and together with RTR, "**Ryder**") and Chanje, pursuant to which RVP agreed to purchase 900 vehicles from Chanje; and (iv) that certain Promissory Note, issued by RTR to Chanje on November 13, 2019 (the "**Promissory Note**" and together with the Agreement, the FedEx PO and the Ryder PO, the "**Transaction Documents**"), for the principal amount of $3.5M. RVP, RTR, and Chanje shall be collectively referred to herein as the Parties.

In consideration of the premises and the mutual covenants and agreements set forth in this letter agreement (this "**Letter Agreement**") and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1.      Notwithstanding anything to the contrary contained in the Transaction Documents, the Parties hereby acknowledge and agree to terminate the Ryder PO as of the date hereof with respect to the 100 vehicles that have not been delivered. In connection with the termination, the Parties agree that Ryder is entitled to a full refund of the $3,500,000 paid to Chanje thereunder (the "**Paid Amount**"). The Parties agree that such refund shall be made in the form of a credit of $5,000 deducted from the purchase price applicable to each vehicle required to be delivered by Chanje under the FedEx PO (each, a "**Vehicle Credit**"), until such time as the aggregate Vehicle Credits total the Paid Amount. The Parties hereby agree that each Vehicle Credit shall also be applied to offset the principal amount owed by Chanje under the Promissory Note. The Parties hereby further agree that Chanje may prepay the Paid Amount in whole or in part at any time or from time to time without penalty or premium.

2.      In the event that Chanje fails to deliver at least 700 vehicles under the FedEx PO by December 1, 2020, then Ryder shall be entitled to declare the balance of the principal amount under the Promissory Note (less any Vehicle Credits) as immediately due and payable. For the avoidance of doubt, the balance of the principal amount shall equal the outstanding portion of the Paid Amount that has not yet been refunded by Chanje to Ryder as of such date.

3.      In the event that Chanje fails to deliver any vehicles under the FedEx PO by August 30, 2020, then Ryder shall declare the entire principal amount of the Promissory Note immediately due and payable.

4.      The provisions of Section 16 (Miscellaneous) of the Agreement are incorporated herein and shall apply to this Letter Agreement, *mutatis mutandis*.

5.      This Letter Agreement, when accepted by each of the Parties, will amend the Transaction Documents and evidence the agreement of the Parties with respect to the matters contained herein. Except as amended or modified in this Letter Agreement, all other terms and provisions of the Transaction Documents shall not be affected by this Letter Agreement and shall continue in full force and effect.

[SIGNATURES ON FOLLOWING PAGES]

Very truly yours,

Ryder Vehicle Purchasing LLC
Ryder Truck Rental, LLC


By:_____
Name:
Title:


**Accepted and agreed effective as of November 13, 2019:**


Chanje Energy, Inc.


By:_____
Name: Scott Griffin
Title: General Counsel

# EXHIBIT F

**Cata, Gladys E.**

---

| | |
|---|---|
| **From:** | do_not_reply@psc.uscourts.gov |
| **Sent:** | Wednesday, March 17, 2021 7:00 PM |
| **To:** | Cata, Gladys E. |
| **Subject:** | Pay.gov Payment Confirmation: FLORIDA SOUTHERN DISTRICT COURT |

External Email: This email was sent from outside of your organization.

Your payment has been successfully processed and the details are below. If you have any questions or you wish to cancel this payment, please contact: Financial Section at 305-523-5050.

Account Number: 4067281
Court: FLORIDA SOUTHERN DISTRICT COURT
Amount: $402.00
Tracking Id: AFLSDC-14532498
Approval Code: 021084
Card Number: ************1055
Date/Time: 03/17/2021 07:00:26 ET

NOTE: This is an automated message. Please do not reply