# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

CASE NO.  1:21-cv-21044-JLK

RYDER TRUCK RENTAL, INC.,

      Plaintiff,

v.

CHANJE ENERGY, INC. and
FDG ELECTRIC VEHICLES
LIMITED,

      Defendants.

_____/

**DECLARATION OF RYDER TRUCK RENTAL, INC.**
**IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT**
**AGAINST CHANJE ENERGY, INC. AND FDG ELECTRIC VEHICLES LIMITED**

I, Isabel M. Marini, pursuant to 28 U.S.C. § 1746 and Section 92.525, Fla. Stat., declare under penalty of perjury that the following is true and correct:

1.      I am over the age of eighteen (18) and make this declaration in support of Ryder Truck Rental, Inc.'s Motion for Default Judgment against Defendant Chanje Energy, Inc. ("Chanje") and its parent company FDG Electric Vehicles Limited ("FDG," collectively with Chanje, the "Defendants").  The facts in this declaration are based on my own personal knowledge and if called as a witness I could, and would, testify competently thereto.

2.      I serve as the Chief Financial Officer for Ryder Truck rental, Inc. ("Ryder").

3.      As part of my job duties, I am familiar with Ryder's business relationship with the Defendants, as well as the Defendants' failure to fulfill numerous obligations spanning multiple agreements between the parties.

4.      On March 17, 2017, Ryder and Chanje entered into a Vehicle Service and Parts Distribution Agreement (the "Vehicle Agreement"), attached hereto as Exhibit A.

5.      Through the Vehicle Agreement, Ryder and Chanje contracted to exchange services and payment, and the Agreement details Ryder's Chanje-related services and operations, including parts distribution services, repair services, authorized uses of new Chanje vehicles purchased from Chanje, sales facilitation services, use of trademarks, and additional terms and conditions. *See* Ex. A at 1.

### A.      The Overpayment of the 2017 Purchase Order

6.      The first Purchase Order connected to the Vehicle Agreement was dated June 26, 2017. *See* Purchase Order (June 26, 2017, referred to herein as the "2017 Purchase Order"), attached hereto as Exhibit B.

7.      Via the 2017 Purchase Order, Ryder agreed to purchase a total of 125 vehicles from Chanje.

8.      Specifically, the 2017 Purchase Order required Ryder to pay Chanje an initial deposit of $35,000 per vehicle (the "initial deposit") upon execution of the Purchase Order and a remaining balance of $10,000 per vehicle upon delivery (the "remaining balance payment"). *See* Ex. B at 1.

9.      On June 26, 2017, Ryder made an initial deposit in the amount of $4,375,000 for all 125 Chanje vehicles ordered in the Purchase Order.  This amount included the $35,000 initial deposit per vehicle, as described in the Purchase Order. *See id.*

10.     By December 2017, only 22 Chanje vehicles had been delivered.  Pursuant to the Purchase Order, Ryder was required to remit the remaining $10,000 balance payment for those 22 vehicles.

11.     On December 7, 2017, Ryder made a payment to Chanje for the 22 vehicles that had been delivered, but did so in the mistaken amount of $45,000 per vehicle (the entire cost of the vehicle), rather than the remaining balance due of $10,000 per vehicle for the 22 vehicles actually delivered, as set out in the Purchase Order.

12.     This mistake resulted in an overpayment of $35,000 per vehicle for the 22 vehicles that had been delivered, amounting in **a total overpayment of $770,000** (the "Overpayment Amount").  Chanje acknowledged the mistake and overpayment and agreed to return the excess but deposited the funds and has not returned the overpayment.

13.     Chanje has not delivered the remaining 100 vehicles ordered and for which Ryder paid the $35,000 deposit for each.

14.     At all times, Chanje acknowledged that the Overpayment Amount demanded by Ryder was an overpayment for the 22 vehicles, and must be reimbursed.

**B.      Failure to Deliver the Remaining 100 Vehicles on the 2017 Purchase Order And Refund for the Initial Deposit for Those 100 Vehicles**

15.     After the delivery of the 22 vehicles, for which Ryder overpaid, Chanje only delivered 3 more vehicles.

16.     That is, out of the 125 vehicles that Ryder ordered and paid a deposit for according to the Purchase Order, Ryder only received 25 out of the 125 vehicles it submitted a deposit for in the 2017 Purchase Order; 100 vehicles have not been delivered.

17.     Chanje advised that it could not meet its obligation to deliver the remaining 100 vehicles that Ryder paid a deposit for.

18.     Following Chanje's failure to perform, Ryder terminated the 2017 Purchase Order with respect to the remaining 100 vehicles that had not been delivered.

19.     However, because Ryder had already paid the initial deposit of $35,000/vehicle, totaling $4,375,000 for *__all 125__* of the vehicles ordered, Chanje agreed that the deposit for the 100 undelivered vehicles should have been returned to Ryder.

20.     The deposit for those 100 undelivered vehicles was $3,500,000.  Therefore, Ryder is entitled to a full refund of $3,500,000 for the 100 undelivered vehicles (the "$3.5M Termination Reimbursement Amount").

21.     Ryder has repeatedly demanded the return of the $3.5M Termination Reimbursement Amount, and Chanje has acknowledged the necessity of that reimbursement through e-mails and phone conversations, but has not refunded Ryder.

**C.     Two Promissory Notes and an Accompanying Side Letter Have Been Breached**

22.     In recognition of Chanje's indebtedness to Ryder of approximately $4,270,000 (the $770,000 Overpayment Amount and $3.5M Termination Reimbursement Amount), Chanje entered into two promissory notes.

        **i.**    The Overpayment Promissory Note (Note #1)

23.     On February 28, 2019, Chanje as the borrower and FDG as the guarantor executed a Promissory Note unconditionally promising to pay Ryder the principal amount of $770,000.  *See* Promissory Note (Feb. 28, 2019), attached hereto as Exhibit C (the "Overpayment Promissory Note").

24.     Since then, Defendants have paid $500,000 towards the Overpayment Promissory Note, leaving Defendants with an outstanding balance of $270,000 on the $770,000 note.

25.     Defendants have made no more payments that were due and missed the last payment date on the Overpayment Promissory Note.

ii.     The $3.5M Promissory Note (Note #2) and Side Letter Agreement

26.     Subsequently, on November 13, 2019, Chanje executed a second Promissory Note unconditionally promising to pay Ryder the principal amount of $3,500,000 for the return of the remainder of the deposit (the $3.5M Termination Reimbursement Amount), as a result of vehicles not being delivered under the Agreement.  *See* Promissory Note (Nov. 13, 2019), attached hereto as Exhibit D (the "$3.5M Promissory Note," and together with the Overpayment Promissory Note, the "Two Promissory Notes").

27.     Chanje has not paid anything towards the $3.5M Promissory Note and has not satisfied its obligations under the Vehicle Service and Parts Distribution Agreement.

28.     In conjunction with the $3.5M Promissory Note, Chanje signed a contemporaneous Side Letter Agreement, which imposed the conditions of payment for the Note.  *See* Side Letter Agreement to $3.5 Million Promissory Note (Nov. 13, 2019), attached hereto as Exhibit E (the "Side Letter Agreement").

29.     The Side Letter Agreement specifically incorporated each of the agreements between the parties up until that time, including the Vehicle Agreement, the 2017 Purchase Order, and the $3.5M Promissory Note.  *See id.*

30.     The Side Letter Agreement also served as the termination of the 2017 Purchase Order for the remaining 100 vehicles that were not delivered.  *See id.*

31.     In the Side Letter Agreement, the parties agreed that Ryder is entitled to a full refund of $3,500,000, and further agreed that the refund should be made in the form of a credit deducted from the purchase price of vehicles ordered in a separate purchase order involving leases

to FedEx (note that the FedEx purchase order was for the purchase of 900 vehicles that would be leased by FedEx).[1]

32.     The Side Letter Agreement stated that in the event that Chanje failed to deliver at least 700 vehicles under the FedEx purchase order by December 1, 2020, then Ryder "shall be entitled to declare the balance of the principal amount under the Promissory Note (less any Vehicle Credits) as immediately due and payable." *Id.*

33.     Chanje did not meet its obligations and deliver the 700 vehicles under the FedEx purchase order, therefore the $3.5M Purchase Order became immediately due and recoverable.

34.     Chanje has accordingly breached its obligations under the Side Letter Agreement and $3.5M Promissory Note, and are in default under that Note.

35.     Chanje has failed to pay the principal amounts of the Two Promissory Notes upon their coming due.

36.     Ryder has demanded payment and has attempted to collect the outstanding principal balance from Chanje in the amount of $3,770,000.  Chanje has acknowledged its debt to Ryder but has not paid these amounts.

37.     Chanje even committed to pay some of the outstanding balance by the end of January 2021, but that promise was not fulfilled either.

**D.     FDG's Role**

38.     Defendant, FDG, is a limited liability company incorporated in Bermuda, organized and existing under the laws of Bermuda with its principal place of business at Rooms 3001-3005, 30th Floor, China Resources Building, 25 Harbour Road, Wanchai, Hong Kong.  FDG is also the parent company of Chanje.

---

[1] The FedEx purchase order was entered into in November 2018.

39.    The parent company, FDG, entered into a Joinder Agreement alongside Ryder and Chanje in 2020, "for the purpose of adding FDG as a party to the Vehicle Service and Parts Distribution Agreement."   Joinder Agreement (Jan. 7, 2020), attached hereto as Exhibit F. Therefore, FDG is considered a party to the Vehicle Agreement in the same manner as Chanje.

79.    The Joinder Agreement states that by signing the Joinder Agreement, FDG "will be deemed to be a party to the Chanje Agreement in accordance with the terms of the Chanje Agreement and shall have all of the rights and obligations of Chanje as fully as if it had executed the Chanje Agreement," *id.*, and as a result FDG has breached the Vehicle Agreement and the Joinder Agreement, as well as its obligations under both of the foregoing promissory notes.

40.    Since March 2018, Ryder has made repeated requests that FDG (as well as Chanje) reimburse the Overpayment Amount, but neither FDG or Chanje has not done so.

41.    After numerous unsuccessful attempts to obtain reimbursement of the Overpayment Amount, Ryder sent Defendants a demand letter on October 4, 2019, requiring them to reimburse Ryder for the Overpayment Amount for the 22 vehicles, and reserving the right to commence legal action to recover it.

42.    At all times, Defendants have acknowledged that the amount demanded by Ryder was an overpayment and must be reimbursed.

43.    Ryder has repeatedly demanded the return of the $3.5M Termination Reimbursement Amount, and Defendants have acknowledged the necessity of that reimbursement through e-mails and phone conversations, but have not refunded Ryder.

44.    In recognition of Chanje's indebtedness to Ryder of approximately $4,270,000 (the $770,000 Overpayment Amount and $3.5M Termination Reimbursement Amount), the Defendants entered into two promissory notes.

45.     On February 28, 2019, Chanje as the borrower and FDG as the guarantor executed a Promissory Note unconditionally promising to pay Ryder the principal amount of $770,000.  *See* Ex. D.

46.     Since then, Defendants have paid $500,000 towards the Overpayment Promissory Note, leaving Defendants with an outstanding balance of $270,000 on the $770,000 note.

47.     Defendants have made no more payments that were due and missed the last payment date on the Overpayment Promissory Note.  *See id*.

48.     The Overpayment Promissory Note further contains an indemnity provision. Section 8.2 titled "Expenses" states: "The Borrower shall reimburse the Noteholder on demand for all reasonable out-of-pocket costs, expenses, and fees (including reasonable expenses and fees of its counsel) incurred by the Noteholder in connection with the transactions contemplated hereby including and the enforcement of the Noteholder's rights hereunder."  *Id.* at 3.  FDG, who guaranteed all obligations of Chanje as the Borrower, is responsible for such indemnity if Chanje does not comply.

49.     Subsequently, on November 13, 2019, Chanje executed a second Promissory Note unconditionally promising to pay Ryder the principal amount of $3,500,000 for the return of the remainder of the deposit (the $3.5M Termination Reimbursement Amount), as a result of vehicles not being delivered under the Agreement that FDG joined, as being responsible for.  *See* Ex. E.

50.     The Defendants have not paid anything towards the $3.5M Promissory Note and have not satisfied their obligations under the Vehicle Service and Parts Distribution Agreement.

51.     The $3.5M Promissory Note further contains an indemnity provision.  Section 7.2 titled "Expenses" states: "The Borrower shall reimburse the Noteholder on demand for all reasonable out-of-pocket costs, expenses, and fees (including reasonable expenses and fees of its

counsel) incurred by the Noteholder in connection with the transactions contemplated hereby including and the enforcement of the Noteholder's rights hereunder." *Id.* at 3.

52.     In conjunction with the $3.5M Promissory Note, Chanje signed a contemporaneous Side Letter Agreement, which imposed the conditions of payment for the Note. *See* Ex. F.

53.     The Side Letter Agreement specifically incorporated each of the agreements between the parties up until that time, including the Vehicle Agreement, the 2017 Purchase Order, and the $3.5M Promissory Note. *See id.*

54.     The Side Letter Agreement stated that in the event that Chanje failed to deliver at least 700 vehicles under the FedEx purchase order by December 1, 2020, then Ryder "shall be entitled to declare the balance of the principal amount under the Promissory Note (less any Vehicle Credits) as immediately due and payable." *Id.*

55.     Paragraph 2.1 of the $3.5M Promissory Note titled "Payment" specifically stated that "[t]he full amount of the Loan shall become immediately due and payable upon the Noteholder demanding payment thereof in accordance with the terms and conditions of that certain Letter Agreement, dated November 13, 2019." $3.5 Promissory Note ¶ 2.1. Ryder has demanded this payment and neither Chanje nor FDG has complied.

56.     Because the Joinder Agreement states that by signing the Joinder Agreement, FDG "will be deemed to be a party to the Chanje Agreement in accordance with the terms of the Chanje Agreement and shall have all of the rights and obligations of Chanje as fully as if it had executed the Chanje Agreement."

**E.     Sum Certain Due Upon Default Judgment Against Chanje and FDG**

57.     Chanje and FDG owe $270,000 on the Overpayment Promissory Note and $3,500,000 on the $3.5M Promissory Note, totaling a sum certain indebtedness of $3,770,000 in damages.

58.     In addition to the foregoing damages, Ryder also incurred a filing fee cost of $402 to file its Complaint against the Defendants.  *See* "Pay.gov Payment Confirmation: FLORIDA SOUTHERN DISTRICT COURT," attached hereto as Exhibit G.

59.     The total amount due upon default judgment against Chanje is the sum certain of **$3,770,402.00**.

60.     I declare under penalty of perjury that the foregoing is true and correct.


Executed on December 9, 2021


By:     *Isabel M. Marini*
        Isabel M. Marini (Dec 9, 2021 19:15 EST)

        ISABEL M. MARINI
        CHIEF FINANCIAL OFFICER,
        RYDER TRUCK RENTAL, INC.

# EXHIBIT A

# VEHICLE SERVICE AND PARTS DISTRIBUTION AGREEMENT

This **Vehicle Service and Parts Distribution Agreement** ("Agreement") is made and entered into as of March 17, 2017 ("Effective Date") by and between **Ryder Truck Rental, Inc.**, a Florida corporation with an address of 11690 NW 105th Street, Miami, Florida 33178 ("Ryder"), and **Chanje Energy, Inc.**, a Delaware Corporation with an address of 1025 Rollins Road, Burlingame, California 94010 ("Chanje"). In this Agreement, each of Ryder and Chanje may be individually referred to as a "Party" or collectively as the "Parties."

## Recitals

A. Chanje manufactures, sells, and distributes electric vehicles together with the parts, accessories, and components for such vehicles.

B. Ryder leases trucks and other commercial vehicles to third parties; provides vehicle maintenance, and repair services to fleets of trucks and other commercial vehicles through its network of vehicle maintenance and repair service centers; and distributes vehicle parts through its parts distribution network.

C. Through this Agreement, (a) Chanje will sell to Ryder Chanje Vehicles for lease or rental by Ryder; (b) Ryder will assist Chanje in the facilitation of the sale or lease of Chanje Vehicles by Chanje to third parties; (c) Chanje will sell Chanje Vehicle Parts to Ryder and Ryder will inventory and distribute Chanje Vehicle Parts for use in Chanje Vehicles; and (d) Ryder will perform Repair Services on Chanje Vehicles.

D. The Parties agree that this Agreement does not establish a franchise relationship of any kind between the Parties. This conclusion constitutes an essential and mutual understanding of each of the Parties in entering into this Agreement.

E. This Agreement does not constitute the appointment of Ryder as an authorized dealer, reseller or distributor of new Chanje motor vehicles.

## Terms of Agreement

1. Definitions.

   1.1 **"Change of Control"** means (a) any person or group of persons within the meaning of Section 13(d)(3) of the Securities Act of 1934 becomes the beneficial owner, directly or indirectly, of 51% or more of the outstanding equity interests of a Party; (b) the current equity holders of a Party shall cease to own or control, of record and beneficially, at least a majority of the outstanding equity interests of the Party; (c) the current equity holders of the parent company of a Party shall cease to own at least a majority of the outstanding equity interests of such company including as a result of merger, consolidation or similar transaction;

90090030 10 0059994-00001

(d) any merger, consolidation or similar transaction involving a Party (other than a reincorporation merger solely to change the jurisdiction of the formation or incorporation or a merger or consolidation with an affiliate or the Party) where the Party is not the surviving entity; or (e) any sale of all or substantially all of the assets of a Party.

1.2     **"Chanje IP"** means all IP owned by or licensed to Chanje by third parties as of the Effective Date or at any time during the Term.

1.3     "Chanje Service IP" has the meaning set forth in Section 5.6.(b).

1.4     **"Chanje Trademarks"** refers to all trademarks, service marks, logos, and other source indicators owned by or licensed to Chanje as of the Effective Date or at any time during the Term for use in connection with the Chanje Vehicles, the Chanje Vehicle Parts, and any products or services offered in connection therewith by Chanje or its affiliates and its and their licensees (other than Ryder). The Parties understand that Chanje may transition its branding to different trademarks than those currently in use and any such future branding will be viewed as part of Chanje's Trademark.

1.5     **"Chanje Vehicles"** means those new vehicles listed on <u>Exhibit A</u> attached to this Agreement.  <u>Exhibit A</u> may be modified from time to time upon written agreement of the Parties.

1.6     **"Chanje Vehicle Parts"** means all Proprietary Parts (defined below) for the Chanje Vehicles.

1.7     **"Confidential Information"** shall mean all financial (including non-public pricing information), business, marketing, drawings, specifications, scientific, technical, economic or engineering information, prototypes, know-how, computer software (source and object code), and inventions, regardless of how that information is received, accessed or viewed by the Party receiving such Confidential Information, that are trade secrets, including all originals, copies, analyses and summaries prepared by either Party in any form, which is disclosed by either Party to the other in relation to this Agreement, and is either (a) disclosed in writing and marked as confidential at the time of disclosure, or (b) disclosed in any manner such that a reasonable person would understand the confidential or proprietary nature of the information.  For the sake of clarity, the identity of customers or pricing of Chanje Vehicles (defined above) or Chanje Vehicle Parts (defined above) is not Confidential Information, but Chanje will not, except as required by law or as authorized by Ryder, provide the identity of Ryder customers or Ryder non-public pricing to third parties.

1.8     **"Delivery Date"** means the date the Chanje Vehicle is delivered from Chanje's U.S. facility, currently 1025 Rollins Road, Burlingame, CA 94010, to the address set forth in the purchase order.

CHANJE - RYDER AGREEMENT -- 2

1.9     **"Exclusive Accounts"** means those customers that may be designated from time to time by Chanje as its exclusive accounts for sale or leasing of Chanje Vehicles with the agreement of Ryder or if they meet the criteria set forth in (a) below.

    (a)     The list of Exclusive Accounts will be maintained as <u>Exhibit D</u> to this Agreement.  It is the intention of the Parties that all leads shall be channeled through Ryder.  However, Chanje may designate any customer an Exclusive Account at any time if the customer meets the following criteria: the potential customer independently initiates contact with Chanje without Chanje's direct solicitation and wishes to consummate one or more transactions directly through Chanje and not through Ryder and Chanje wishes to designate that customer as an Exclusive Account.  Once the preceding criteria are satisfied, Chanje shall notify Ryder of Chanje's decision to add the customer as an Exclusive Account.  Notwithstanding the foregoing, no Exclusive Account may be added within one hundred eighty (180) days after the Effective Date of this Agreement.

    (b)     Except as set forth above, Chanje may transact with any customer for which notice has been given to Ryder as provided under <u>Section 1.8(a)</u> for the customer's addition as an Exclusive Account, but any order or direct purchase with Chanje that is accepted or signed by Chanje with any Ryder customer within one hundred eighty (180) days of the notice to Ryder as required under <u>Section 1.8(a)</u> will be commissionable to Ryder in accordance with the Parties' agreed commission structure then in effect. Chanje will not proceed with such a transaction prior to giving notice to Ryder.

1.10    **"Exclusivity Period"** means the earlier of (a) the first 50,000 Chanje Vehicles delivered to anyone in the U.S. market or (b) five (5) years from Agreement execution date, unless this Agreement is earlier terminated.

1.11    **"Introductory Period"** means the earlier of (a) the first 2,000 Chanje Vehicles delivered into the U.S. market or (b) two (2) years from Agreement execution date, unless this Agreement is earlier terminated.  The purpose of the Introductory Period is to, among other things, (a) develop and assess U.S. market demand for Chanje products, (b) develop appropriate Performance Standards (as defined in <u>Section 5.4</u>), (c) establish standard times for Repair Services, and (d) develop an appropriate parts management and inventory system at Chanje and Ryder.

1.12    **"IP"** means all forms of intellectual property rights, including Patents, trademarks, service marks, trade names, copyrights, software, and trade secrets, including technical and diagnostic information, data, know-how, and any other information subject to trade secret protection.

1.13    **"Material Adverse Effect"** means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the

aggregate, materially adverse to (a) the business, prospects, results of operations, condition (financial, reputational or otherwise) or assets of Chanje, its parent or their successors or affiliates, (b) the ability for Chanje to manufacture and distribute the Chanje Vehicle effectively throughout the Territory or compete in the marketplace or (c) the ability of Chanje to consummate the transactions contemplated hereby on a timely basis.

1.14 **"Parts Distribution Services"** means Ryder's authorized marketing and distribution of Chanje Vehicle Parts sourced by Ryder from Chanje or its designee as described in Exhibit B, which is attached to this Agreement and incorporated herein by reference.

1.15 **"Patents"** means any patents and patent applications, together with renewals, divisions, continuations or continuations-in-part of any such patents and applications, and all patents issuing thereon, and any and all reissues, reexaminations, extensions, divisions, renewals of or to any of the foregoing, and any international counterparts of any of the foregoing.

1.16 **"Proprietary Parts"** means parts and supplies for Chanje Vehicles that are manufactured by or for, or sourced by, Chanje or any of its affiliates. However, Proprietary Parts do not include parts such as brake pads, tires or wiper blades, or any "generic" consumable part identified by agreement of the Parties as not being included as a Proprietary Part. Chanje will provide Ryder with a list of parts and supplies as well as associated costs that are Proprietary Parts after consultation with Ryder no later than April 1, 2017. Only Chanje-approved Proprietary Parts may be used by Ryder for warranty Repair Services unless otherwise agreed to by the Parties.

1.17 **"Repair Services"** means the maintenance and repair of the Chanje Vehicles and Chanje Vehicle Parts, including, but not limited to, warranty maintenance and repair, recall services, emergency break down services, delivery inspections, vehicle modifications, and other after-sales services performed by Ryder pursuant to Exhibit C, which is attached to this Agreement and incorporated herein by reference.

1.18 **"Ryder IP"** means Ryder IP owned by or licensed to Ryder by third parties as of the Effective Date or at any time during the Term.

1.19 **"Ryder Service IP"** has the meaning set forth in Section 5.6(d).

1.20 **"Sales Facilitation Services"** means the services performed by Ryder to promote the market acceptance of Chanje Vehicles and to facilitate the direct sale or lease of such vehicles by Chanje to customers as permitted under this Agreement.

1.21  **"Self-Service Account"** means a customer that is authorized by Chanje under the terms of this Agreement to perform certain Repair Services on some or all of the customer's fleet of Chanje Vehicles.

1.22  **"Services"** means the Repair Service, Parts Distribution Services and Sales Facilitation Services performed by Ryder pursuant to this Agreement.

1.23  **"Service IP"** has the meaning set forth in Section 5.6.

1.24  **"Term"** means the term of this Agreement as provided in Section 6.1.

1.25  **"Territory"** means the 50 states of the United States of America.

1.26  **"Warranty Period"** means the applicable warranty period for each component as set forth in Exhibit F.

2.  Ryder's Chanje-Related Services and Operations.

2.1  Parts Distribution Services.  During the Exclusivity Period, Ryder will serve as the sole and exclusive distributor of Chanje Vehicle Parts in the Territory and Chanje will not, directly or indirectly, authorize any person or entity other than Ryder to perform Parts Distribution Services in the Territory.

2.2  Repair Services.

(a)  During the Exclusivity Period, Ryder will serve as the sole and exclusive provider of Repair Services in the Territory.  Chanje will not, directly or indirectly, authorize any person or entity other than Ryder to perform the Repair Services in the Territory.  Prior to the expiration of the Introductory Period, no Self-Service Accounts will be permitted to perform any Repair Services.

(b)  Notwithstanding the foregoing, after the Introductory Period, in its sole discretion, Chanje may authorize Self-Service Accounts to perform Repair Services on Chanje Vehicles operated by the Self-Service Account. However, only customers with substantial in-house technical capabilities will be authorized by Chanje as Self-Service Accounts to perform "Major Repairs" on their Chanje Vehicles.  The services constituting Major Repairs include any repairs or maintenance on the electric drivetrain or the battery system and any other repairs jointly agreed to by the Parties.

2.3  Ryder's Authorized Uses of New Chanje Vehicles Purchased from Chanje.

(a)  Rental of Chanje Vehicles from Ryder's Rental Fleet.  Ryder may purchase new Chanje Vehicles for inclusion in Ryder's rental fleet for rental to Ryder's customers.  In such transactions, Ryder will retain title to the Chanje Vehicle.

CHANJE - RYDER AGREEMENT -- 5

(b) <u>Turnkey Leasing</u>. Ryder may purchase new Chanje Vehicles to lease to customers under a leasing arrangement that includes maintenance terms as determined in Ryder's sole discretion. Ryder hereby warrants and represents that for any Chanje Vehicle sold to Ryder where Ryder leases such Chanje Vehicle to a third party, no such lease will be considered to be, or result in, a transaction that would establish Ryder as a motor vehicle dealer or distributor.

(c) Should Ryder become aware that it has engaged in a transaction which would entitle or cause Ryder to be covered by any state motor vehicle or other franchise law, Ryder will refrain from continuing such conduct in the affected state or states.

(d) <u>Ryder's Purchases of Chanje Vehicles</u>. The terms governing Ryder's purchase of new Chanje Vehicles for authorized rental or lease as described above are set out in <u>Exhibit E</u>, which is attached to this Agreement and incorporated herein by reference.

2.4 <u>Sales Facilitation Services</u>.

(a) Ryder will actively assist Chanje in promoting the market acceptance of Chanje Vehicles and, under appropriate circumstances, will facilitate potential purchases or financed leases of such vehicles directly between customers and Chanje (or Chanje's designated financing entities). During the Exclusivity Period, and subject to the terms of this Agreement and the exception noted in the following paragraph within this <u>Section 2.4</u>, Chanje will not appoint any third-party sales facilitator, agent, dealer, distributor or broker other than Ryder. Ryder is not authorized to act or hold itself out as an agent of Chanje regarding any potential sale or lease of a Chanje Vehicle by Chanje to a customer, and Ryder is not authorized to bind Chanje to any sales or lease agreement with a customer. Ryder may identify itself as a facilitator or broker of any potential sale or lease of a Chanje Vehicle by Chanje (or its designee) to a customer.

(b) Chanje is currently in discussion with REV Group concerning a potential relationship involving the assembly, development and distribution of non-package commercial cargo transport vehicles (shuttles, cab chassis, transit and school buses) for the U.S. market. Chanje is free to enter into such a relationship with REV Group for the U.S. market notwithstanding anything to the contrary in this Agreement. Nothing in this paragraph (b) limits the rights granted to Ryder under this Agreement.

(c) Chanje represents that during the Exclusivity Period it will not enter into a franchise arrangement or relationship with any OEM or other service provider that will be providing the same or substantially similar Services

CHANJE - RYDER AGREEMENT -- 6

as those covered under this Agreement that will entitle or cause Chanje to be covered under any state motor vehicle or other franchise law.

3.     Use of Trademarks.

3.1     Ryder only may use the Chanje Trademarks to fairly and accurately describe the Chanje products and related Services offered by Ryder.  Ryder may, for example, advise the public that it is an "Authorized Chanje Service Center" or an "Authorized Chanje Parts Distributor."  Ryder is not authorized to use any of the Chanje Trademarks other than in a nominative manner.

3.2     Ryder will not alter or remove any Chanje Trademark from any Chanje products, manuals or marketing materials, and will not alter or remove any Chanje identity plates, numbers, marks or operating instruction labels from any Chanje products, without Chanje's prior written consent.

3.3     Ryder will not label, identify or mark Chanje products or packaging with any Ryder or third-party trademark.  However, Ryder is free to label Chanje products or packaging with barcodes or other Ryder inventory management labels and parts numbers so long as any such labeling does not obscure any Chanje Trademark or product identification number or barcode.

3.4     All goodwill associated with the Chanje Trademarks, now or hereafter acquired by Ryder, belongs exclusively to Chanje, and Ryder will not assert otherwise.  Ryder hereby assigns to Chanje any and all rights that Ryder may acquire in any Chanje Trademark and associated goodwill.

3.5     Ryder will not register or maintain, directly or indirectly, any Internet domain name that utilizes any Chanje Trademark.

3.6     Relationship of the Parties.  Notwithstanding anything to the contrary herein, the Parties acknowledge and agree that the relationship created by this Agreement is one of independent contractors and nothing in this Agreement shall:  (a) give either Party the power to direct and control the day-to-day activities of the other Party; (b) deem the Parties to be acting as employer/employee, franchisor/franchisee, partners, joint venturers, co-owners, or other participants in a joint undertaking; and (c) permit either Party to create or assume any obligation on behalf of the other Party, except as otherwise expressly set forth in this Agreement.

3.7     Demand Creation.  It is the goal of the Parties to create demand for the Chanje commercial electric vehicles.  It is understood that both Parties will make investments to create this demand.  The Parties intend to embark on a national campaign to jointly promote Chanje electric vehicles.  This could include joint marketing, promotional materials, fleet visits, and cooperative efforts at trade

shows.  The Parties agree to cooperate in such efforts on a commercially reasonable efforts basis as jointly agreed upon by the Parties.

3.8     Sales Launch.  Chanje and Ryder will determine jointly, on a commercially reasonable basis, which markets to enter based on the capabilities of the Parties. The Services will be launched jointly on a coordinated basis market by market.

4.     Warranty on Chanje Vehicles, Chanje Vehicle Parts.

4.1     Chanje shall warrant the Chanje Vehicles and Chanje Vehicle Parts to Ryder and customers.  The warranty that Chanje anticipates offering is substantially in the form set out in Exhibit F, but the Parties understand that this warranty has not yet been finalized by Chanje and its supplier and is subject to adjustment from time to time by Chanje, in good faith, based on market demands.  Ryder does not assume any obligation or liability in connection with any breach of warranty by Chanje applicable to the Chanje Vehicle Parts or Chanje Vehicles.  Every Ryder transaction document with a customer for the authorized lease or rental of a Chanje Vehicle or for the sale of a Chanje Vehicle Part shall contain the following disclaimer printed in capital letters:

IN THE EVENT THE CHANJE VEHICLE OR CHANJE VEHICLE PARTS ARE SUBJECT TO A CHANJE WARRANTY, RYDER EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS AND IMPLIED (INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE), ON THE CHANJE VEHICLE OR CHANJE VEHICLE PARTS.  FURTHER, RYDER NEITHER MAKES NOR AUTHORIZES ANY OTHER PERSON TO MAKE ON RYDER'S BEHALF ANY WARRANTY IN CONJUNCTION WITH THE SALE OF THE CHANJE VEHICLE OR CHANJE VEHICLE PART.  AS TO ANY MANUFACTURER'S WARRANTY EXTENDED TO THE END USER BY CHANJE, RYDER SPECIFICALLY DISCLAIMS ANY LIABILITY THEREUNDER, SUCH MANUFACTURER'S WARRANTY BEING BETWEEN THE END USER AND CHANJE ONLY.

In order to ensure Chanje meets its warranty reimbursement obligations, Chanje will provide a warranty/performance bond in favor of Ryder.  As an alternative to a warranty/performance bond, Ryder may allow Chanje to provide a letter of credit or cash escrow deposit in Ryder's favor, upon the terms determined by Ryder in its sole discretion.  Prior to the earlier of (a) the first 1,000 Chanje Vehicles delivered into the U.S. market or (b) one (1) year from the Agreement execution date Chanje and Ryder shall evaluate the service and warranty performance requirements of the Chanje Vehicles and jointly determine the expected warranty reimbursement obligations over the Warranty Period.  If Ryder determines that a warranty performance bond is required, the warranty/performance bond shall be in an amount based on the projected warranty expense over the Warranty Period and will be calculated based on industry

CHANJE - RYDER AGREEMENT -- 8

standards and the estimated cost of the warranty repairs of the Chanje Vehicles during the Warranty Period. As an example, the industry benchmark for obtaining a surety bond to guarantee maintenance and/or warranty obligations is 10-50% of the total warranty contract value. The percentage typically depends on whether the bond is meant to cover defective design, poor or substandard workmanship (i.e., warranty obligations) or maintenance requirements of the underlying asset. The bond amount will be adjusted annually as mutually agreed between the Parties based on the vehicle fleet covered by warranty provisions sold, leased or distributed pursuant to this Agreement and actual warranty costs incurred. The Parties agree to review and discuss the potential adjustment (including the potential cancellation) of the warranty/performance bond once Chanje has proven to have a record of product performance in the market.

5.   Services.

5.1   Parts Distribution Services. Ryder will perform the Parts Distribution Services as set forth in Exhibit B.

5.2   Repair Services. Ryder will perform the Repair Services as set forth in Exhibit C. Notwithstanding anything to the contrary herein, Ryder reserves the right to enter into different types of extended warranty or maintenance agreements with Chanje Vehicle owners/lessees after the applicable Warranty Period on terms and conditions determined in Ryder's sole discretion. Ryder will share the extended warranty terms and/or terms of any such maintenance agreements with Chanje. Ryder represents and warrants that the warranty service maintenance will be carried out with commercially reasonable care and skill and performed in a timely, workmanlike, and cost-effective manner using properly trained staff familiar with the functions and operation of the Chanje Vehicles and the Chanje Vehicle Parts.

5.3   Sales Facilitation Services.

Ryder will perform the Sales Facilitation Services described in Section 2.4(a). The initial commission or fee for facilitating certain sales or leasing transactions of Chanje Vehicles directly between Chanje (or Chanje's designee) and third-party customers will be 2.5% of the total purchase price of each Chanje Vehicle sold and 2.5% of the transaction value (total lease payments) for each Chanje Vehicle lease. For sales and leasing transactions Ryder will be paid within thirty (30) days of the execution or consummation of the transaction subject to Ryder's standard commission clawback provisions. This initial commission rate will be subject to quarterly review and modification by the Parties as the Parties gain experience with the market so that the commission rate(s) will more accurately reflect the value of the Facilitation Services and the economics and market demand associated with the Chanje Vehicles. In instances where Ryder is the purchaser of the Chanje Vehicle, 2.5% will be discounted from the Chanje Vehicle purchase price.

CHANJE - RYDER AGREEMENT -- 9

Each customer that signs a lease for a Chanje Vehicle for a period of less than one (1) year will be considered a rental customer. Chanje and Ryder will jointly determine, and Chanje will receive, a rental fee ("Rental Fee") from customers based upon a daily Rental Fee rate and assessed each day the vehicle was on an active agreement. Ryder will set the rate charged to end users ("Market Rate") and keep the difference between the Rental Fee paid to Chanje and the Market Rate as the Ryder transaction management fee. The Rental Fee and Market Rate will be determined by the Parties prior to the delivery of the first Chanje Vehicle to the United States for entry into the market. If the Parties cannot agree on the Rental Fee and Market Rate, Ryder will not be obligated to engage in any Sales Facilitation Services with respect to rental services for rental customers.

5.4    Performance Standards. Ryder agrees that, from time to time, Chanje may adopt commercially reasonable standards and measurements by which to assess Ryder's performance of the warranty service maintenance ("Performance Standards"). Chanje will only adopt such Performance Standards after consultation with Ryder and due consideration of Ryder's comments and suggestions. Ryder agrees to perform the warranty service maintenance in accordance with any such Performance Standards.

5.5    Personnel and Staff. Ryder has sole responsibility for its activities and the activities of its personnel and staff. Ryder shall have the right to appoint and authorize qualified subcontractors to perform the Services and exercise the rights granted to it under this Agreement; provided, however, that (a) Ryder flows down its obligations under this Agreement to its subcontractors; and (b) Ryder will remain fully liable to Chanje, including obligations of indemnity, for the negligence or willful misconduct of Ryder's subcontractors that if performed by Ryder would amount to a breach by Ryder of the terms of this Agreement.

5.6    Development of Training, Manuals, Specifications and Information in Furtherance of Agreement.

(a)    Chanje will provide to Ryder, and/or work cooperatively with Ryder to develop, training, assistance, and materials, including instruction manuals, operations manuals, user guides, product and equipment specifications, marketing and advertising materials and content, repair or service processes and methods, and other documentation or information reasonably necessary or appropriate for Ryder to market and perform the Services and to exercise the rights granted to it under this Agreement, including all related intellectual property rights ("Service IP"). Service IP does not include any trademarks owned by the respective Parties, each of which shall retain all right, title and interest to its respective marks.

(b)    All Service IP developed by or on behalf of Chanje independently or jointly with Ryder during the Term of this Agreement, and the intellectual property rights related thereto, will be owned exclusively by Chanje (the

"Chanje Service IP"), and Ryder shall have the right to use and duplicate the Chanje Service IP in the performance of the Services.  Ryder hereby assigns to Chanje all of its right, title and interest and intellectual property rights to any and all such jointly created Service IP.

(c)     Chanje hereby grants to Ryder a fully paid up, perpetual, world-wide, irrevocable license to make, have made, use, duplicate, make derivative works from, sublicense and distribute that portion of the Chanje Service IP that is jointly developed by Chanje and Ryder.

(d)     All Service IP developed by or on behalf of Ryder independently, and the intellectual property rights related thereto, will be owned exclusively by Ryder (the "Ryder Service IP").

(e)     Ryder grants to Chanje a fully paid up, perpetual, world-wide, irrevocable license to make, have made, use, duplicate, make derivative works from, sublicense and distribute any Ryder Service IP that is specifically and exclusively related to the service of Chanje Vehicles.  However, such license does not cover any Ryder Service IP for which Ryder is under a contractual obligation to a third party precluding Ryder from granting a license to a third party such as Chanje due to the use or incorporation of the third party's intellectual property or confidential information into the applicable Ryder Service IP.

(f)      Each Party shall reasonably assist and cooperate with the other Party, as reasonably requested by the other Party, to verify and acknowledge the owner Party's ownership of or rights in the Service IP pursuant to this Agreement, including to enable the other Party to acquire, transfer, maintain, perfect, and enforce its intellectual property rights and other legal protections in and to that Service IP.

(g)     A technician training program will be developed by Chanje, or the Parties jointly, that Ryder will deliver at its expense to all Ryder technicians authorized to work on Chanje Vehicles.  Should Chanje request, Ryder will provide training, at a reasonable charge determined by Ryder, to technicians at Exclusive Accounts that have been authorized by Chanje to service the Exclusive Account's Chanje Vehicles.

(h)     Ryder reserves the right to establish reasonable training cost charges for Self-Service Accounts.

5.7     Taxes and Duties.  Chanje shall be responsible for payment of all applicable taxes assessed on its delivery of the Chanje Vehicles and Chanje Vehicle Parts to Ryder under this Agreement; provided that Ryder shall be responsible for payment of all sales and use taxes applicable to its purchase or lease of Chanje Vehicle Parts and/or Chanje Vehicles.  Ryder shall also be responsible for all point-of-sale sales

and use tax withholding and remittance obligations for Ryder's sales of Chanje products or services to end users, and for any and all service tax withholding and remittance obligations for the Repair Services that Ryder performs.

5.8   Books and Records.  Ryder will keep complete and accurate books and records in sufficient detail to permit Chanje to confirm the payments due hereunder and compliance with this Agreement.  Upon at least thirty (30) days' prior written notice by Chanje and by agreement with Ryder as to a suitable time, which agreement shall not be unreasonably withheld, Ryder shall permit (not more than once in any calendar year, during normal business hours and in a manner that does not disrupt normal business operations), at Chanje's cost, an independent accounting firm to access Ryder's books and records for the purpose of conducting an audit to verify compliance with cost reimbursement provisions of this Agreement related to Ryder's warranty and recall Repair Services to Chanje and, as necessary, to verify warranty claims.  The audit will not review any records older than two (2) full calendar years plus the portion of the year in which the audit is conducted.  Prior to conducting the audit, the auditor shall meet with Ryder to describe the plan for conducting the audit, including limiting access to those books and records reasonably related to the subject of the audit.

6.   Term and Termination.

6.1   Term.  The initial term of this Agreement will commence on the Effective Date and, unless earlier terminated as provided herein, will continue through March __, 2022.  The Parties may extend the Term by mutual agreement in a writing signed by authorized representatives of the Parties.  For the avoidance of doubt, irrespective of any termination or expiration of this Agreement, Ryder shall retain the right to perform Repair Services on Chanje Vehicles in Ryder's rental inventory or for the term of any lease or maintenance agreement Ryder may have with a Chanje Vehicle customer.

6.2   Termination for Cause.  Either Party may, by written notice to other Party, terminate this Agreement, in whole or in part, if the other Party:  (a) materially breaches this Agreement and such breach is incapable of cure, including breaches of confidentiality; (b) with respect to a material breach of this Agreement or any persistent material breach of a Performance Standard capable of cure, does not cure the breach within ninety (90) calendar days of receiving written notice of that breach (the cure period for failure to pay undisputed sums due shall be ten (10) business days); (c) becomes insolvent or admits its inability to pay its debts generally as they become due; (d) becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law, which is not fully stayed within seven (7) business days or is not dismissed or vacated within thirty (30) calendar days after filing; (e) is dissolved or liquidated or takes any corporate action for such purpose; (f) makes a general assignment for the benefit of creditors; (g) has a receiver, trustee, custodian or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell

CHANJE - RYDER AGREEMENT -- 12

any material portion of its property or business; (h) fails to comply with Applicable Laws, which causes a Material Adverse Effect (any act of fraud or any criminal felony by either Party shall be deemed a Material Adverse Effect); or (i) operates in a manner or manufactures a product that is not safe, or the performance or quality of such product is below general industry standards, and such operation or product will cause the terminating Party material reputational harm (should it continue to operate under this Agreement).  In lieu of termination of the entire Agreement, if Ryder is in material breach of this Agreement and such breach is incapable of being cured or if the material breach is not cured within the cure period provided above, and without prejudice to any other rights Chanje may have, Chanje may elect to terminate Ryder's exclusive rights under this Agreement with all other aspects of the Agreement continuing in full force and effect.  Furthermore, either Party may, by written notice to the other, terminate this Agreement, in whole or in part, if the other Party experiences a Change of Control and the acquiring or controlling person, or persons, is a competitor of the notifying Party or is viewed by the notifying Party, in good faith, as having reputational, safety or credit concerns.

6.3     Effect of Termination.

(a)     Within thirty (30) days following termination or expiration of this Agreement for any reason, Ryder shall submit to Chanje a list of all the Chanje Vehicles and Chanje Vehicle Parts in Ryder's inventory and Ryder shall indicate the condition (new in original packaging, used, refurbished, etc.) and physical location of such vehicles and parts.  Chanje shall have the right to inspect such Chanje Vehicles and Chanje Vehicle Parts before any disposition by Ryder.  Chanje shall have up to thirty (30) calendar days following receipt of the list provided by Ryder in which to inspect the identified Chanje Vehicles and Chanje Vehicle Parts, and to notify Ryder of Chanje's election as to whether Chanje wishes to repurchase all, any or none of the Chanje Vehicles or the Chanje Vehicle Parts.  Chanje may make the election at any time before the expiration of the election period.  If Chanje does not elect to repurchase some or all of the identified Chanje Vehicles or Chanje Vehicle Parts within such period, and if Ryder otherwise has fulfilled all of its obligations under this Section 6.3(a), Ryder may sell or otherwise dispose of or utilize the remaining Chanje Vehicles and Chanje Vehicle Parts that Chanje has not elected to purchase in accordance with this Agreement.

Should Ryder wish to retain any Chanje Vehicle Parts in its inventory, then it shall exclude such parts from the initial list it provides Chanje.

(b)     If Chanje elects to repurchase any Chanje Vehicle from Ryder upon termination or expiration of this Agreement, Chanje may repurchase such Chanje Vehicles at the following prices: (i) if a new vehicle, the original price Ryder paid inclusive of any transportation costs; or (ii) if a used

CHANJE - RYDER AGREEMENT -- 13

vehicle, the fair market value on the date of the exercise of Chanje's repurchase option. Should Chanje elect to exercise its option, Chanje shall be responsible for all costs of transporting the Chanje Vehicles from the Ryder location at which they are located to the location designated by Chanje. Ryder agrees to cooperate with and assist Chanje in making all necessary arrangements for such transportation.

(c)    If Chanje elects to repurchase any new Chanje Vehicle Parts from Ryder upon termination or expiration of this Agreement, it will pay for such parts at the lesser of (a) fair market value or (b) the price paid by Ryder. Any other parts that Chanje elects to purchase will be at fair market value. Notwithstanding anything in this Section 6.3 to the contrary, if Ryder requests, Chanje must repurchase all new and undamaged Proprietary Parts that are in their original packaging.

(d)    Upon expiration or termination of this Agreement for any reason whatsoever, each Party shall return, upon request, to the other any and all Confidential Information.

6.4    Loss of Exclusive Rights. In addition to Chanje's option to terminate Ryder's exclusive rights under this Agreement as provided under Section 6.2 above, if during the Exclusivity Period, Ryder enters into an agreement to become, or becomes, an exclusive distributor of a total electric commercial vehicle model competitive with any Chanje Vehicle ("Competitor Vehicle"), Ryder's exclusive rights to provide Sales Facilitation Services may be terminated by Chanje without penalty or liability. "Competitor Vehicle" shall not include any commercial vehicle that is not a total electric drivetrain vehicle, and will exclude those electric vehicles that have a secondary fuel source that is not electric. Ryder's provision of warranty repairs, maintenance and/or parts distribution services for a Competitor Vehicle shall not be grounds for termination as exclusive Sales Facilitation Services provider. For avoidance of doubt, in the event Ryder becomes an exclusive distributor of a Competitive Vehicle and Chanje exercises its right to terminate Sales Facilitation Services, Ryder will continue to provide Repair Services and Parts Distribution Services pursuant to the terms of this Agreement.

6.5    Force Majeure. Notwithstanding anything to the contrary in this Agreement, except for each Party's obligations to pay amounts due under this Agreement, neither Party will be deemed to be in default of any provision of this Agreement for any delay, error, failure, or interruption of performance due to any act of God, terrorism, war, insurrection, riot, boycott, strike, or other labor or civil disturbance, interruption of power service, interruption of communications services, disruption of regular transportation providers or routes, problems with the Internet, epidemic, act of any other person not under the control of such Party, or other similar cause. The Party subject to any of the foregoing events shall give

the other Party reasonable written notification of any resulting material or indefinite delay.

6.6    Survival.  The following provisions of this Agreement will survive expiration or termination of this Agreement:  Sections 1, 4,  5.6(c), 5.6(e), 5.6(f), 6.3, 6.4, 6.5, 6.6, 6.7, 7, 8.3, 8.4(a), 8.4(b), 8.5, 8.6, 9, 11, 13, 14, 16.2, 16.3 and 16.6.  All payment obligations of the Parties survive termination.

6.7    Chanje IP.  Chanje represents and warrants that:  (a) it is the sole owner of the Chanje IP and has the full legal right and authority to convey the rights and licenses that it conveys under this Agreement; (b) it is under no obligation or restriction, nor will it assume any such obligation or restriction, that does or would in any way interfere or conflict with the rights granted by it under this Agreement; and (c) neither the Chanje IP, the Chanje Vehicles, nor the Chanje Vehicle Parts, nor the use of any of the foregoing by Ryder or its agents or representatives as permitted under this Agreement, including in the performance of the Services, does or will misappropriate, infringe, violate, or interfere with any Patent, trademark, copyright, trade secret, or other intellectual property or proprietary right of any person or entity.

7.    Representations and Warranties.

Each Party represents and warrants that the Party's execution, delivery, and performance of this Agreement: (a) have been authorized by all necessary corporate action; (b) do not violate the terms of any law, regulation, or court order to which such Party is subject or the terms of any agreement to which the Party or any of its assets may be subject; and (c) are not subject to the consent or approval of any third party.

8.    Intellectual Property.

8.1    Background IP.  Subject to the terms of this Agreement, each Party shall retain sole and exclusive ownership of all IP discovered, produced, conceived, created, or reduced to practice by it before the Effective Date, and all IP made after the Effective Date made or conceived by it independently from any non-public IP disclosed by the other Party.

8.2    Chanje IP.  Subject to Section 5.6, Chanje reserves all right, title, and interest in and to the Chanje IP.

Ryder IP.  Subject to Section 5.6, Ryder reserves all right, title and interest in and to the Ryder IP.

8.3    Chanje Developments.  Subject to the terms of this Agreement, Chanje shall have sole and exclusive ownership of all IP conceived solely by it or its agents and representatives after the Effective Date that arises from the performance of its activities under this Agreement.  Chanje hereby grants to Ryder a fully paid up, perpetual, world-wide, irrevocable license to make, have made, use, duplicate,

CHANJE - RYDER AGREEMENT -- 15

make derivative works from, sublicense and distribute any Chanje IP that arises from the performance by Chanje of its activities under this Agreement except that Ryder may not use any such materials or processes in a manner competitive to Chanje's development, design and manufacturing of electric vehicles.

8.4    Ryder Developments.

(a)    Subject to the terms of this Agreement, Ryder shall have sole and exclusive ownership of all IP conceived solely by it or its agents and representatives after the Effective Date that arises from the performance of the activities under this Agreement.  Ryder hereby grants to Chanje a fully paid up, perpetual, irrevocable license to make, have made, use, duplicate, make derivative works from, sublicense and distribute, anywhere in the world other than the United States, Mexico, Canada and the United Kingdom, Ryder IP that arises from the performance by Ryder of its activities under this Agreement, except that Chanje may not use any of such materials or processes in a manner competitive to Ryder's leasing, rental, dedicated contract carriage or supply chain services operations.

(b)    Notwithstanding Section 8.3 and Section 8.4(a), unless expressly authorized in this Agreement, Chanje may not use or disclose any Ryder IP or Ryder Confidential Information for the purpose of creating any Chanje IP, and may not use or disclose any Chanje IP based on or derived from independently created Ryder IP or Ryder Confidential Information, except in support of Chanje-related business activities authorized under this Agreement.  In the event of a breach of this Section 8.4(b), and without limitation on any other rights Ryder may have under this Agreement or governing law, Chanje hereby grants to Ryder a fully paid up, perpetual, world-wide, irrevocable license to make, have made, use, duplicate, make derivative works from, sublicense and distribute any such Chanje creative or inventive contribution or other rights or interest based on or derived from Ryder IP or Ryder Confidential Information for any purpose other than in connection with any activity competitive to Chanje's development, design and manufacturing of electric vehicles operations.

8.5    Joint Developments.  Except as may be otherwise provided in Section 5.6, which governs the Parties' rights related to Service IP, Chanje and Ryder shall jointly own all other IP and creative works conceived jointly or jointly created by the Parties during the Term (the "Joint Developments").  Chanje and Ryder are free to use, sublicense to their respective agents, distributors and contractors, make derivative works from and distribute such Joint Developments for the benefit of their own respective business and their respective distribution and service channels.  However, neither Party may grant any license or right in or to the Joint Developments to any motor vehicle manufacturer or vehicle service provider without the prior written consent of the other Party, which consent may be conditioned on the payment of a reasonable royalty to that other Party.  Without

CHANJE - RYDER AGREEMENT -- 16

90090030 10 0059994-00001

limiting the foregoing, neither Party shall have any obligation of accounting to the other Party for any profits arising out of its authorized use of the Joint Developments.  The Parties shall cooperate in good faith regarding the prosecution of any Patents covering the Joint Developments, and the Parties shall share equally in the costs of preparing, prosecuting, and maintaining any Patents covering the Joint Developments.  If a Party decides not to pay such costs for a particular Patent or its maintenance, then that Party shall assign its interests in that Patent, and the underlying Joint Development, to the other Party.

8.6   Further Assistance and Infringement.  Each Party shall reasonably assist and cooperate with the other Party, as reasonably requested by the other Party, to verify and acknowledge the other Party's ownership of or rights in its IP pursuant to this Agreement, including to enable the other Party to acquire, transfer, maintain, perfect, and enforce its intellectual property rights and other legal protections in and to that IP.  Such assistance and cooperation include executing documents reasonably necessary for filing and prosecuting Patents and assigning rights in those Patents, as well as executing declarations and other papers necessary for prosecuting those Patents.

9.   Confidentiality.

9.1   Confidential Information.  Each Party acknowledges the need to preserve Confidential Information that a Party discloses (the "Discloser") to the other Party (the "Recipient") in connection with this Agreement, regardless of the form or manner in which the information is disclosed or learned.  The Parties' obligations under this Section 9 shall continue after the termination of this Agreement for any reason, and shall constitute independent and unconditional covenants of the Parties.

9.2   Limitations.  Each of the Parties agrees and acknowledges that the other Party's Confidential Information is that Party's valuable property.  Accordingly, the Recipient may use Confidential Information of the Discloser only for the purposes of exercising Recipient's rights and fulfilling Recipient's obligations under this Agreement.  Recipient shall use the same degree of care, but no less than a reasonable degree of care, to protect against the unauthorized disclosure or use of Discloser's Confidential Information as it uses to protect its own Confidential Information of a similar type.  Recipient shall disclose Confidential Information of Discloser only to its employees or independent contractors who have a need to know for the above-stated purpose, and who are bound by obligations of confidentiality no less restrictive than the terms of this Agreement.  Any duplication, use, disclosure, or other act or omission by any person that obtains access to or possession of Confidential Information through Recipient that would be a breach of this Agreement if committed by Recipient is deemed a breach of this Agreement by Recipient for which Recipient shall be responsible.

9.3     Exceptions.  Recipient's obligation under this Agreement to treat information as Confidential Information does not apply to information that:  (i) is already known to Recipient at the time of disclosure and was not obtained, directly or indirectly, from Discloser; (ii) is independently developed by Recipient without reference to or use of the Discloser's Confidential Information; (iii) is obtained by Recipient from another source without a breach of any obligation of confidentiality owed by that source to Discloser; or (iv) is or becomes part of the public domain through no wrongful act of Recipient or any party that obtained the information from Recipient.  If Recipient is served with a subpoena or other legal process, court, or governmental request or order requiring disclosure of, or is otherwise required by law or securities exchange requirement to disclose, any of Discloser's Confidential Information, Recipient shall, unless prohibited by law, promptly notify Discloser of that fact and cooperate fully (at Discloser's expense) with Discloser and its legal counsel in opposing, seeking a protective order, seeking to limit, or appealing the subpoena, legal process, request, order, or requirement to the extent deemed appropriate by Discloser.  Recipient may comply with the subpoena or other legal process or requirement after complying with the foregoing sentence, but only to the extent necessary for compliance.

9.4     Public Announcements - Marketing.

(a)     Other than as explicitly set forth in this Agreement, neither Party shall issue or release any initial announcement, statement, press release or other publicity announcing this Agreement without the prior written consent of the other Party.  In any event, the terms of this Agreement shall not be publicly disclosed by either Party except as authorized by this Agreement or by subsequent agreement of the Parties.  Notwithstanding the foregoing, disclosure of this Agreement may be made in a public announcement or filing with the Securities and Exchange Commission or any national securities exchange or governing agency if and to the extent, in the opinion of either Party's counsel, such disclosure is required.

(b)     The Parties will cooperate and coordinate on public announcements concerning the availability of Chanje Vehicles and Services in any U.S. market.  However, Chanje will have the sole discretion and control over any communication concerning the availability of new Chanje Vehicles in any market.  However, any press release or public announcement or communication that references the other Party or the relationship between the Parties must be approved in advance by such Party.

10.     The Parties anticipate that they will establish a joint marketing fund which will be used to invest in marketing efforts to promote the acceptance of the Chanje Vehicles in the marketplace through innovative initiatives.  At the end of each quarter, Ryder will set aside a sum equal to $100 from the commission received from Chanje on each Chanje Vehicle that is sold or leased by Chanje through Ryder's Facilitation Services.  Such

CHANJE - RYDER AGREEMENT -- 18

amount will be set aside and will be matched by Chanje at the end of each quarter. Decisions on how to allocate the funds in the joint account will be made by the Parties, in good faith, with the ultimate goal of promoting the acceptance of the Chanje Vehicles in the market. Each Party is expected to engage in marketing efforts individually outside of the joint marketing fund.

11.    Indemnification.

11.1    General.  To the fullest extent permitted by law, each Party shall defend, indemnify, and hold harmless the other Party and its members, directors, officers, employees, agents, representatives, and customers from and against all third party claims arising out of or resulting from:  (a) any actual or alleged breach by it of any of its obligations, representations or warranties under this Agreement; (b) its willful misconduct, negligence, or fraud; or (c) personal injury (including death) or property damage, loss, or destruction arising out of its negligence.  For purposes of this Agreement, "indemnify" and "hold harmless" mean to pay any settlement amount with a third party agreed to by the indemnifying Party, to pay the costs of any award or final judgment (including any damages or penalties awarded) and to otherwise satisfy any obligation owed to the claiming third party including any attorneys' fees awarded to the third party.  For purposes of this Agreement, "defend" means to hire, manage and pay legal counsel together with all court or administrative costs, expert and consulting fees, litigation expenses (such as document management, retention and duplication), alternative dispute resolution expenses, and similar costs associated with managing, handling or resolving claims.

11.2    Personnel and Staff.  Each Party shall defend, indemnify, and hold harmless the other Party and its members, directors, officers, employees, agents, and representatives from and against claims or liabilities arising out of or resulting from any failure by such Party to pay when due all federal, state and local taxes and contributions imposed or required under unemployment insurance, social security, and income tax laws, as well as any tariffs required to be paid with respect to the rights and obligations under this Agreement.

11.3    Chanje Vehicles and Chanje Vehicle Parts.  Chanje shall defend, indemnify, and hold harmless Ryder and its members, directors, officers, employees, agents, representatives, and customers from and against a third-party claim (a) arising out of any latent or patent defect in the Chanje Vehicles, or Chanje Vehicle Parts, in whole or in part, including, but not limited to, any product liability claim and all claims based on strict liability in tort or (b) arising by virtue of Chanje's business dealings or relationship with (i) REV Group or any third-party OEM involving Chanje Vehicles, or (ii) any third-party provider of Repair Services to Chanje Vehicles.

11.4    Infringement.  Each Party shall defend, indemnify, and hold harmless the other, and the indemnified Party's members, directors, officers, employees, agents,

CHANJE - RYDER AGREEMENT -- 19

representatives, and customers, from and against all third-party claims arising out of or resulting from any actual or alleged infringement, violation, or misappropriation of any Patent, copyright, trademark, trade secret, or other intellectual property right, under the laws of the countries where Ryder is authorized by Chanje to provide Services or distribute Chanje Vehicle Parts based on the indemnified Party's authorized use or distribution of the other Party's IP or performance of Services under this Agreement.  In the case of Ryder as the indemnified Party, Chanje's obligations under this Section 11.4 include third-party IP infringement claims directed to Chanje Vehicles or Chanje Vehicle Parts.

11.5   Procedure and Limitations.  A Party shall promptly notify the other Party in writing of any claims, suits, actions, hearings, or proceedings for which it may seek indemnification under this Section 11.  The Party seeking indemnification shall permit the indemnifying Party to assume and control the defense of any action; provided, however, the indemnifying Party shall not enter into any settlement or compromise, or consent to the entry of any judgment admitting any liability, without the prior written consent of the other Party, which consent shall not be unreasonably withheld.  The Party seeking indemnification shall have the right to participate in the defense of any such claims, suits, hearings, actions, or proceedings with counsel of its own choosing, at its own expense.

12.   Insurance.

12.1   Prior to the delivery of the first Chanje Vehicle into the United States, each Party will obtain and keep in force during the Term:  (a) Commercial General Liability insurance (including bodily injury, property damage, personal injury and broad form contractual liability) in the following amounts:  each occurrence - $1,000,000; general aggregate - $2,000,000; products and completed operations aggregate - $2,000,000; and personal and advertising injury - $1,000,000, and (b) Workers' Compensation insurance subject to statutory limits under the Applicable Laws of the state in which the Party operates. Ryder's insurer will be responsible for the Workers' Compensation benefits due to its injured employee, and Chanje's insurer will be responsible for the Workers' Compensation benefits due to its injured employee.  Unless prohibited by law, Ryder may self-insure or utilize the Texas non-subscriber program, if applicable, for the required Workers' Compensation coverage set forth above.

12.2   Chanje Obligations.  Chanje will obtain and keep in force during the Term and for one (1) year thereafter products liability insurance to cover the Chanje Vehicles, Chanje Vehicle Parts, and Chanje's obligations in connection with those materials in the following amounts: (a) each occurrence - $25,000,000 and (b) aggregate per year - $25,000,000.  Ryder will be named as an additional insured to the foregoing General Liability policy with respect to the obligations set forth in this Agreement.  Upon Ryder's request, Chanje shall provide Ryder with proof of all such insurance, redacted for proprietary information such as premiums, copies of all such policies, and evidence of the payment of the premiums therefor.

CHANJE - RYDER AGREEMENT -- 20

12.3   Ryder Obligations.  Ryder will obtain and keep in force during the Term Business Automobile Liability, Garage Liability, and Garagekeepers Legal Liability insurance to cover liability with respect to Ryder's obligations under this Agreement in the following amounts: (a) each occurrence - $5,000,000 and (b) aggregate per year - $5,000,000.  The foregoing insurance policy shall identify Chanje as an additional insured.  Upon Chanje's request, Ryder shall provide Chanje with proof of all such insurance, with copies of all such policies redacted for proprietary information, such as premiums, and evidence of the payment of the premiums therefor.

12.4   Parties shall waive, and require their insurers to waive, any and all subrogation recovery rights to which any insurer of the other Party may have against the other Party by virtue of the payment of any loss under any insurance.

12.5   Upon request, each Party will provide the other with proof that is has obtained and is maintaining any insurance required of the Party pursuant to this Section 12.

13.   Limitations of Liability.

EXCEPT FOR CLAIMS OF INDEMNITY OR BREACH OF OBLIGATIONS REGARDING CONFIDENTIAL INFORMATION, IN NO EVENT SHALL EITHER PARTY OR ITS RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ADVISERS, REPRESENTATIVES, AFFILIATES, OR SUCCESSOR OR ASSIGNS BE LIABLE TO THE OTHER PARTY FOR INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES, WHETHER FORESEEABLE OR UNFORESEEABLE, OF ANY KIND WHATSOEVER (INCLUDING LOST PROFITS, LOSS OF GOODWILL, AND BUSINESS INTERRUPTION) ARISING FROM OR RELATING TO THIS AGREEMENT.  Each Party acknowledges and agrees that the warranty disclaimers and liability and remedy limitations in this Agreement are material, bargained for provisions of this Agreement, and that fees and consideration payable hereunder reflect these disclaimers and limitations.

14.   Notices.

All notices given or required to be given hereunder shall be deemed to be given and received as of the date sent, if sent by express courier, email, or facsimile, as follows or to such other address as shall have been provided pursuant to notice under this Section 14:

> *If to Ryder:*
> Ryder System, Inc.
> 11690 NW 105th Street
> Miami, FL 33178
> United States of America
> Attn:  Legal Department

CHANJE - RYDER AGREEMENT -- 21

*If to Chanje:*

    Chanje Energy, Inc.
    1025 Rollins Road
    Burlingame, CA 94010
    United States of America
    Attn:  Legal Department

15.   <u>Compliance</u>.  Each Party shall comply in all material respects with all Applicable Laws, legislation, rules, regulations, treaties, governmental requirements and orders, including those regarding the export and import of products or technical data or information in any form whatsoever as such laws currently exist and as they may from time to time be amended, of any U.S. or foreign government agency or authority, with respect to the Services and its performance hereunder ("<u>Applicable Laws</u>"), including, but not limited to, the U.S. Department of State International Traffic in Arms Regulations, the U.S. Department of Commerce Export Administration Regulations and the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State. The Chanje Vehicles and Chanje Vehicle Parts and the materials and components thereof will not, to the knowledge of Chanje, after due inquiry, contain tin, tantalum, tungsten or gold from sources that contribute to conflict.  The Chanje Vehicles and the Chanje Vehicle Parts and the materials and components thereof will not, to the knowledge of Chanje, after due inquiry, be produced using forced, compulsory or prison labor or labor that was the subject of modern slavery or human trafficking.  Chanje shall adopt, implement and maintain such policies and procedures as shall be reasonably necessary for compliance with this covenant.  Chanje shall promptly notify Ryder of any breach of this covenant.

16.   <u>Miscellaneous</u>.

    16.1   <u>Entire Agreement; Modifications and Amendments</u>.  This Agreement, together with all related Exhibits, schedules, and attachments, constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.  This Agreement may be amended, modified, or supplemented only by an agreement in writing signed by each Party.

    16.2   <u>Construction</u>.  The headings and captions in this Agreement are for reference purposes only and are not intended to affect the terms and conditions of this Agreement or the interpretation thereof.  When from the context it appears appropriate, each term stated either in the singular or the plural shall include the singular and the plural and pronouns stated either in the masculine, the feminine or the neuter shall include the masculine, the feminine and the neuter. Furthermore, this Agreement has been mutually negotiated by the Parties hereto and represents their voluntary agreement.  No presumption of interpretation shall be imposed against any Party in the construction of this Agreement.  When used

CHANJE - RYDER AGREEMENT -- 22

herein, the words "includes" and "including" and their syntactical variations shall be deemed followed by the words "without limitation." If one or more of the provisions in this Agreement are deemed void or voidable under Applicable Law, then the remaining provisions will continue in full force and effect.

16.3    Successors and Assigns.  This Agreement is binding on the successors or assigns of Chanje.  Ryder may assign its rights or obligations under this Agreement to an affiliate of Ryder without consent of but with notice to Chanje.  Any other assignment by Ryder must be approved in advance in writing by an officer of Chanje.  This Agreement will be binding upon the Parties' permitted successors and their assigns.  Any assignment in breach of this Section 16.3 will be null and void.

16.4    Waiver.  Any waiver of any breach of any provision of this Agreement will not be construed as a continuing waiver of other breaches of the same or other provisions hereof.

16.5    No Third-Party Beneficiaries.  This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other party any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Agreement.

16.6    Governing Law; Jurisdiction; Waiver of Jury Trial.  For the convenience of the Parties, the Parties' respective contractual rights and obligations under this Agreement shall be governed by and construed in accordance with the internal laws of the Commonwealth of Massachusetts without giving effect to any choice or conflict of law provision or rule (whether of the Commonwealth of Massachusetts or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the Commonwealth of Massachusetts.  The United Nations Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.  Notwithstanding anything to the contrary that may be expressed or implied in the foregoing sentence, the Parties specifically agree that the laws of the Commonwealth of Massachusetts do not apply with respect to determining if any state franchise or other statutory scheme governs the Parties' business relationship or transactions, or what the Parties' respective rights and obligations would be as a consequence of such a determination.  Any legal suit, action, or proceeding arising out of or related to this Agreement or the Services provided hereunder shall be instituted exclusively in any state or federal court of competent jurisdiction in Boston, Massachusetts, and each Party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding.  If an action initially is filed in state court, the defending Party may remove the case to federal court under applicable removal jurisdiction rules. EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY

CHANJE - RYDER AGREEMENT -- 23

90090030.10 0059994-00001

LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

16.7    Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.  Each Party agrees to execute and deliver such additional agreements, certificates, and other documents as may be necessary or appropriate to carry out the intent and purposes of this Agreement.

IN WITNESS WHEREOF, and intending to be legally bound, the Parties each by its authorized officer or representative have executed this Agreement.

**Ryder System, Inc.**

_____
*Authorized Signature*

____Scott Perry_____
*Printed Name*

___Chief Technology & Procurement Officer___
*Title*

___March 17, 2017_____
*Date*

**Chanje Energy, Inc.**

_____
*Authorized Signature*

Bryan Hansel_____
*Printed Name*

CEO_____
*Title*

3 - 2 2 - 2017
*Date*

*ATTACHMENTS FOLLOW:*

     Exhibit A – Chanje Vehicles
     Exhibit B – Parts Distribution Services
     Exhibit C – Repair Services
     Exhibit D – Exclusive Accounts - None listed at time of execution
     Exhibit E – Ryder's Acquisition of New Chanje Vehicles
     Exhibit F – Warranty

90090030.10 0059994-00001

## EXHIBIT A

### *Subject to Change*

## CHANJE VEHICLES

**Platform Specifications**

Table 1 below illustrates the primary specifications applicable to the entire Chanje model lineup:

*Table 1: Primary Vehicle Specifications*

| Performance Characteristics | |
|---|---|
| Maximum Speed [MPH] | 74 |
| Constant Speed Range [mi] | 120 – 140 |
| Maximum Gradeability | 30% |
| On-board Charge Time | 8-10 hours |
| DC Fast-Charge Time (MY2018) | 1 hour (80% SOC) |
| **Electric Drive and Electronic Control System** | |
| Vehicle Controller | 32-bit MCU with Electronic Differential Control |
| Motor Controller | Liquid Cooled |
| User Interface | 10.4-inch touch screen |
| Battery Capacity and Chemistry | 76 kWh (LiFePO4) |
| Electric Drivetrain | Integrated Rear Axle with Dual Wheel-Side Motors |
| Steering System | Rack & Pinion, High Voltage Electric Hydraulic Assist |
| Brake System | Hydraulic Disc Brake w/ ABS and Regenerative System |
| Air Conditioning | High Voltage Scroll Compressor |
| **Body and Suspension Structure** | |
| Vehicle Structure | Unibody Structure |
| Front Suspension | Independent Suspension |
| Rear Suspension | Leaf Spring or 4-Bag Air Suspension |
| Tire Specification | 215/75R17.5 |
| **Additional Vehicle Options** | |
| Electronic Stability Control | |
| Tire Pressure Monitoring System | |
| Heated Mirrors | |
| Various Body Colors and Interior Materials/Colors | |

CHANJE - RYDER AGREEMENT  --  Exhibit A-1

**Intended operating conditions and expected longevity**

Nominal operating conditions for these heavy duty electric vehicles are:
- Altitude 1,570 meters or less.
- Ambient temperature: -40°C to 50°C.
- Humidity range: 2% to 100%.
- Radiation and UV protection: ISO3917:1999, GB/T 1865.
- On-road operation.
- Regular maintenance required.

If operated under more aggressive conditions such as off-road, over-loading, or in corrosive environments, some maintenance items are subject to change and must be addressed directly with Chanje.

**Technical description of vehicles and propulsion components**

All vehicles have a gross vehicle weight rating (GVWR) of 7,500 kg (16,535 pounds).
All vehicle models are designed from the ground up as electric commercial/passenger vehicles.
The vehicles chassis are of unibody construction.
The vehicle includes an on-board AC charger and is capable of DC fast charging (MY 2018+).
All charging is supported by the SAE J-1772 Combined Charging Standard (CCS). The 76 kWh high voltage battery pack consists of (240) Sinopoly SP-LFP-100AHB cells configured in a 2P120S configuration. The system carries a nominal voltage of 384 VDC with a range of 300-444 VDC. The battery pack utilizes active thermal management and consists of cells utilizing LiFePO4 chemistry.
The vehicle propulsion system is an integrated rear axle consisting of dual permanent magnet motors. Each motor has a rated power output of 37 kW constant and 74 kW peak with a maximum speed of 10,000 RPM and a 10.6 ratio, direct-coupled gear box.
In the long nose vehicles (V-Series, S-Series, C-Series), most of the power electronics and distribution modules are located in the front of the vehicle under the hood, while the B-Series utilizes a component stack at the rear of the vehicle.

**C-Series Cab-Chassis**

Table 2 below illustrates the characteristics unique to the C-Series vehicle models.

*Table 2: C-Series Cab-Chassis Specifications*

| Vehicle Model | C5700 | C6700 | C7700 |
|---|---|---|---|
| Length [in] | 235.8 | 266.5 | 297.2 |
| Width [in] | 86.4 | 86.4 | 86.4 |
| Height [in] | 107.7 | 107.7 | 107.7 |
| Wheelbase [in] | 118.1 | 149.6 | 194.3 |
| Curb Weight [lbs] | 8,805 | 8,841 | 8,885 |
| Gross Vehicle Weight Rating [lbs] | 16,535 | 16,535 | 16,535 |
| Maximum Payload [lbs] | 7,730 | 7,694 | 7,650 |
| Min. Turning Radius [in] | 252 | 260 | 311 |



*Figure 1: C-Series High Voltage Component Locations*

**V-Series Panel Van**

Table 3 below illustrates the characteristics unique to the V-Series vehicle models.

*Table 3:  V-Series Panel Van Specifications*

| Vehicle Model | V5700 | V6700 | V7700 | V8700 | V9700 |
|---|---|---|---|---|---|
| Length [in] | 235.8 | 266.5 | 297.2 | 318.1 | 350.4 |
| Width [in] | 86.4 | 86.4 | 86.4 | 86.4 | 86.4 |
| Height [in] | 107.7 | 107.7 | 107.7 | 107.7 | 107.7 |
| Wheelbase [in] | 118.1 | 149.6 | 194.3 | 194.3 | 221.8 |
| Curb Weight [lbs] | 9,537 | 9,619 | 9,700 | 9,921 | 10,274 |
| Gross Vehicle Weight Rating [lbs] | 16,535 | 16,535 | 16,535 | 16,535 | 16,535 |
| Maximum Payload [lbs] | 6,998 | 6,917 | 6,835 | 6,614 | 6,261 |
| Min. Turning Radius [in] | 252 | 260 | 311 | 319 | 370 |



Dual Rear Traction Motors

Distribution Box and High Voltage

High Voltage Battery System

*Figure 2:  V-Series High Voltage Component Locations*

**S-Series Shuttle Van**

Table 4 below illustrates the characteristics unique to the S-Series vehicle models.

*Table 4:  S-Series Panel Van Specifications*

| Vehicle Model | S5700 | S6700 | S7700 | S8700 | S9700 |
|---|---|---|---|---|---|
| Length [in] | 235.8 | 266.5 | 297.2 | 318.1 | 350.4 |
| Width [in] | 86.4 | 86.4 | 86.4 | 86.4 | 86.4 |
| Height [in] | 107.7 | 107.7 | 107.7 | 107.7 | 107.7 |
| Wheelbase [in] | 118.1 | 149.6 | 194.3 | 194.3 | 221.8 |
| Seating Capacity | 13 | 16 | 19 | 20 | 23 |
| Curb Weight [lbs] | 10,163 | 11,354 | 11,574 | 11,519 | 11,905 |
| Gross Vehicle Weight Rating [lbs] | 16,535 | 16,535 | 16,535 | 16,535 | 16,535 |
| Min. Turning Radius [in] | 252 | 260 | 311 | 319 | 370 |



*Figure 3:  S-Series High Voltage Component Locations*

**B-Series Minibus**

Table 5 below illustrates the characteristics unique to the B-Series vehicle models.

*Table 5:  B-Series Minibus Specifications*

| Vehicle Model | B6700 | B7700 | B8700 |
|---|---|---|---|
| Length [in] | 268.1 | 294.9 | 327.2 |
| Width [in] | 86.4 | 86.4 | 86.4 |
| Height [in] | 107.7 | 107.7 | 107.7 |
| Wheelbase [in] | 136.0 | 162.8 | 162.8 |
| Seating Capacity | 19 | 22 | 25 |
| Curb Weight [lbs] | 11,310 | 11,645 | 12,192 |
| Gross Vehicle Weight Rating [lbs] | 16,535 | 16,535 | 16,535 |
| Min. Turning Radius [in] | 260 | 268 | 323 |



*Figure 4:  B-Series High Voltage Component Locations*

CHANJE - RYDER AGREEMENT  --  Exhibit A-6

**Product Portfolio Timing**

| Series | Description | Model | US Market Introduction |
|---|---|---|---|
| C-Series | Cab-Chassis | C5700 | TBD |
| | | C6700 | MY 2018 |
| | | C7700 | TBD |
| V-Series | Panel Van | V5700 | TBD |
| | | V6700 | MY 2018 |
| | | V7700 | TBD |
| | | V8700 | MY 2017 |
| | | V9700 | TBD |
| S-Series | Shuttle Van | S5700 | TBD |
| | | S6700 | TBD |
| | | S7700 | TBD |
| | | S8700 | MY 2018 |
| | | S9700 | TBD |
| B-Series | Mini-Bus | B6700 | TBD |
| | | B7700 | TBD |
| | | B8700 | MY 2018 |

# EXHIBIT B

### Parts Distribution Services

1.     Purchasing Chanje Vehicle Parts.  Ryder is required to purchase all of its requirements for Proprietary Parts exclusively from Chanje unless otherwise agreed by Chanje.  To order Chanje Vehicle Parts, Ryder will submit a purchase order in a format or manner mutually agreed upon by the Parties (each, a "Purchase Order").  The Purchase Order will be for the convenience of the Parties in effecting and documenting orders, and the terms of the Purchase Order will neither supplement nor modify this Agreement.  Chanje will have ten (10) business days to accept or reject the Purchase Order or to make a counter-proposal.  If Chanje does not respond by the end of the ten (10) day period, then the Purchase Order will be deemed accepted by Chanje.  Chanje agrees it will use reasonable commercial efforts to meet the delivery date set forth in the Purchase Order (the "Delivery Date").

2.     Pricing of Chanje Vehicle Parts.  With respect to Chanje Vehicle Parts ordered by Ryder to fulfill Chanje's warranty obligations for a specific Chanje Vehicle, such parts typically will be provided to Ryder at no charge.  Ryder will be reimbursed for any parts in Ryder's inventory utilized to fulfill Chanje's warranty obligations.  For any Chanje Vehicle Parts ordered by Ryder for any purpose other than the warranty obligations described herein, Chanje will sell or lease (as may be applicable to the specific part) the Chanje Vehicle Parts to Ryder at prices to be mutually agreed upon by the Parties, but, in no case, at prices higher than those that Chanje charges other distributors of the Chanje Vehicle Parts.  Ryder will charge Chanje a 10% service fee on the value of the list price for each Proprietary Part provided by Chanje to Ryder not to exceed $200 per Proprietary Part, for warranty repair maintenance to cover distribution costs and inventory holding costs.  Such fee will be calculated based on parts delivered to Ryder shops from centralized distribution centers for warranty repairs, and will be billed to Chanje on a monthly basis and will be paid within thirty (30) days of the date of invoice.

3.     Shipment and Delivery.  All sales of Chanje Vehicle Parts under this Agreement shall be delivered Free Carrier (FCA) Chanje's designated shipping point.  Title to and risk of loss of Chanje Vehicle Parts shall be transferred to Ryder by Chanje when the Chanje Vehicle Parts are delivered by the carrier to the Ryder designated location.

4.     Chanje's Warranties.

   4.1.   Each Chanje Vehicle Part shall meet all applicable Chanje published specifications and, at time of delivery, shall be without damage, free of all defects and with all components in working order (a "Conforming Product").

   4.2.   Chanje further warrants that each Chanje Vehicle Part shall be manufactured and furnished in accordance with all Applicable Laws, including Federal Motor Vehicle Safety Standards in effect at the time of manufacture.

   4.3.   Chanje warrants that the Chanje Vehicle Parts will not interfere with any contractual rights or infringe upon any U.S. or foreign patents and/or copyrights

CHANJE - RYDER AGREEMENT  --  Exhibit B-1

90090030 10 0059994-00001

and/or any U.S. federal, state or common law trademark, trade dress, trade name or similar property right.

4.4.    Chanje further represents and warrants that at the time of delivery, all Chanje Vehicle Parts that are being sold to Ryder shall be free and clear of all encumbrances, liens and debts of any nature whatsoever and, upon delivery thereof, Ryder shall have good and marketable title to each such Chanje Vehicle Part and Chanje agrees to defend such title.

4.5.    Chanje warrants that physical delivery of each Chanje Vehicle Part (i) shall be rightful and shall not be subject to any import quota, restriction or regulation preventing or forbidding the importation or sale of such Chanje Vehicle Part or any component part thereof, and (ii) shall not be subject to any unpaid duty, tariff or penalty.

4.6.    Non-Conforming Chanje Vehicle Parts.  In the event Ryder concludes that a Chanje Vehicle Part is not a Conforming Product or that Chanje has breached an applicable warranty, Ryder may within ten (10) business days of such determination return such Chanje Vehicle Part (in the manner that may be provided by Chanje for such returns), without penalty, liability or further obligation to Ryder, with a description of the alleged nonconformity or breach of warranty.  If Chanje confirms Ryder's determination, Chanje will reimburse or credit Ryder for any shipping costs incurred by Ryder associated with the delivery and return of the Chanje Vehicle Part and, in Chanje's sole discretion, either (i) provide a refund or credit or (ii) replace the Chanje Vehicle Part with an equivalent Conforming Product, within a reasonable amount of time.

5.    Payment for Chanje Vehicle Parts.  Upon acceptance of a Purchase Order and delivery of the applicable Chanje Vehicle Parts, Chanje will send Ryder an invoice covering the delivered Chanje Vehicle Parts with reference to the applicable Purchase Order(s) and Ryder will pay all amounts due under that invoice within thirty (30) days of receipt of the invoice without deduction or set-off.

6.    Promotion of Chanje Vehicle Parts.  In its promotion and marketing of Chanje Vehicle Parts, Ryder:

6.1.    May represent itself to the public and prospective customers as an authorized distributor of Chanje Vehicle Parts and, during the Exclusivity Period, may advise such customers that Ryder is the exclusive authorized distributor of such parts;

6.2.    Will utilize promotional materials provided or approved by Chanje, including brochures and point-of-sale materials, as reasonable;

6.3.    Will provide periodic reports concerning Ryder's promotion and sales of Chanje Vehicle Parts;

CHANJE - RYDER AGREEMENT  -- Exhibit B-2

6.4.   Will provide Chanje technical access to relevant Ryder information concerning Ryder's distribution of Chanje Vehicle Parts and service of Chanje Vehicles, and the Parties will work together to enable such information to be accessed and integrated by Chanje into Chanje's software systems; and

6.5.   Meet with Chanje not less than annually regarding Ryder's plan for marketing and promotion of Chanje Vehicle Parts and for the delivery and performance of Repair Services.

7.   Further Obligations of Chanje.

7.1.   Identification.  At Ryder's request, during the Exclusivity Period, Chanje will identify Ryder as the exclusive authorized distributor of Chanje Vehicle Parts in all lists and other documentation in which Chanje identifies such distributors in the Territory.

7.2.   Information and Materials.  Chanje will deliver to Ryder, or assist Ryder in developing, marketing and promotional materials (in hard copy and/or electronic form) as necessary or appropriate to assist in the marketing and promotion of Chanje Vehicle Parts.

7.3.   Regulatory Approvals.  Chanje will acquire and obtain all regulatory approvals and licenses necessary for Chanje to be able to deliver all Chanje Vehicle Parts to Ryder in the Parts Distribution Services Territory for Ryder's use and resale. Ryder will reasonably cooperate with Chanje to the extent necessary to acquire those regulatory approvals and licenses that are necessary for either Party to perform their respective obligations under this Agreement.  Notwithstanding the foregoing, Chanje has no obligation to do anything that would establish or give the impression that Ryder is operating pursuant to a franchise relationship with Chanje.

8.   Prices.  Ryder may establish the price of the Chanje Vehicle Parts to its customers or Exclusive Accounts in its sole discretion consistent with the terms and purpose of this Agreement and may retain the difference between the purchase price (to Ryder) and the sale or lease price (to customers).  Notwithstanding the foregoing, in order to maintain exclusivity regarding sales of Chanje Vehicle Parts to Exclusive Accounts, Chanje may require Ryder to reduce or cap its margins on sales of Proprietary Parts to Exclusive Accounts but in no event will Ryder be obliged to price Chanje Vehicle Parts at a price that reflects a mark-up of less than 10% above Ryder's cost as determined from  the Chanje invoice for the Chanje Vehicle Part.

## EXHIBIT C

### *Repair Services*

1. <u>Promotion of Repair Services</u>.  In its marketing and promotion of the Repair Services, Ryder, during the Exclusivity Period:

   1.1.   May represent itself to the public and prospective customers as an "Authorized Chanje Vehicle Service Center" or equivalent statement;

   1.2.   Will use reasonable efforts to promote the Repair Services through, among other things, systematic contacts with owners, users, and prospective owners and users of the Chanje Vehicles and Chanje Vehicle Parts;

   1.3.   Will use reasonable commercial efforts to provide competent Repair Services consistent with the greater of the standards in the industry or the standard of service Ryder provides for other vehicles, and to promote a high level of customer satisfaction with the Repair Services;

   1.4.   Will utilize promotional materials provided to Ryder by Chanje, including brochures and point-of-sale materials;

   1.5.   Will provide Chanje reasonable access to relevant Ryder information concerning Repair Service as provided in <u>Section 6.4</u> of <u>Exhibit B</u> and will provide Chanje with reasonable access to facilities where Repair Services are being performed; and

   1.6.   Will meet with Chanje not less than annually regarding Ryder's plan for marketing and promotion of Chanje Vehicle Parts and for the delivery and performance of Repair Services.

2. <u>Specific Services</u>.

   2.1.   <u>Comprehensive Repair and Maintenance Services</u>.  Ryder will offer and provide comprehensive diagnostic, repair and maintenance services for Chanje Vehicles upon the request of Chanje or an owner, lessor or operator of a Chanje Vehicle ("<u>Owner/User</u>").  All such Services will be performed in accordance with the technical information and relevant documentation developed by Chanje or in cooperation between the Parties.

   2.2.   <u>Warranty Service</u>.  For all authorized warranty repairs performed by Ryder on Chanje Vehicles or Chanje Vehicle Parts during the applicable Warranty Period Chanje will reimburse Ryder as set forth in <u>Section 4</u> below.  All other Chanje Vehicle Parts will be sold to Ryder at prices to be mutually agreed upon by the Parties, but, in no case, at prices higher than those that Chanje charges any other buyer or customer.  Ryder shall charge its customer (i.e., the Owner/User) its prevailing labor and parts rate for any non-warranty Repair Services.  Physical

CHANJE - RYDER AGREEMENT  --  Exhibit C-1

damage repairs shall be charged to the Owner/User at Ryder's prevailing rates at all times (both during and after the Warranty Period expires).  As set forth in Section 4 below, in cases where Ryder subcontracts any authorized warranty services, Chanje will reimburse Ryder for such costs with a 10% mark-up.

2.3.     Rates for Non-Warranty Repair Services.  For non-warranty services, Ryder shall charge the Owner/User its prevailing labor and parts rate for such Repair Services.

2.4.     Recall Campaigns.  Ryder will, upon Chanje's request or the request of an Owner/User, perform recall inspections and services on the Chanje Vehicles, in strict accordance with the applicable policies and procedures provided to Ryder by Chanje, including all timetables and deadlines reasonably designated by Chanje.  Upon completion of any recall inspection or recall Services, Ryder will record the name, address and contact details of the Owner/User, a description of the work done, the Chanje Vehicle Parts installed or delivered and the date of service or delivery, and all other information reasonably requested by Chanje.  Ryder will retain these records for at least four (4) years from the date of service (or as long as may be required by governing law) and will charge Chanje for the parts and labor as provided in Section 4 below.  Any recall service or parts provided as requested by Chanje will be treated the same as warranty repairs for purposes of reimbursement.  Recall services will be at no charge to any third-party Owner/Lessee of the affected Chanje Vehicles.

2.5.     Emergency Services.  During the Warranty Period, Ryder will offer and provide roadside emergency breakdown services for Chanje Vehicles within reasonably acceptable response intervals, regardless of where, when, or by whom those Chanje Vehicles were purchased.  Ryder will ensure that these services are available on a twenty-four (24) hours a day, seven (7) days a week basis.  Upon receipt of a request for these services, by an Owner/User or by Chanje, Ryder will begin processing that request and performing the services as soon as is reasonably practicable.  While Chanje will not appoint any other emergency breakdown service provider other than Ryder during the Exclusivity Period, it is understood that any Owner/User may secure such emergency services from any source, and is not limited to securing those services from Ryder.

2.6.     Pre-Delivery Inspections.  Prior to delivering any new Chanje Vehicle to a third party, Ryder will, at Chanje's request, carry out receiving and pre-delivery inspections on the vehicle.  Chanje will provide Ryder with checklists, or help Ryder develop checklists, to assist Ryder in such inspections but Ryder may add additional steps to such checklists as it deems fit.  Ryder will be reimbursed according to the labor charges set forth herein.

2.7.     Product Modifications.  Ryder may make modifications (including bodywork and machinery installation) to a Chanje Vehicle or Chanje Vehicle Part (e.g., upfit), as requested by an Owner/User (and such cost to be paid by Owner/User); provided,

CHANJE - RYDER AGREEMENT  --  Exhibit C-2

however, that all such modifications must comply with the engineering specifications and guidelines provided to Ryder by Chanje, including all instructions manuals, service bulletins, and chassis drawings for the applicable Chanje Vehicle. Any modifications made by Ryder shall comply with all state and federal vehicle alteration requirements including but not limited to the Federal Motor Vehicle Safety Standards, specifically 49 CFR § 567.7. This service is not an exclusive service for the purposes of the Exclusivity Period. Chanje assumes no liability and makes no warranty with respect to any such Ryder modifications.

2.8. <u>Performance Evaluation</u>. Chanje and Ryder will cooperate on a service quality assessment survey that periodically will be conducted by or for Chanje. Such cooperation will include discussing when, how many, to whom, and how the survey will be sent out. On a quarterly basis, Chanje and Ryder will review service results on both Ryder-specific and Chanje-requested data.

3. <u>Assistance by Chanje</u>.

3.1. <u>Identification</u>. During the Exclusivity Period, at the request of Ryder, Chanje will identify Ryder as the exclusive "Authorized Chanje Service Center" in all customer-facing lists and documentation in which Chanje identifies "Authorized Chanje Service Centers" in the Territory.

3.2. <u>Training</u>. As provided in this Agreement, Chanje will provide the information necessary for Ryder to develop and deliver training to both Ryder technicians and Exclusive Account technicians. Such training programs will be mutually agreeable to the Parties.

3.3. <u>Technical Information and Tools</u>. Chanje will deliver to Ryder all technical information, diagnostic and other equipment, tools, software, and other materials necessary or appropriate for Ryder to safely perform the Repair Services. To clarify this point:

a) Ryder will be expected to have available at its own expense all standard and necessary equipment, tools, software, and other materials necessary and appropriate to be in the business of servicing and maintaining the Chanje Vehicles.

b) If there are special equipment, tools, or software that are needed specifically for Chanje Vehicles and can only be provided by Chanje, then during the Exclusivity Period Chanje may provide these to Ryder for its use at no cost but Chanje shall retain title to such loaned equipment, tools, etc.

3.4. <u>Warranty and Recall Information</u>. Chanje will deliver to Ryder all information and materials necessary or appropriate for Ryder to perform the warranty and recall services described above.

CHANJE - RYDER AGREEMENT -- Exhibit C-3

4. <u>Payment</u>.

    4.1.   <u>Warranty Service Pricing</u>.  Chanje shall reimburse Ryder for any such warranty or recall repair services as follows:

        a)   Hourly Labor Charge:  $100 which may be adjusted annually on January 1, at Ryder's discretion, by providing thirty (30) days' notice to Chanje.  These adjustments will be computed based on the percentage change in the Revised Consumer Price Index for Urban Wage Earners and Clerical Workers (1967 base period) published by the U.S. Bureau of Labor Statistics (or any successor index designated by Ryder) from the base index.

        b)   Parts (other than parts received from Chanje without charge):  Ryder's cost plus 20%.  Ryder will charge Chanje a 10% service fee on the value of the list price of each Proprietary Part provided by Chanje to Ryder not to exceed $200 per Proprietary Part, for warranty repair maintenance to cover distribution costs and inventory holding costs.  Such fee will be calculated when parts are shipped from centralized distribution centers to Ryder shops for warranty repairs and will be billed to Chanje on a monthly basis and will be paid within thirty (30) days of the date of invoice.

        c)   Outside Repairs:  Ryder's cost plus 10%.

    4.2.   <u>Standard Repair Times</u>.  On a monthly basis during the first (1st) year or one thousand (1,000) vehicles (whichever is longer), and quarterly thereafter, Chanje and Ryder agree to meet to determine Standard Repair Times ("<u>SRT</u>") on all known repairs.  Ryder will bring forth data to support the effort, and to understand the likely time savings to be achieved via further familiarity, and will work with Chanje to create an SRT and rate for that work so that type of repair or service can be removed from the Hourly Labor Charge and be billed instead as an event.

    4.3.   <u>Continuous Improvement</u>.  Ryder will measure and track vehicle delivery, vehicle uptime, customer satisfaction and repair times for standard tasks performed during the Term.  Repair times will be communicated to Chanje as part of the standard reporting package.  Quarterly, Ryder and Chanje will meet and review data related to vehicle delivery times, vehicle uptime, customer satisfaction and repair times for standard tasks to discuss ways to improve efficiencies, to develop continuous improvement initiatives and to determine a set of SRTs for common tasks and task strings for warrantable and non-warrantable repairs.

    4.4.   <u>Charges for All Repairs Will Be Billed After the Repair Is Performed</u>.  Chanje shall pay Ryder for all charges properly due from Chanje under this <u>Exhibit C</u> within thirty (30) days of the date of Ryder's invoice without deduction or set-off.

## EXHIBIT D

*Exclusive Accounts*

NONE LISTED AT TIME OF EXECUTION.

## EXHIBIT E

### RYDER'S ACQUISITION OF NEW CHANJE VEHICLES

1.  Acquiring Chanje Vehicles.

    1.1  In order to acquire Chanje Vehicles from Chanje for the rental or leasing transactions that Ryder is authorized to engage in under this Agreement, Ryder will submit a purchase order in a format mutually agreed upon by the Parties (each, a "Purchase Order"). Chanje will have ten (10) business days to accept the Purchase Order or make changes. If Chanje does not respond by the end of the ten (10) day period, then the Purchase Order will be deemed accepted by Chanje. Chanje agrees it will use commercially reasonable efforts to meet the delivery date set forth in the Purchase Order (the "Delivery Date").

    1.2  Ryder will have the right to cancel any order for any Chanje Vehicle so long as a cancellation notice is received in writing by Chanje not less than sixty (60) days prior to the commencement of the manufacturing of that vehicle. Such date for the commencement of manufacturing will be communicated to Ryder in writing upon acceptance of the Purchase Order.

2.  Pricing of Chanje Vehicles. Chanje will sell the Chanje Vehicles to or through Ryder at prices and terms to be mutually agreed upon by the Parties, but, in no case, at prices higher than those that Chanje charges its other distributors of Chanje Vehicles.

3.  Shipment and Delivery. All Chanje Vehicles purchased or leased under this Agreement shall be delivered Free Carrier (FCA) Chanje's shipping point. Title to (as may be applicable) and risk of loss of Chanje Vehicles shall be transferred to Ryder by Chanje when the Chanje Vehicles are delivered by the carrier to the Ryder designated locations.

4.  Chanje's Warranties.

    4.1  Each Chanje Vehicle shall meet all product specifications (color, equipment, configuration, etc.) contained in the applicable Purchase Order and shall be delivered to Ryder without damage, free of all defects and with all components in working order.

    4.2  Chanje further warrants that each Chanje Vehicle shall be manufactured and furnished in accordance with all Applicable Laws, including Federal Motor Vehicle Safety Standards in effect at the time of manufacture.

    4.3  Chanje warrants that the Chanje Vehicle will not interfere with any contractual rights or infringe upon any patents and/or copyrights and/or any federal, state or common law trademark, trade dress, trade name or similar property right.

    4.4  Chanje further represents and warrants that at the time of delivery, all Chanje Vehicles sold to Ryder shall be free and clear of all encumbrances, liens and debts

CHANJE - RYDER AGREEMENT -- Exhibit E-1

of any nature whatsoever and, upon delivery thereof, Ryder shall have good and marketable title to each such Chanje Vehicle and Chanje agrees to defend such title forever.

4.5    Chanje warrants that physical delivery of each Chanje Vehicle (i) shall be rightful and shall not be subject to any import quota, restriction or regulation preventing or forbidding the importation or sale of such Chanje Vehicle or any component part thereof, and (ii) shall not be subject to any unpaid duty, tariff or penalty.

4.6    <u>Non-Conforming Chanje Vehicle</u>.  In the event a new Chanje Vehicle is determined  to be a Defective Vehicle (as defined below), and Ryder  notifies Chanje in writing that the Vehicle is a Defective Vehicle within one (1) year of Ryder's  purchase, then Ryder  shall be entitled to return such Chanje Vehicle, without penalty, liability or further obligation, and at Chanje's sole option, after taking into account Ryder's and the customer's preference, Chanje will either: (i) pay Ryder the fair market value of an equivalent non-defective Chanje Vehicle; or (ii) at Chanje's sole cost and expense, exchange such Defective Vehicle for an equivalent Chanje Vehicle of the same type that meets the standards in <u>Section 4.1</u> of this <u>Exhibit E</u> within a reasonable amount of time.  A "Defective Vehicle" means a Chanje Vehicle in which the same defect that substantially impairs the value of the vehicle and has not been repaired after five (5) attempts, including consultation with Chanje on the final two (2) attempts, or a vehicle that is out of service for thirty (30) or more consecutive days for repairs of material defects within the one (1) year following purchase.

5.    <u>Payment for Chanje Vehicles</u>.  Upon acceptance of a Purchase Order and delivery of the applicable Chanje Vehicle, Chanje will send Ryder an invoice covering the delivered Chanje Vehicle with reference to the applicable Purchase Order(s) and Ryder will pay all amounts due under that invoice within thirty (30) calendar days of receipt of the invoice without deduction or set-off.

6.    <u>Information and Materials</u>.  Chanje will deliver to Ryder, or assist Ryder in developing, marketing and promotional materials (in hard copy and/or electronic form) to assist in the marketing and promotion of Chanje Vehicles.

7.    <u>Pricing</u>.  Ryder may establish the rental and lease terms for the Chanje Vehicles it offers to its third-party customers in its sole discretion and may retain any margin between the price it pays Chanje for the Chanje Vehicles and the economic return it receives from the rental or lease of those vehicles.

8.    <u>Title to Environmental Attributes</u>.  As between the Parties, all Environmental Attributes (defined below) relating to the manufacture of the Chanje Vehicles including, but not limited to, HVIP, LCFS and eRIN credits, shall remain the property of Chanje.  To the extent ownership and operation of the Chanje Vehicles remain with a lease company owned and operated by Chanje, or jointly with Ryder, such Environmental Attributes related to the use or operation of the Chanje Vehicles shall remain with Chanje unless

otherwise specified in writing. Ryder shall not have any right, title or interest in or to any such Environmental Attributes. "Environmental Attributes" means any and all credits, benefits, emissions reductions, offsets and allowances, howsoever entitled, that have tax benefits, credits or monetizeable benefits attributable to the manufacture, ownership or operation of Chanje Vehicles. These Environmental Attributes include economic or monetizeable credits in connection with the manufacturing process associated with (a) avoided emissions of pollutants to the air, soil or water such as sulfur oxides (SOx), nitrogen oxides (NOx), carbon monoxide (CO) and other pollutants; and (b) any avoided emissions of carbon dioxide (CO2), methane (CH4) nitrous oxide, hydrofluorocarbons, perfluorocarbons, sulfur hexafluoride and other greenhouse gases (GHGs) that have been determined by the United Nations Intergovernmental Panel on Climate Change, or otherwise by law, to contribute to the actual or potential threat of altering the Earth's climate by trapping heat in the atmosphere.

Environmental Attributes shall not include, and Ryder shall be entitled to, any non-monetizeable benefits. These may include the reporting rights to avoided emissions, including, but not limited to, Green Tag Reporting Rights as well as any other reputational benefits. Environmental Attributes shall not include and Ryder shall be entitled to any nonmonetizeable financial, reporting or reputational incentives in the form of credits, reductions, or allowances associated with or any products or software included in such Chanje Vehicles, or any services related to such Chanje Vehicles. In cases where a monetizeable credit or benefit not herein described can be claimed by either Party, the Parties will jointly determine which Party will claim such credit and how such credit or benefit will be applied to the cost of the Chanje Vehicle or any other products or services in connection with such Chanje Vehicles. In the event that Chanje sells or leases vehicles to other parties and the purchasing party desires, and is capable of, monetizing Environmental Attributes, then Chanje shall negotiate in good faith to include the value of the monetizeable Environmental Attributes in the purchase price. In no event will Ryder, as purchaser of Chanje Vehicles, be treated less favorably than any other third party customer with respect to monetizeable Environmental Attributes.

9. <u>EVSE</u>. Chanje, at its sole cost, shall install, maintain, pay for and manage the electric vehicle charging apparatus at Ryder and customer locations where vehicles are located. Notwithstanding anything to the contrary in this Agreement, Chanje shall not be responsible for any charges associated with upgrading or installing the site infrastructure or utility connectivity infrastructure that may be required to enable the charging of Chanje Vehicles. Ryder or the customer will be solely responsible for any infrastructure installation or upgrades other than as set forth above.

**Facility Energy Management:**

**Baseline Demand Charges**: Chanje intends to utilize the capabilities of its vehicle charging apparatus to select economically preferable times for vehicle charging, when and where available, and manage the monthly Demand Charge for the sites where Chanje Vehicles are being charged. Prior to the installation of any electric vehicle charging apparatus, Chanje shall compute the Baseline Demand Charges incurred by the customer

CHANJE - RYDER AGREEMENT -- Exhibit E-3

or Ryder at each of its Electric Vehicle charging facilities for each month during the prior calendar year "Baseline Demand Charge." The "Demand Charge" is the electricity charge based on the highest demand, during any fifteen (15) to thirty (30) minute interval that is measured by the electric utility during a billing period.

**Monthly Grid Service Revenues**:  Each month, Chanje shall calculate the difference between the current Demand Charges assessed by the electric utility for each charging facility using the vehicle charging apparatus during the previous month and the Baseline Demand Charges for that charging facility prior to the installation of the vehicle charging apparatus.  The sum of the calculations for each facility shall constitute each month's "Grid Service Revenues" and shall be subject to a sharing agreement to be negotiated by the Parties and reviewed annually.  At no time will the Grid Services Revenues exceed the actual Chanje Vehicle energy consumption for each given month.

As additional grid services are developed and become commercialized and Vehicle to Grid ("V2G") interconnection and interoperability becomes commercially feasible, then Chanje shall, in its sole discretion, commercialize, monitor and monetize the V2G services.

## EXHIBIT F

## STANDARD WARRANTY (Tentative)

| STANDARD WARRANTY | Chanje |
|---|---|
| Bumper to Bumper | 36 MO / 60k miles |
| **Standard Warranty Exclusions** | |
| Loose Fasteners / Components | 3 MO / 3k miles |
| Adjustments (Alignment Excluded) | 3 MO / 3k miles |
| Light Bulbs | 12 MO / 15k miles |
| Bright Metal Finishes | 12 MO / Unlimited |
| Paint and Finish | 12 MO / Unlimited |
| Battery (12VDC System) | 6 MO / 6k miles |
| **DRIVE TRAIN** | |
| Engine | |
| Transmission / Gearbox | |
| **CHANJE EXTENDED SERVICE COVERAGE** | |
| HV Battery | 60 MO / Unlimited |
| HV Charger | 60 MO / Unlimited |
| Traction Motors | 60 MO / Unlimited |
| Traction Motor Controller | 60 MO / Unlimited |
| Other HV Components (???) | ??? |
| **TOWING COVERAGES** | |
| Standard Towing Coverage | 36 MO / Unlimited |

CHANJE - RYDER AGREEMENT -- Exhibit F-1

# EXHIBIT B



Date 6/26/2017

Chanje Energy, Inc.
1025 Rollins Road
Burlingame, CA 94010
Bryan.hansel@chanje.us

**TO**  Scott Perry
Ryder Truck Rental,
Inc.
11690 NW 105 Street
Miami, FL 33178

| | Job | Shipping Method | Shipping Terms | Delivery Date | Payment Terms | Due Date |
|---|---|---|---|---|---|---|
| | | | FOB Ryder | TBD | 35% deposit, Net 30** | |

| Qty | | Description | Unit Price | Discount | Sale Price |
|---|---|---|---|---|---|
| 125 | V8070 | 16,500 GVWR, Panel Van | $145,000.00 | $45,000 | $100,000.00 |
| | | Each of the vehicles will qualify | | | |
| | | for California HVIP or New York, | | | |
| | | Chicago ZVIP funds. Specific to | | | |
| | | HVIP the minimum funding per | | | |
| | | Vehicle that will be distributed to | | | |
| | | Ryder will be $50,000.00 and targeted credit amount of $55,000.*** | | | |
| | | The Deposit of $35,000 is due with PO. | | | |

| | | |
|---|---|---|
| Minimum HVIP Reimbursement* | | $55,000.00 |
| | Net Price | $45,000.00 |
| | Total Price Due to Chanje | $100,000.00 |
| | Total | $12,500,000.00 |

\* Minimum HVIP Reimbursement is for illustration purposes only. Depending on the placement of vehicle the figures may vary. For example, if the vehicle is placed in a ZVIP market, the reimbursement number could decrease or if placed in a disadvantaged market, would receive an additional incentive of $10,000 per vehicle. Final Ryder Net Price will depend on final vehicle placement.
\*\* By the time the final payment is due net 30 from delivery for vehicles listed in this Purchase Order, all vehicles will qualify for HVIP or ZVIP funds and be recorded as such by respective state authorities or their designees, where applicable. For California placed vehicles, the vehicles will be listed as HVIP eligible by the California Air Resources Board (CARB) or its designated agent, Calstart. In addition, the

specific VIN numbers will have been submitted and accepted by Calstart for HVIP funds before the final payment due date.  If the vehicles are not listed as HVIP eligible and Calstart has not accepted the VIN numbers for delivered vehicles by the final payment due date, only the Net Price will be payable to Chanje.  Should Ryder be required to pay only Net Price due to the foregoing condition, the HVIP reimbursement amount listed in this Purchase Order will be retained by Chanje when paid by CARB or Calstart. Upon delivery, Ryder and Chanje will calculate final amounts due based upon HVIP Reimbursement received by Chanje and Ryder will pay all funds due once HVIP Reimbursement is deducted within 30 days.

*** Ryder shall receive a minimum credit of $50,000 and targeted credit amount of $55,000 per vehicle towards the purchase of each vehicle simultaneously with the delivery of such vehicle for a total minimum credit amount of $6,250,000 and targeted total credit amount of $6,875,000.


IN WITNESS WHEREOF, and intending to be legally bound, the Parties each by its authorized officer or representative have executed this Agreement.

Ryder Truck Rental, Inc.                                    Chanje Energy, Inc.

_____                      _____
Authorized Signature                                        Authorized Signature

Scott Perry                                                 Bryan Hansel
Printed Name                                                Printed Name

Chief Technology & Procurement Officer                      CEO
Title                                                       Title

6/24/17                                                     6/24/17
Date                                                        Date



# Terms and Conditions

1. The terms and conditions of the Vehicle Service and Parts Distribution Agreement dated March 17, 2017 by and between Ryder Truck Rental, Inc. and Charje Energy, Inc. (the "Agreement") shall govern the purchase of vehicles pursuant to the attached PO. In case of direct conflict between the terms of the Agreement and terms herein, the terms herein shall govern. In all other cases, the terms of the Agreement shall govern.

2. Orders: Orders may be placed with Charje Energy, Inc. ("Charje") only.

3. Prices: Charje reserves the right to change prices without notice; however, prices in effect at the time of order acceptance will prevail. Written quotations are valid for thirty (30) days unless otherwise noted. All applicable taxes and shipping charges will be added to each invoice and shall be payable by Customer.

4. Terms: Unless otherwise noted, thirty percent (30%) of invoice total is due and payable upon receipt, the balance is due upon delivery and

5. Inspection
   Acceptance

5.1 Product Changes and Substitutions: Charje reserves the right (a) to make changes in products without notice, and without any obligation to incorporate those changes in any products previously delivered to Customer and (b) to ship to Customer the most current product regardless of catalog description, if applicable.

6. Change Orders; Cancellation; Returns; Repair/Exchange

6.1 Change Orders: Customer may by written notice to Charje, request changes to the purchase orders (which terms shall not supersede the terms contained herein). If, in its sole and absolute discretion, Charje accepts such request, Customer agrees to pay Charje's change order fees as well as any additional costs incurred by Charje and associated with the change in the purchase order.

6.2 Cancellation: Customer may cancel its order only with written consent of Charje and only upon payment of Charje's cancellation fees and all outstanding invoices. If orders are cancelled before being completed, Customer is liable to Charje for the contract price of all products completed prior to such termination, Charje's cost of material or work in progress, as shown on Charje's books, plus a reasonable profit thereon, but in no event more than the contract price.

# EXHIBIT C

PROMISSORY NOTE AND GUARANTY

FOR VALUE RECEIVED, and subject to the terms and conditions set forth herein, Chanje Energy, Inc., a Delaware corporation (the "**Borrower**"), hereby unconditionally promises to pay to the order of Ryder Truck Rental, Inc., a Florida corporation, or its assigns (the "**Noteholder**") the principal amount of $770,000 (the "**Loan**") as provided in this Promissory Note and Guaranty (the "**Note**"). Furthermore, FDG Electric Vehicles Limited, a limited liability company incorporated in Bermuda (the "**Guarantor**" and together with the Borrower and the Noteholder, the "**Parties**") has agreed to guarantee the obligations of Borrower hereunder, on the terms and conditions specified herein.

1.   <u>Definitions</u>. Capitalized terms used herein shall have the meanings set forth in this Section 1.

> "**Borrower**" has the meaning set forth in the introductory paragraph.

> "**Event of Default**" has the meaning set forth in Section 6.

> "**Governmental Authority**" means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, municipal, or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank, or other entity exercising executive, legislative, judicial, taxing, regulatory, or administrative powers or functions of, or pertaining to, government.

> "**Guaranteed Obligations**" has the meaning set forth in Section 5.

> "**Guarantor**" means FDG Electric Vehicles Limited, a limited liability company incorporated in Bermuda.

> "**Law**" as to any Person, means the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law (including common law), statute, ordinance, treaty, rule, regulation, order, decree, judgment, writ, injunction, settlement agreement, requirement or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

> "**Loan**" has the meaning set forth in the introductory paragraph.

> "**Maturity Date**" means the earlier of (a) May 1, 2020 and (b) the date on which all amounts under this Note shall become due and payable pursuant to Section 7.

> "**Note**" has the meaning set forth in the introductory paragraph.

> "**Noteholder**" has the meaning set forth in the introductory paragraph.

> "**Order**" as to any Person, means any order, decree, judgment, writ, injunction, settlement agreement, requirement, or determination of an arbitrator or a court or other Governmental Authority, in each case, applicable to or binding on such Person or any of its properties or to which such Person or any of its properties is subject.

> "**Parties**" has the meaning set forth in the introductory paragraph.

"**Person**" means any individual, corporation, limited liability company, trust, joint venture, association, company, limited or general partnership, unincorporated organization, Governmental Authority, or other entity.

2.    Payment Dates; Optional Prepayments; Interest.

2.1    Payment Dates. The Loan shall be payable as follows: (a) a lum sum payment of $200,000 on March 6, 2020; a lum sum payment of $100,000 on April 1, 2020; and a lump sum payment of $470,000 on May 1, 2020; provided that all amounts outstanding under this Note shall be due and payable by the Maturity Date.

2.2    Optional Prepayments. The Borrower may prepay the Loan in whole or in part at any time or from time to time without penalty or premium by paying the principal amount. No prepaid amount may be reborrowed.

2.3    Interest. The Loan shall be non-interest bearing.

3.    Payment Mechanics. All payments of principal shall be made no later than 12:00 PM EST on the date on which such payment is due by wire transfer of immediately available funds to the Noteholder's account at a bank specified by the Noteholder in writing to the Borrower from time to time.

4.    Representations and Warranties. The Borrower hereby represents and warrants to the Noteholder on the date hereof as follows:

4.1    Power and Authority. The Borrower has the power and authority, and the legal right, to execute and deliver this Note and to perform its obligations hereunder.

4.2    Authorization; Execution and Delivery. The execution and delivery of this Note by the Borrower and the performance of its obligations hereunder have been duly authorized by all necessary corporate action in accordance with all applicable Laws. The Borrower has duly executed and delivered this Note.

4.3    No Violations. The execution and delivery of this Note and the consummation by the Borrower of the transactions contemplated hereby do not and will not (a) violate any provision of the Borrower's organizational documents; (b) violate any Law or Order applicable to the Borrower or by which any of its properties or assets may be bound; or (c) constitute a default under any material agreement or contract by which the Borrower may be bound.

5.    Guaranty.

5.1    Guarantor hereby irrevocably guarantees to the Noteholder the full and punctual payment when due (whether at stated maturity, by acceleration or otherwise) of all of the obligations of the Borrower under this Note (all such obligations of the Borrower being referred to herein as the "**Guaranteed Obligations**"). This guaranty is an absolute, unconditional and continuing guaranty of the full and punctual payment of all of the Guaranteed Obligations and not of their collectability only and is in no way conditioned upon any requirement that the Noteholder first attempt to collect any of the Guaranteed Obligations from the Borrower or any other Person or resort to other means of obtaining payment.  Should an Event of Default occur, the Obligations of Guarantor hereunder with respect to such Guaranteed Obligations in default shall, upon demand by the Noteholder, become immediately due and payable to the Noteholder, without demand or notice of any nature, all of which are expressly waived by Guarantor.  Payments by Guarantor hereunder may be required by the

Noteholder on any number of occasions. All payments by Guarantor hereunder shall be made to the Noteholder, in the manner specified therefor in Section 3 hereof, for the account of the Noteholder.

5.2    Until the final payment in full in cash of all of the Guaranteed Obligations: Guarantor shall not exercise and hereby waives any rights against the Borrower arising as a result of payment by Guarantor hereunder, by way of subrogation, reimbursement, restitution, contribution or otherwise, and will not prove any claim in competition with the Noteholder in respect of any payment hereunder in any bankruptcy, insolvency or reorganization case or proceedings of any nature; and Guarantor will not claim any setoff, recoupment or counterclaim against the Borrower in respect of any liability of the Borrower. The payment of any amounts due with respect to any indebtedness of the Borrower for money borrowed or credit received now or hereafter owed to Guarantor is hereby subordinated to the prior final payment in full in cash of all of the Guaranteed Obligations; provided that, so long as no Event of Default has occurred and is continuing, the Borrower may pay, and Guarantor may receive, such payment. Guarantor agrees that, after the occurrence of any Event of Default, Guarantor will not demand, sue for or otherwise attempt to collect any such indebtedness of the Borrower to Guarantor until all of the Guaranteed Obligations shall have been irrevocably paid in full in cash. If, notwithstanding the foregoing sentence, Guarantor shall collect, enforce or receive any amounts in respect of such indebtedness while any Guaranteed Obligations are still outstanding, such amounts shall be collected, enforced and received by Guarantor as trustee for the Noteholder and be paid over to the Noteholder on account of the Guaranteed Obligations without affecting in any manner the liability of Guarantor under the other provisions hereof.

6.    <u>Events of Default</u>. The occurrence and continuance of any of the following shall constitute an Event of Default hereunder:

6.1    <u>Failure to Pay</u>. The Borrower fails to pay any principal amount of the Loan when due.

6.2    <u>Breach of Representations and Warranties</u>. Any representation or warranty made or deemed made by the Borrower to the Noteholder herein is incorrect in any material respect on the date as of which such representation or warranty was made or deemed made.

6.3    <u>Breach of Covenants</u>. The Borrower fails to observe or perform any covenant, obligation, condition, or agreement contained in this Note.

6.4    <u>Bankruptcy</u>.

(a)    the Borrower commences any case, proceeding, or other action (i) under any existing or future Law relating to bankruptcy, insolvency, reorganization, or other relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition, or other relief with respect to it or its debts or (ii) seeking appointment of a receiver, trustee, custodian, conservator, or other similar official for it or for all or any substantial part of its assets, or the Borrower makes a general assignment for the benefit of its creditors; or

(b)    the Borrower is generally not, or shall be unable to, or admits in writing its inability to, pay its debts as they become due.

7.    <u>Remedies</u>. Upon the occurrence of any Event of Default and at any time thereafter during the continuance of such Event of Default, the Noteholder may, at its option, by written notice to the Borrower

(a) declare the entire principal amount of this Note immediately due and payable; and (b) exercise any or all of its rights, powers or remedies under applicable Law.

8.   Miscellaneous.

   8.1   Notices.

      (a)   All notices, requests, or other communications required or permitted to be delivered hereunder shall be delivered in writing, in each case to the address specified below or to such other address as such Party may from time to time specify in writing in compliance with this provision:

      (i)   If to the Borrower:

      Chanje Energy, Inc.
      12824 Cerise Avenue
      Hawthorne, CA 90250
      Attn: Legal Department
      Telephone: 913-940-8353
      Email: bryan.hansel@chanjeus.com

      (ii)   If to the Noteholder:

      Ryder Truck Rental, Inc.
      Attn: Legal Department
      11690 NW 105th Street
      Miami, FL 33178
      Telephone: 305.500.4946
      Email: alena_brenner@ryder.com

      (iii)   If to the Guarantor:

      FDG Electric Vehicles Limited
      Attn: Jaime Che
      China Resources Building
      26 Harbour Road
      Wanchai, Hong Kong
      Telephone: 852-3104-2803
      Email: jche@fdgev.com

      (b)   Notices if (i) mailed by certified or registered mail or sent by hand or overnight courier service shall be deemed to have been given when received; and (ii) sent by email shall be deemed received on the date delivered.

   8.2   Expenses. The Borrower shall reimburse the Noteholder on demand for all reasonable out-of-pocket costs, expenses, and fees (including reasonable expenses and fees of its counsel) incurred by the Noteholder in connection with the enforcement of the Noteholder's rights hereunder.

8.3   Governing Law. This Note and any claim, controversy, dispute, or cause of action (whether in contract or tort or otherwise) based upon, arising out of, or relating to this Note, and the transactions contemplated hereby shall be governed by the laws of the State of Florida.

8.4   Submission to Jurisdiction.

(a)   The Borrower hereby irrevocably and unconditionally (i) agrees that any legal action, suit, or proceeding arising out of or relating to this Note may be brought in the courts of the State of Florida and (ii) submits to the exclusive jurisdiction of any such court in any such action, suit, or proceeding. Final judgment against the Borrower in any action, suit, or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment.

(b)   Nothing in this Section 8.4 shall affect the right of the Noteholder to (i) commence legal proceedings or otherwise sue the Borrower in any other court having jurisdiction over the Borrower or (ii) serve process upon the Borrower in any manner authorized by the laws of any such jurisdiction.

8.5   Waiver of Jury Trial. THE BORROWER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY, WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY.

8.6   Counterparts; Effectiveness. This Note and any amendments, waivers, consents, or supplements hereto may be executed in counterparts, each of which shall constitute an original, but all taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Note in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Note.

8.7   Successors and Assigns. This Note may be assigned or transferred by the Noteholder to any Person. Neither the Borrower nor the Guarantor may not assign or transfer this Note or any of its rights hereunder without the prior written consent of the Noteholder. This Note shall inure to the benefit of, and be binding upon, the Parties and their permitted assigns.

8.8   Waiver of Notice. The Borrower hereby waives demand for payment, presentment for payment, protest, notice of payment, notice of dishonor, notice of nonpayment, notice of acceleration of maturity, and diligence in taking any action to collect sums owing hereunder.

8.9   Amendments and Waivers. No term of this Note may be waived, modified, or amended except by an instrument in writing signed by all Parties hereto. Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.

8.10   No Waiver; Cumulative Remedies. No failure to exercise, and no delay in exercising on the part of the Noteholder, of any right, remedy, power, or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege. The rights, remedies, powers, and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers, and privileges provided by law.

8.11    <u>Severability</u>. If any term or provision of this Note is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Note or invalidate or render unenforceable such term or provision in any other jurisdiction.

*[SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, the Borrower and Guarantor have executed this Note as of  Feb. 28  , 2019.

CHANGE ENERGY, INC.

By: _____

Name:

Title:   Bryan Hansel
         CEO

FDG ELECTRIC VEHICLES LIMITED

By: _____

Name:  JAIME  CHE

Title:  EXECUTIVE  DIRECTOR

# EXHIBIT D

## PROMISSORY NOTE

FOR VALUE RECEIVED, and subject to the terms and conditions set forth herein, Chanje Energy, Inc., a Delaware corporation (the "**Borrower**"), hereby unconditionally promises to pay to the order of Ryder Truck Rental, Inc., a Florida corporation, or its assigns (the "**Noteholder**") the principal amount of $3,500,000 (the "**Loan**") as provided in this Promissory Note (the "**Note**").  The Borrower and the Noteholder shall be collectively referred to herein as the "**Parties**".

1.    <u>Definitions</u>. Capitalized terms used herein shall have the meanings set forth in this Section 1.

"**Borrower**" has the meaning set forth in the introductory paragraph.

"**Debt**" of the Borrower, means all (a) indebtedness for borrowed money; (b) obligations for the deferred purchase price of property or services, except trade payables arising in the ordinary course of business; (c) obligations evidenced by notes, bonds, debentures, or other similar instruments; (d) obligations as lessee under capital leases; (e) obligations under acceptance facilities and letters of credit; and (f) indebtedness set out in clauses (a) through (e) of any Person other than Borrower secured by any lien on any asset of the Borrower, whether or not such indebtedness has been assumed by the Borrower.

"**Event of Default**" has the meaning set forth in Section 5.

"**Governmental Authority**" means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, municipal, or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank, or other entity exercising executive, legislative, judicial, taxing, regulatory, or administrative powers or functions of, or pertaining to, government.

"**Law**" as to any Person, means the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law (including common law), statute, ordinance, treaty, rule, regulation, order, decree, judgment, writ, injunction, settlement agreement, requirement or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Lien**" means any mortgage, pledge, hypothecation, encumbrance, lien (statutory or other), charge, or other security interest.

"**Loan**" has the meaning set forth in the introductory paragraph.

"**Note**" has the meaning set forth in the introductory paragraph.

"**Noteholder**" has the meaning set forth in the introductory paragraph.

"**Order**" as to any Person, means any order, decree, judgment, writ, injunction, settlement agreement, requirement, or determination of an arbitrator or a court or other Governmental Authority, in each case, applicable to or binding on such Person or any of its properties or to which such Person or any of its properties is subject.

"**Parties**" has the meaning set forth in the introductory paragraph.

"**Person**" means any individual, corporation, limited liability company, trust, joint venture, association, company, limited or general partnership, unincorporated organization, Governmental Authority, or other entity.

"**Side Letter**" has the meaning set forth in Section 2.

2.    Payment; Deduction of Principal Balance; Interest.

2.1    Payment. The full amount of the Loan shall become immediately due and payable upon the Noteholder demanding payment thereof in accordance with the terms and conditions of that certain Letter Agreement, dated November 13, 2019 ("**Side Letter**"), by and between the Borrower and the Noteholder.

2.2    Deduction of Principal Balance. The Parties hereby acknowledge and agree that pursuant to the terms of the Side Letter, upon Noteholder's demand for payment as set forth in Section 2.1 hereof, the principal amount of the Loan payable by Borrower shall be reduced by any amounts previously paid by Borrower to Noteholder under the Side Letter in the form of Vehicle Credits (as defined in the Side Letter).

2.3    Interest. The Loan shall be non-interest bearing.

3.    Payment Mechanics. Payment of the principal shall be made no later than 12:00 PM EST on the date on which such payment is due by wire transfer of immediately available funds to the Noteholder's account at a bank specified by the Noteholder in writing to the Borrower from time to time.

4.    Representations and Warranties. The Borrower hereby represents and warrants to the Noteholder on the date hereof as follows:

4.1    Power and Authority. The Borrower has the power and authority, and the legal right, to execute and deliver this Note and to perform its obligations hereunder.

4.2    Authorization; Execution and Delivery. The execution and delivery of this Note by the Borrower and the performance of its obligations hereunder have been duly authorized by all necessary corporate action in accordance with all applicable Laws. The Borrower has duly executed and delivered this Note.

4.3    No Violations. The execution and delivery of this Note and the consummation by the Borrower of the transactions contemplated hereby do not and will not (a) violate any provision of the Borrower's organizational documents; (b) violate any Law or Order applicable to the Borrower or by which any of its properties or assets may be bound; or (c) constitute a default under any material agreement or contract by which the Borrower may be bound.

5.    Events of Default. The occurrence and continuance of any of the following shall constitute an Event of Default hereunder:

5.1    Breach of Representations and Warranties. Any representation or warranty made or deemed made by the Borrower to the Noteholder herein is incorrect in any material respect on the date as of which such representation or warranty was made or deemed made.

5.2    Breach of Covenants. The Borrower fails to observe or perform any covenant, obligation, condition, or agreement contained in this Note.

5.3     Bankruptcy.

(a)     the Borrower commences any case, proceeding, or other action (i) under any existing or future Law relating to bankruptcy, insolvency, reorganization, or other relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition, or other relief with respect to it or its debts or (ii) seeking appointment of a receiver, trustee, custodian, conservator, or other similar official for it or for all or any substantial part of its assets, or the Borrower makes a general assignment for the benefit of its creditors; or

(b)     the Borrower is generally not, or shall be unable to, or admits in writing its inability to, pay its debts as they become due.

6.     Remedies. Upon the occurrence of any Event of Default and at any time thereafter during the continuance of such Event of Default, the Noteholder may, at its option, by written notice to the Borrower (a) declare the entire principal amount of this Note immediately due and payable; and (b) exercise any or all of its rights, powers or remedies under applicable Law.

7.     Miscellaneous.

7.1     Notices.

(a)     All notices, requests, or other communications required or permitted to be delivered hereunder shall be delivered in writing, in each case to the address specified below or to such other address as such Party may from time to time specify in writing in compliance with this provision:

(i)     If to the Borrower:

Chanje Energy, Inc.
12824 Cerise Avenue
Hawthorne, CA 90250
Attn: Legal Department
Telephone: 913-940-8353
Email: bryan.hansel@chanje.com

(ii)     If to the Noteholder:

Ryder Truck Rental, Inc.
Attn: Legal Department
11690 NW 105th Street
Miami, FL 33178
Telephone: 305.500.4946
Email: alena_brenner@ryder.com

(b)     Notices if (i) mailed by certified or registered mail or sent by hand or overnight courier service shall be deemed to have been given when received; and (ii) sent by email shall be deemed received on the date delivered.

7.2    Expenses. The Borrower shall reimburse the Noteholder on demand for all reasonable out-of-pocket costs, expenses, and fees (including reasonable expenses and fees of its counsel) incurred by the Noteholder in connection with the transactions contemplated hereby including and the enforcement of the Noteholder's rights hereunder.

7.3    Governing Law. This Note and any claim, controversy, dispute, or cause of action (whether in contract or tort or otherwise) based upon, arising out of, or relating to this Note, and the transactions contemplated hereby shall be governed by the laws of the State of Florida.

7.4    Submission to Jurisdiction.

(a)    The Borrower hereby irrevocably and unconditionally (i) agrees that any legal action, suit, or proceeding arising out of or relating to this Note may be brought in the courts of the State of Florida and (ii) submits to the exclusive jurisdiction of any such court in any such action, suit, or proceeding. Final judgment against the Borrower in any action, suit, or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment.

(b)    Nothing in this Section 7.4 shall affect the right of the Noteholder to (i) commence legal proceedings or otherwise sue the Borrower in any other court having jurisdiction over the Borrower or (ii) serve process upon the Borrower in any manner authorized by the laws of any such jurisdiction.

7.5    Waiver of Jury Trial. THE BORROWER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY, WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY.

7.6    Counterparts; Effectiveness. This Note and any amendments, waivers, consents, or supplements hereto may be executed in counterparts, each of which shall constitute an original, but all taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Note in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Note.

7.7    Successors and Assigns. This Note may be assigned or transferred by the Noteholder to any Person. The Borrower may not assign or transfer this Note or any of its rights hereunder without the prior written consent of the Noteholder. This Note shall inure to the benefit of, and be binding upon, the Parties and their permitted assigns.

7.8    Waiver of Notice. The Borrower hereby waives demand for payment, presentment for payment, protest, notice of payment, notice of dishonor, notice of nonpayment, notice of acceleration of maturity, and diligence in taking any action to collect sums owing hereunder.

7.9    Amendments and Waivers. No term of this Note may be waived, modified, or amended except by an instrument in writing signed by all Parties hereto. Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.

7.10    No Waiver; Cumulative Remedies. No failure to exercise, and no delay in exercising on the part of the Noteholder, of any right, remedy, power, or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege

hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege. The rights, remedies, powers, and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers, and privileges provided by law.

      7.11   <u>Severability</u>. If any term or provision of this Note is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Note or invalidate or render unenforceable such term or provision in any other jurisdiction.

*[SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, the Borrower has executed this Note as of November 13, 2019.

CHANGE ENERGY, INC.

By:

Name: Scott Griffin
Title: General Counsel

# EXHIBIT !

November 13, 2019

Chanje Energy, Inc.
12824 Cerise Avenue
Hawthorne, CA 90250
Attention: Legal Department
Email: bryan.hansel@chanje.com

Ladies and Gentlemen:

Reference is made to the (i) Vehicle Service and Parts Distribution Agreement, dated March 17, 2017 (the "**Agreement**"), by and between Ryder Truck Rental, Inc. ("**RTR**") and Chanje Energy, Inc. ("**Chanje**"); (ii) Purchase Order, dated June 26, 2017 (the "**Ryder PO**"), by and between RTR and Chanje pursuant to which RTR agreed to purchase a total of 125 vehicles from Chanje of which 25 have been delivered as of the date hereof; (iii) Purchase Order, dated November 13, 2019 (the "**FedEx PO**") by and between Ryder Vehicle Purchasing, LLC ("**RVP**" and together with RTR, "**Ryder**") and Chanje, pursuant to which RVP agreed to purchase 900 vehicles from Chanje; and (iv) that certain Promissory Note, issued by RTR to Chanje on November 13, 2019 (the "**Promissory Note**" and together with the Agreement, the FedEx PO and the Ryder PO, the "**Transaction Documents**"), for the principal amount of $3.5M. RVP, RTR, and Chanje shall be collectively referred to herein as the Parties.

In consideration of the premises and the mutual covenants and agreements set forth in this letter agreement (this "**Letter Agreement**") and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1.      Notwithstanding anything to the contrary contained in the Transaction Documents, the Parties hereby acknowledge and agree to terminate the Ryder PO as of the date hereof with respect to the 100 vehicles that have not been delivered. In connection with the termination, the Parties agree that Ryder is entitled to a full refund of the $3,500,000 paid to Chanje thereunder (the "**Paid Amount**"). The Parties agree that such refund shall be made in the form of a credit of $5,000 deducted from the purchase price applicable to each vehicle required to be delivered by Chanje under the FedEx PO (each, a "**Vehicle Credit**"), until such time as the aggregate Vehicle Credits total the Paid Amount. The Parties hereby agree that each Vehicle Credit shall also be applied to offset the principal amount owed by Chanje under the Promissory Note. The Parties hereby further agree that Chanje may prepay the Paid Amount in whole or in part at any time or from time to time without penalty or premium.

2.      In the event that Chanje fails to deliver at least 700 vehicles under the FedEx PO by December 1, 2020, then Ryder shall be entitled to declare the balance of the principal amount under the Promissory Note (less any Vehicle Credits) as immediately due and payable. For the avoidance of doubt, the balance of the principal amount shall equal the outstanding portion of the Paid Amount that has not yet been refunded by Chanje to Ryder as of such date.

3.      In the event that Chanje fails to deliver any vehicles under the FedEx PO by August 30, 2020, then Ryder shall declare the entire principal amount of the Promissory Note immediately due and payable.

4.      The provisions of Section 16 (Miscellaneous) of the Agreement are incorporated herein and shall apply to this Letter Agreement, *mutatis mutandis*.

5.      This Letter Agreement, when accepted by each of the Parties, will amend the Transaction Documents and evidence the agreement of the Parties with respect to the matters contained herein. Except as amended or modified in this Letter Agreement, all other terms and provisions of the Transaction Documents shall not be affected by this Letter Agreement and shall continue in full force and effect.

[SIGNATURES ON FOLLOWING PAGES]

Very truly yours,

Ryder Vehicle Purchasing LLC
Ryder Truck Rental, LLC


By:_____
Name:
Title:


**Accepted and agreed effective as of November 13, 2019:**


Chanje Energy, Inc.


By:_____
Name: Scott Griffin
Title: General Counsel

# EXHIBIT F

## JOINDER AGREEMENT

This Joinder Agreement (this "**Agreement**") is effective as of January 7, 2020 and is entered into by and between **FDG ELECTRIC VEHICLES LIMITED** ("**FDG**"), **CHANJE ENERGY, INC.** ("**Chanje**") and **RYDER TRUCK RENTAL, INC. ("Ryder**") for the purpose of adding FDG as a party to the Vehicle Service and Parts Distribution Agreement dated March 17, 2017 by and between Ryder and Chanje Energy, Inc. (the "**Chanje Agreement**"), attached hereto and incorporated herein as Exhibit A. Capitalized terms not otherwise defined herein are defined in the Chanje Agreement.

1.      FDG hereby acknowledges, agrees and confirms that, by executing this Agreement, effective the date hereof, FDG will be deemed to be a party to the Chanje Agreement in accordance with the terms of the Chanje Agreement and shall have all of the rights and obligations of Chanje as fully as if it had executed the Chanje Agreement. FDG hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Chanje Agreement, as may be supplemented from time to time in accordance with the terms thereof.

2.      FDG, Chanje, and Ryder further confirm that immediately upon execution of this Agreement by the parties hereto, FDG shall become a party to the Chanje Agreement.

3.      FDG represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Agreement and to consummate the transactions contemplated hereby and to become a party to the Chanje Agreement, (ii) from and after the date hereof, it shall be bound by the relevant provisions of the Chanje Agreement and shall have the rights and obligations as specifically set forth in the Chanje Agreement, and (iii) it has received a copy of the Chanje Agreement and any other documents and information as it has deemed appropriate to make its own decision to enter into this. Notwithstanding anything to the contrary in this Agreement or the Chanje Agreement, Section 2.4 of the Chanje Agreement shall not apply to FDG and FDG shall not be bound by the exclusivity provisions therein.

4.      **Jurisdiction and Governing Law.** FDG hereby irrevocably and unconditionally submits to the exclusive jurisdiction of the courts of the State of Massachusetts and the federal courts of the United States of America for the District of Massachusetts for the purpose of any action or proceeding relating to this Agreement. FDG irrevocably and unconditionally waives, to the fullest extent permitted by law, any objection to the laying of venue of any action or proceeding in such courts, including, without limitation, any claim that such action or proceeding has been brought in an inconvenient forum.  Ryder shall have the right to enforce any award granted by any of the aforementioned courts in any appropriate court in any jurisdiction in which FDG is incorporated or where any of FDG's assets may be maintained.

5.      **Chanje Vehicle Parts and Chanje IP.**

(a)      FDG shall supply Ryder with the Chanje Vehicle Parts in accordance with the terms of the Chanje Agreement. Additionally, solely in case of Insolvency or Bankruptcy (as defined below) on the part of Chanje and FDG, Chanje and FDG shall provide Ryder with the following ("**Insolvency Protections**"): (i) a list of manufacturers used by Chanje and FDG to manufacture the Chanje Vehicle Parts including the manufacturer name, product, and product number or SKU number ("**Manufacturer Data**") and facilitate the sale of such parts directly to Ryder on the same terms extended to Chanje and/or FDG by the manufacturer; (ii) grant to Ryder a fully paid up, perpetual, world-wide, irrevocable license to make, have made, use, duplicate, make derivative works from, sublicense and distribute the Chanje IP related to Chanje Vehicle Parts necessary to service Chanje Vehicles purchased for which Ryder has entered into lease and/or maintenance agreements with its customers. Within thirty (30) calendar days of the execution of this Agreement,  Chanje and FDG shall execute an Escrow Agreement, in the form substantially attached hereto as Exhibit A (with modifications solely to reflect the terms of this Agreement), with Iron Mountain, who shall serve as an escrow agent (the "**Escrow Agent**") for purposes of the safekeeping, administration and controlled access of the Manufacturer Data by the parties hereto in accordance with the terms of this Agreement. Ryder shall be responsible for the fees associated with the Escrow

Agreement. Chanje and FDG shall be responsible for updating the Manufacturer Data on an annual basis and promptly providing an accurate and complete copy thereof to the Escrow Agent, provided however, Chanje and FDG shall be responsible for updating the Manufacturing Data within sixty (60) days of any change to the suppliers of the specific parts provided in Exhibit B (the "**Critical Components**"). Chanje and FDG shall authorize the Escrow Agent to release the Manufacturer Data to Ryder in the event neither FDG nor Chanje have provided Ryder with the Manufacturer Data within five (5) days of the occurrence of an Insolvency or Bankruptcy. The escrow requirements in this Section 5(a) shall expire or terminate upon Ryder's written request.

(b)        For the purposes of this Agreement, "**Insolvency or Bankruptcy**" shall mean: (i) Neither Chanje nor FDG are able to provide Ryder with Chanje Vehicle Parts pursuant to the Chanje Agreement; and (ii) (a) Chanje or FDG has filed a voluntary petition under any bankruptcy laws; (b) an involuntary petition has been filed by or against Chanje or FDG under the applicable bankruptcy laws of any jurisdiction that is not dismissed within sixty (60) days after filing or prevents Chanje or FDG from meeting the parts delivery obligations under the Chanje Agreement; (c) an appointment of a receiver has been made for all or a substantial portion of Chanje's or FDG's business or operations; (d) a filing or petition for dissolution has been made by Chanje or FDG under applicable laws; (e) an assignment of all or substantially all the assets of Chanje or FDG has been made for the benefit of creditors; or (f) when the shares of FDG which are traded and listed on the Stock Exchange of Hong Kong Limited involuntarily cease to be so listed or admitted to trading as determined by the Stock Exchange of Hong Kong Limited, or are suspended for a period equal to or exceeding 15 consecutive trading days. Each of Chanje and FDG shall defend, indemnify, and hold harmless Ryder and its members, directors, officers, employees, agents, representatives, and customers from and against any and all claims arising out of, relating to, or caused by either of Chanje's or FDG's breach of this Agreement. Further, each of FDG and Chanje agrees to provide Ryder with written notice (in the manner specified in the Chanje Agreement) within five (5) days of the occurrence of an event of Insolvency or Bankruptcy.

(c)        This Agreement shall expire or terminate upon the earlier of: (i) the agreement of the parties hereto; and (ii) termination or expiration of the Chanje Agreement.

IN WITNESS WHEREOF, FDG, Chanje, and Ryder have caused this Agreement to be duly executed by their duly authorized officers, respectively, and have caused the same to be accepted by their duly authorized officers.

**RYDER TRUCK RENTAL, INC.**

By: _____

Name & Title: __Rich Mohr CTO__

Date:__01/08/2020_____

**CHANJE ENERGY, INC.**

By: _____

Name & Title: __Bryan Hansel, CEO___

Date:____01 / 06 / 2020_____

**FDG ELECTRIC VEHICLES LIMITED**

By:_____

Name & Title: _____Director_____

Date:_01/07/2020_____

## EXHIBIT A TO JOINDER AGREEMENT

### Escrow Agreement



| Effective Date | |
|---|---|
| Deposit Account Number | |
| *Effective Date and Deposit Account Number to be supplied by Iron Mountain only. | |

## Three-Party Escrow Service Agreement

1. **Introduction**
   This Three Party Escrow Service Agreement (the "**Agreement**") is entered into by and between _____*[insert full legal name of Depositor]*_____ (the "**Depositor**"), and by _____*[insert full legal name of Beneficiary]*_____ (the "**Beneficiary**") and by Iron Mountain Intellectual Property Management, Inc. ("**Iron Mountain**").  Depositor, Beneficiary, and Iron Mountain may be referred to individually as a "**Party**" or collectively as the "**Parties**" throughout this Agreement.

   (a)  The use of the term services in this Agreement shall refer to Iron Mountain services that facilitate the creation, management, and enforcement of software or other technology escrow accounts as described in Exhibit A attached to this Agreement ("**Services**").  A Party shall request Services under this Agreement by selecting such Service on Exhibit A upon execution of the Agreement or by submitting a work request for certain Iron Mountain Services ("**Work Request**") via written instruction or the online portal maintained at the website located at www.ironmountainconnect.com or other websites owned or controlled by Iron Mountain that are linked to that website (collectively the "**Iron Mountain Website**").

   (b)  The Beneficiary and Depositor have, or will have, entered into a license agreement or other agreement ("**License Agreement**") conveying intellectual property rights to the Beneficiary, and the Parties intend this Agreement to be considered as supplementary to such agreement, pursuant to  Title 11 United States [Bankruptcy] Code, Section 365(n).

2. **Depositor Responsibilities and Representations**
   (a)  It shall be solely the Depositor's responsibility to: (i) make an initial deposit of all proprietary technology and other materials covered under this Agreement ("**Deposit Material**") to Iron Mountain within thirty (30) days of the Effective Date; (ii) make any required updates to the Deposit Material during the Term (as defined below) of this Agreement; and (iii) ensure that a minimum of one (1) copy of Deposit Material is deposited with Iron Mountain at all times.  At the time of each deposit or update, Depositor will provide an accurate and complete description of all Deposit Material sent to Iron Mountain using the form attached to this Agreement as Exhibit B.

   (b)  Depositor represents that it lawfully possesses all Deposit Material provided to Iron Mountain under this Agreement and that any current or future Deposit Material liens or encumbrances will not prohibit, limit, or alter the rights and obligations of Iron Mountain under this Agreement.  Depositor warrants that with respect to the Deposit Material, Iron Mountain's proper administration of this Agreement will not violate the rights of any third parties.

   (c)  Depositor represents that all Deposit Material is readable and useable in its then current form; if any portion of such Deposit Material is encrypted, the necessary decryption tools and keys to read such material are deposited contemporaneously.

3. **Beneficiary Responsibilities and Representations**
   (a)  Beneficiary acknowledges that, as between Iron Mountain and Beneficiary, Iron Mountain's obligation is to maintain the Deposit Material as delivered by the Depositor and that, other than Iron Mountain's inspection of the Deposit Material (as described in Section 4) and the performance of any of the optional verification Services listed in Exhibit A, Iron Mountain has no other obligation regarding the completeness, accuracy, or functionality of the Deposit Material.

   (b)  It shall be solely the Beneficiary's responsibility to monitor whether a deposit or deposit update has been accepted by Iron Mountain.

4. **Iron Mountain Responsibilities and Representations**

4

(a) Iron Mountain agrees to use commercially reasonable efforts to provide the Services requested by Authorized Person(s) (as identified in the "**Authorized Person(s)/Notices Table**" below) representing the Depositor or Beneficiary in a Work Request.  Iron Mountain may reject a Work Request (in whole or in part) that does not contain all required information at any time upon notification to the Party originating the Work Request.

(b) Iron Mountain will conduct a visual inspection upon receipt of any Deposit Material and associated Exhibit B.  If Iron Mountain determines that the Deposit Material does not match the description provided by Depositor represented in Exhibit B, Iron Mountain will notify Depositor of such discrepancy.

(c) Iron Mountain will provide notice to the Beneficiary of all Deposit Material that is accepted and deposited into the escrow account under this Agreement.  Either Depositor or Beneficiary may obtain information regarding deposits or deposit updates upon request or through the Iron Mountain Website.

(d) Iron Mountain will follow the provisions of Exhibit C attached to this Agreement in administering the release of Deposit Material.

(e) Iron Mountain will hold and protect Deposit Material in physical or electronic vaults that are either owned or under the control of Iron Mountain, unless otherwise agreed to by the Parties.

(f) Upon receipt of written instructions by both Depositor and Beneficiary, Iron Mountain will permit the replacement or removal of previously submitted Deposit Material.  The Party making such request shall be responsible for getting the other Party to approve the joint instructions.  Any Deposit Material that is removed from the deposit account will be either returned to Depositor or destroyed in accordance with Depositor's written instructions.

(g) Should transport of Deposit Material be necessary for Iron Mountain to perform Services requested by Depositor or Beneficiary under this Agreement or following the termination of this Agreement, Iron Mountain will use a commercially recognized overnight carrier such as Federal Express or United Parcel Service.  Iron Mountain will not be responsible for any loss or destruction of, or damage to, such Deposit Material while in the custody of the common carrier.

5. **Deposit Material Verification**

(a) Beneficiary may submit a verification Work Request to Iron Mountain for one or more of the Services defined in Exhibit A attached to this Agreement and Depositor consents to Iron Mountain's performance of any level(s) of such Services. Upon request by Iron Mountain and in support of Beneficiary's request for verification Services, Depositor shall promptly complete and return an escrow deposit questionnaire and reasonably cooperate with Iron Mountain by providing reasonable access to its technical personnel whenever reasonably necessary.

(b) The Parties consent to Iron Mountain's use of a subcontractor to perform verification Services.  Such subcontractor shall be bound by the same confidentiality obligations as Iron Mountain and shall not be a direct competitor to either Depositor or Beneficiary.  Iron Mountain shall be responsible for the delivery of Services of any such subcontractor as if Iron Mountain had performed the Services.  Depositor warrants and Beneficiary warrants that any material it supplies for verification Services is lawful, does not violate the rights of any third parties and is provided with all rights necessary for Iron Mountain to perform verification of the Deposit Material.

(c) Iron Mountain will work with a Party who submits any verification Work Request for Deposit Material covered under this Agreement to either fulfill any standard verification Services Work Request or develop a custom Statement of Work ("**SOW**").  Iron Mountain and the requesting Party will mutually agree in writing to an SOW on terms and conditions that include but are not limited to: description of Deposit Material to be tested; description of verification testing; requesting Party responsibilities; Iron Mountain responsibilities; Service Fees; invoice payment instructions; designation of the paying Party; designation of authorized SOW representatives for both the requesting Party and Iron Mountain with name and contact information; and description of any final deliverables prior to the start of any fulfillment activity.  Provided that the requesting Party has identified in the verification Work Request or SOW that the Deposit Material is subject to the regulations of the International Traffic in Arms Regulations (22 CFR 120)(hereinafter "**ITAR**"), Iron Mountain shall ensure that any subcontractor who is granted access to the Deposit Material for the performance of verification Services shall be a U.S. Person as defined in 8 U.S.C. 1101(a)(20) or who is a protected person as defined in 8 U.S.C. 1324b(a)(3). After the start of fulfillment activity, each SOW may only be amended or modified in writing with the mutual agreement of both Parties, in accordance with the change control procedures set forth in the SOW.  If the verification Services extend beyond those described in Exhibit A, the Depositor shall be a necessary Party to the SOW governing the Services.

6. **Payment**

The Party responsible for payment designated in the Paying Party Billing Contact Table ("**Paying Party**") shall pay to Iron Mountain all fees as set forth in the Work Request ("**Service Fees**").  All Service Fees are due within thirty (30) calendar days from the date of invoice in U.S. currency and are non-refundable.  Iron Mountain may update Service Fees with a ninety (90) calendar day written notice to the Paying Party during the Term of this Agreement (as defined below).  The Paying Party is liable for any taxes (other than Iron Mountain income taxes) related to Services purchased under this Agreement or shall present to Iron Mountain an exemption certificate acceptable to the taxing authorities.  Applicable taxes shall be billed as a separate item on the invoice.  Any Service Fees not collected by Iron Mountain when due shall bear interest until paid at a rate of one percent (1%) per month (12% per annum) or the maximum rate permitted by law, whichever is less.  Notwithstanding the non-performance of any

obligations of Depositor to deliver Deposit Material under the License Agreement or this Agreement, Iron Mountain is entitled to be paid all Service Fees that accrue during the Term of this Agreement.

7. **Term and Termination**

    (a)  The term of this Agreement is for a period of one (1) year from the Effective Date ("**Initial Term**") and will automatically renew for additional one (1) year terms ("**Renewal Term**") (collectively the "**Term**").  This Agreement shall continue in full force and effect until one of the following events occur**:** (i) Depositor and Beneficiary provide Iron Mountain with sixty (60) days' prior written joint notice of their intent to terminate this Agreement; (ii) Beneficiary provides Iron Mountain and Depositor with sixty (60) days' prior written notice of its intent to terminate this Agreement; (iii) the Agreement terminates under another provision of this Agreement; or (iv) any time after the Initial Term, Iron Mountain provides sixty (60) days' prior written notice to the Depositor and Beneficiary of Iron Mountain's intent to terminate this Agreement. The Effective Date and the Deposit Account Number shall be supplied by Iron Mountain only.  The Effective Date supplied by Iron Mountain and specified above shall be the date Iron Mountain sets up the escrow account.

    (b)  Unless the express terms of this Agreement provide otherwise, upon termination of this Agreement, Iron Mountain shall return physical Deposit Material to the Depositor and erase electronically submitted Deposit Material.  If reasonable attempts to return the physical Deposit Material to Depositor are unsuccessful, Iron Mountain shall destroy the Deposit Material.

    (c)  In the event of the nonpayment of undisputed Service Fees owed to Iron Mountain, Iron Mountain shall provide all Parties to this Agreement with written notice of Iron Mountain's intent to terminate this Agreement.  Any Party to this Agreement shall have the right to make the payment to Iron Mountain to cure the default.  If the past due payment is not received in full by Iron Mountain within thirty (30) calendar days of the date of such written notice, then Iron Mountain shall have the right to terminate this Agreement at any time thereafter by sending written notice to all Parties.  Iron Mountain shall have no obligation to perform the Services under this Agreement (except those obligations that survive termination of this Agreement, which includes the confidentiality obligations in Section 10) so long as any undisputed Service Fees due Iron Mountain under this Agreement remain unpaid.

8. **Infringement Indemnification**

Anything in this Agreement to the contrary notwithstanding, Depositor at its own expense shall defend, indemnify and hold Iron Mountain fully harmless against any claim or action asserted against Iron Mountain (specifically including costs and reasonable attorneys' fees associated with any such claim or action) to the extent such claim or action is based on an assertion that Iron Mountain's administration of this Agreement infringes any patent, copyright, license or other proprietary right of any third party.  When Iron Mountain has notice of a claim or action, it shall promptly notify Depositor in writing.  Depositor may elect to control the defense of such claim or action or enter into a settlement agreement, provided that no such settlement or defense shall include any admission or implication of wrongdoing on the part of Iron Mountain without Iron Mountain's prior written consent, which consent shall not be unreasonably delayed or withheld.  Iron Mountain shall have the right to employ separate counsel and participate in the defense of any claim at its own expense.

9. **Warranties**

IRON MOUNTAIN WARRANTS ANY AND ALL SERVICES PROVIDED HEREUNDER SHALL BE PERFORMED IN A COMMERCIALLY REASONABLE MANNER CONSISTENT WITH INDUSTRY STANDARDS.  EXCEPT AS SPECIFIED IN THIS SECTION, ALL CONDITIONS, REPRESENTATIONS, AND WARRANTIES INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, SATISFACTORY QUALITY, OR ARISING FROM A COURSE OF DEALING, USAGE, OR TRADE PRACTICE, ARE HEREBY EXCLUDED TO THE EXTENT ALLOWED BY APPLICABLE LAW.  AN AGGRIEVED PARTY MUST NOTIFY IRON MOUNTAIN PROMPTLY UPON LEARNING OF ANY CLAIMED BREACH OF ANY WARRANTY AND, TO THE EXTENT ALLOWED BY APPLICABLE LAW, SUCH PARTY'S REMEDY FOR BREACH OF THIS WARRANTY SHALL BE SUBJECT TO THE LIMITATION OF LIABILITY AND CONSEQUENTIAL DAMAGES WAIVER IN THIS AGREEMENT.  THIS DISCLAIMER AND EXCLUSION SHALL APPLY EVEN IF THE EXPRESS WARRANTY AND LIMITED REMEDY SET FORTH ABOVE FAILS OF ITS ESSENTIAL PURPOSE.

10. **Confidential Information**

Iron Mountain shall have the obligation to implement and maintain safeguards designed to protect the confidentiality of the Deposit Material and use at least the same degree of care to safeguard the confidentiality of the Deposit Material as it uses to protect its own confidential information, but in no event less than a reasonable degree of care.  Except as provided in this Agreement Iron Mountain shall not use or disclose the Deposit Material.  Iron Mountain shall not disclose the terms of this Agreement to any third party other than its financial, technical, or legal advisors, or its administrative support service providers.  Any such third party shall be bound by the same confidentiality obligations as Iron Mountain.  If Iron Mountain receives a subpoena or any other order from a court or other judicial tribunal pertaining to the disclosure or release of the Deposit Material, Iron Mountain will promptly notify the Parties to this Agreement unless prohibited by law.  After notifying the Parties, Iron Mountain may comply in good faith with such order or subpoena.  It shall be the responsibility of Depositor or Beneficiary to challenge any such order or

subpoena; provided, however, that Iron Mountain does not waive its rights to present its position with respect to any such order or subpoena. Iron Mountain will cooperate with the Depositor or Beneficiary, as applicable, to support efforts to quash or limit any order or subpoena, at such Party's expense.

**11. Limitation of Liability**

EXCEPT FOR: (I) LIABILITY FOR DEATH OR BODILY INJURY; (II) PROVEN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; OR (III) THE INFRINGEMENT INDEMNIFICATION OBLIGATIONS OF SECTION 8, ALL OTHER LIABILITY RELATED TO THIS AGREEMENT, IF ANY, WHETHER ARISING IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, OF ANY PARTY TO THIS AGREEMENT SHALL BE LIMITED TO $100,000 (USD).

**12. Consequential Damages Waiver**

IN NO EVENT SHALL ANY PARTY TO THIS AGREEMENT BE LIABLE FOR ANY INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES, LOST PROFITS, ANY COSTS OR EXPENSES FOR THE PROCUREMENT OF SUBSTITUTE SERVICES (EXCLUDING SUBSTITUTE ESCROW SERVICES), OR ANY OTHER INDIRECT DAMAGES, WHETHER ARISING IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE EVEN IF THE POSSIBILITY THEREOF MAY BE KNOWN IN ADVANCE TO ONE OR MORE PARTIES.

**13. General**

(a) Purchase Orders. In the event that the Paying Party issues a purchase order or other instrument used to pay Service Fees to Iron Mountain, any terms and conditions set forth in the purchase order which constitute terms and conditions which are in addition to those set forth in this Agreement or which establish conflicting terms and conditions to those set forth in this Agreement are expressly rejected by Iron Mountain.

(b) Right to Make Copies. Iron Mountain shall have the right to make copies of all Deposit Material as reasonably necessary to perform the Services. Iron Mountain shall copy all copyright, nondisclosure, and other proprietary notices and titles contained on Deposit Material onto any copies made by Iron Mountain. Any copying expenses incurred by Iron Mountain as a result of a Work Request to copy will be borne by the requesting Party. Iron Mountain may request Depositor's reasonable cooperation in promptly copying Deposit Material in order for Iron Mountain to perform this Agreement.

(c) Choice of Law. The validity, interpretation, and performance of this Agreement shall be construed under the laws of the Commonwealth of Massachusetts, USA, without giving effect to the principles of conflicts of laws.

(d) Authorized Person(s). Depositor and Beneficiary must each authorize and designate one person whose actions will legally bind such Party ("**Authorized Person**" who shall be identified in the Authorized Person(s) Notices Table of this Agreement or such Party's legal representative) and who may manage the Iron Mountain escrow account through the Iron Mountain website or written instruction. Depositor and Beneficiary warrant that they shall maintain the accuracy of the name and contact information of their respective designated Authorized Person during the Term of this Agreement by providing Iron Mountain with a written request to update its records for the Party's respective Authorized Person which includes the updated information and applicable deposit account number(s).

(e) Right to Rely on Instructions. With respect to release of Deposit Material or the destruction of Deposit Material, Iron Mountain shall rely on instructions from a Party's Authorized Person. In all other cases, Iron Mountain may act in reliance upon any instruction, instrument, or signature reasonably believed by Iron Mountain to be genuine and from an Authorized Person, officer, or other employee of a Party. Iron Mountain may assume that such representative of a Party to this Agreement who gives any written notice, request, or instruction has the authority to do so. Iron Mountain will not be required to inquire into the truth of, or evaluate the merit of, any statement or representation contained in any notice or document reasonably believed to be from such representative.

(f) Force Majeure. No Party shall be liable for any delay or failure in performance due to events outside the defaulting Party's reasonable control, including without limitation acts of God, strikes, riots, war, acts of terrorism, fire, epidemics, or delays of common carriers or other circumstances beyond its reasonable control. The obligations and rights of the excused Party shall be extended on a day-to-day basis for the time period equal to the period of the excusable delay.

(g) Notices. Iron Mountain shall have the right to rely on the last known address provided by each the Depositor and Beneficiary for its respective Authorized Person and Billing Contact as set forth in this Agreement or as subsequently provided as an update to such address. All notices regarding Exhibit C (Release of Deposit Material) shall be sent by commercial express mail or other commercially appropriate means that provide prompt delivery and require proof of delivery. All other correspondence, including but not limited to invoices and payments, may be sent electronically or by regular mail. The Parties shall have the right to rely on the last known address of the other Parties. Any correctly addressed notice to the last known address of the other Parties, that is refused, unclaimed, or undeliverable shall be deemed effective as of the first date that said notice was refused, unclaimed, or deemed undeliverable by electronic mail, the postal authorities, or commercial express mail.

(h)  No Waiver.  No waiver of any right under this Agreement by any Party shall constitute a subsequent waiver of that or any other right under this Agreement.

(i)  Assignment.  No assignment of this Agreement by Depositor or Beneficiary or any rights or obligations of Depositor or Beneficiary under this Agreement is permitted without the written consent of Iron Mountain, which shall not be unreasonably withheld or delayed.  Iron Mountain shall have no obligation in performing this Agreement to recognize any successor or assign of Depositor or Beneficiary unless Iron Mountain receives clear, authoritative and conclusive written evidence of the change of Parties.

(j)  Severability.  In the event any of the terms of this Agreement become or are declared to be illegal or otherwise unenforceable by any court of competent jurisdiction, such term(s) shall be null and void and shall be deemed deleted from this Agreement.  All remaining terms of this Agreement shall remain in full force and effect.

(k)  Independent Contractor Relationship.  Depositor and Beneficiary understand, acknowledge, and agree that Iron Mountain's relationship with Depositor and Beneficiary will be that of an independent contractor and that nothing in this Agreement is intended to or should be construed to create a partnership, joint venture, or employment relationship.

(l)  Attorneys' Fees.  Any costs and fees incurred by Iron Mountain in the performance of obligations imposed upon Iron Mountain solely by virtue of its role as escrow service provider including, without limitation, compliance with subpoenas, court orders, discovery requests, and disputes arising solely between Depositor and Beneficiary, including, but not limited to, disputes concerning a release of the Deposit Material shall, unless adjudged otherwise, be divided equally and paid by Depositor and Beneficiary.

(m)  No Agency.  No Party has the right or authority to, and shall not, assume or create any obligation of any nature whatsoever on behalf of the other Parties or bind the other Parties in any respect whatsoever.

(n)  Disputes.  Any dispute, difference or question arising among any of the Parties concerning the construction, meaning, effect or implementation of this Agreement or the rights or obligations of any Party will be submitted to, and settled by arbitration by a single arbitrator chosen by the corresponding Regional Office of the American Arbitration Association in accordance with the Commercial Rules of the American Arbitration Association.  The Parties shall submit briefs of no more than 10 pages and the arbitration hearing shall be limited to two (2) days maximum.  Arbitration will take place in Boston, Massachusetts, USA.  Any court having jurisdiction over the matter may enter judgment on the award of the arbitrator.  Service of a petition to confirm the arbitration award may be made by regular mail or by commercial express mail, to the attorney for the Party or, if unrepresented, to the Party at the last known business address.

(o)  Interpleader.  Anything to the contrary notwithstanding, in the event of any dispute regarding the interpretation of this Agreement, or the rights and obligations with respect to the Deposit Material in escrow or the propriety of any action contemplated by Iron Mountain hereunder, then Iron Mountain may, in its sole discretion, file an interpleader or similar action in any court of competent jurisdiction to resolve any such dispute.

(p)  Regulations.  Depositor and Beneficiary each represent and covenant that upon the Effective Date of this Agreement and throughout the term of this Agreement, that: (i) it is not identified on any restricted party lists; or located in countries identified on any restricted country lists; or using the Deposit Material or the Services for any restricted end uses; including those promulgated by the U.S. Departments of State, Commerce and Treasury; (ii) it is and shall remain compliant with all laws and regulations applicable to its performance under this Agreement, including, but not limited to ITAR, any export control and economic sanctions or government regulations of any country from or to which the Deposit Material may be delivered in accordance with the provisions of this Agreement; and (iii) it will not take any action that will cause Iron Mountain to be in violation of such laws and regulations, and will not require Iron Mountain to directly or indirectly take any action that might cause it to be in violation of such laws and regulations.  Depositor will not provide Iron Mountain with Deposit Material that is subject to export controls and controlled at a level other than EAR99/AT. With respect to Deposit Material containing personal information and data, Depositor agrees to (i) procure all necessary consents in relation to personal information and data; and (ii) otherwise comply with all applicable privacy and data protection laws as they relate to the subject matter of this Agreement.  Iron Mountain is responsible for and warrants, to the extent of their individual actions or omissions, compliance with all applicable laws, rules and regulations to the extent that it is directly regulated by the law, rule or regulation and to the extent that it knows or has been advised that, as a result of this Agreement, its activities are subject to the law, rule or regulation.

(q)  No Third Party Rights.  This Agreement is made solely for the benefit of the Parties to this Agreement and their respective permitted successors and assigns, and no other person or entity shall have or acquire any right by virtue of this Agreement unless otherwise agreed to by all of the Parties.

(r)  Entire Agreement.  The Parties agree that this Agreement, which includes all attached Exhibits and all valid Work Requests and SOWs submitted by the Parties, is the complete agreement between the Parties concerning the subject matter of this Agreement and replaces any prior or contemporaneous oral or written communications between the Parties.  There are no conditions, understandings, agreements, representations, or warranties, expressed or implied, which are not specified in this Agreement.  Each of the Parties warrant that the execution, delivery, and performance of this Agreement has been duly authorized and signed by a person who meets

statutory or other binding approval to sign on behalf of its organization as named in this Agreement.  This Agreement may be modified only by mutual written agreement of all the Parties.

(s)  <u>Counterparts</u>.  This Agreement may be executed electronically in accordance with applicable law or in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

(t)  <u>Survival</u>.  Sections 7 (Term and Termination), 8 (Infringement Indemnification), 9 (Warranties), 10 (Confidential Information), 11 (Limitation of Liability), 12 (Consequential Damages Waiver), and 13 (General) of this Agreement shall survive termination of this Agreement or any Exhibit attached to this Agreement.

(BALANCE OF THIS PAGE LEFT INTENTIONALLY BLANK – SIGNATURE PAGE FOLLOWS)

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the Effective Date by their authorized representatives:

| DEPOSITOR | | BENEFICIARY | |
|---|---|---|---|
| Signature | | Signature | |
| Print Name | | Print Name | |
| Title | | Title | |
| Date | | Date | |

| IRON MOUNTAIN INTELLECTUAL PROPERTY MANAGEMENT, INC. | |
|---|---|
| Signature | |
| Print Name | |
| Title | |
| Date | |

(BALANCE OF THIS PAGE LEFT INTENTIONALLY BLANK – NOTICES TABLES AND EXHIBITS FOLLOW)

| Authorized Person Notices Table | | | |
|---|---|---|---|
| Please provide the names and contact information of the Authorized Persons under this Agreement.   Please complete all information as applicable.  Incomplete information may result in a delay of processing. | | | |
| **DEPOSITOR (Required information)** | | **BENEFICIARY (Required information)** | |
| **Print Name** | | **Print Name** | |
| **Title** | | **Title** | |
| **Email Address** | | **Email Address** | |
| **Street Address** | | **Street Address** | |
| **City** | | **City** | |
| **State/Province** | | **State/Province** | |
| **Postal/Zip Code** | | **Postal/Zip Code** | |
| **Country** | | **Country** | |
| **Phone Number** | | **Phone Number** | |
| **Fax Number** | | **Fax Number** | |

| Paying Party Billing Contact Information Table (Required information) | |
|---|---|
| Please provide the name and contact information of the Billing Contact for the Paying Party under this Agreement.  All Invoices will be sent to this individual at the address set forth below. Incomplete information may result in a delay of processing. | |
| **Company Name** | |
| **Print Name** | |
| **Title** | |
| **Email Address** | |
| **Street Address** | |
| **City** | |
| **State/Province** | |
| **Postal/Zip Code** | |
| **Country** | |
| **Phone Number** | |
| **Fax Number** | |
| **Purchase Order #** | |

**IRON MOUNTAIN INTELLECTUAL PROPERTY MANAGEMENT, INC.**

All notices should be sent to ipmclientservices@ironmountain.com OR Iron Mountain Intellectual Property Management, Inc., Attn: Client Services, 6111 Live Oak Parkway, Norcross, Georgia, 30093, USA.  Telephone: 800-875-5669. Facsimile: 770-239-9201

**Exhibit A**
**Escrow Services Fee Schedule – Work Request**

| Deposit Account Number | |
|---|---|

| Service | Service Description - Three-Party Escrow Service Agreement<br>All services are listed below. Check the requested service and submit a Work Request to Iron Mountain for services requested after agreement signature. | One-Time/Per Service Fees | Annual Fees |
|---|---|---|---|
| ☒ Setup Fee (Required at Setup) | One-time Setup Fee for Iron Mountain to setup a standard Three-Party Escrow Service Agreement. | $2,700 | |
| ☒ Deposit Account Fee (Required at Setup) | Iron Mountain will set up one deposit account to manage and administrate access to Deposit Material to be secured in a controlled storage environment.  Iron Mountain will provide account services that include unlimited deposits, electronic vaulting, access to Iron Mountain Connect™ Escrow Management Center for secure online account management, submission of electronic Work Requests, and communication of status. Release of deposit material is also included in the annual fee. An oversize fee of $200 USD per 1.2 cubic foot will be charged for deposits that exceed 2.4 cubic feet. | | $1,200 |
| ☒ Beneficiary Fee (Required at Setup) | Iron Mountain will fulfill a Work Request to add a Beneficiary to an escrow deposit account and manage account access rights.  Beneficiary will have access to Iron Mountain Connect™ Escrow Management Center for secure online account management, submission of electronic Work Requests, and communication of status. | | $950 |
| ☐ File List Test | Iron Mountain will perform one (1) File List Test, which includes a Deposit Material media readability analysis, a file listing, a file classification table, virus scan outputs, and confirmation of the presence or absence of a completed escrow deposit questionnaire. A final report will be sent to the requesting Party regarding the Deposit Material. The deposit must be provided on CD, DVD-R, or deposited electronically.  If, through no fault of Iron Mountain, testing cannot be completed within twelve (12) months of being ordered, Iron Mountain will issue a final failed test report identifying the reason for the failure and the testing shall be considered completed. | $3,000 | N/A |
| ☒ Level 1 Inventory and Analysis Test | Iron Mountain will perform one (1) Inventory and Analysis Test on the specified deposit, which includes the outputs of the File List Test, identifying the presence/absence of build, setup and design documentation (including the presence or absence of a completed escrow deposit questionnaire), and identifying materials required to recreate the Depositor's application development and production environments. Output includes a report that includes compile and setup documentation, file classification tables and file listings. The report will list required software development materials, including, without limitation, required source code languages and compilers, third-party software, libraries, operating systems, and hardware, and Iron Mountain's analysis of the deposit.  A final report will be sent to the requesting Party regarding the Deposit Material.  If, through no fault of Iron Mountain, testing cannot be completed within twelve (12) months of being ordered, Iron Mountain will issue a final failed test report identifying the reason for the failure and the testing shall be considered completed. | $6,000 or based on SOW if custom work required | N/A |
| ☐ Dual Vaulting | Iron Mountain will store and manage a redundant copy of the Deposit Material in one (1) additional location. All Deposit Material (original and copy) must be provided by the Depositor. | N/A | $800 |
| ☐ Remote Vaulting | Iron Mountain will store and manage the Deposit Material in a remote location, designated by the client, outside of Iron Mountain's primary escrow vaulting location. All Deposit Material (original and copy) must be provided by the Depositor. | N/A | $800 |
| ☒ Custom Contract Fee | Custom contract changes to Iron Mountain templates are subject to the Custom Contract Fee, which covers the review and processing of custom or modified contracts. | $950 | N/A |
| Additional Verification Services (Fees based on Statement of Work) | | | |
| Level 2 Deposit Compile Test | Iron Mountain will fulfill a Statement of Work (SOW) to perform a Deposit Compile Test, which includes the outputs of the Level 1 - Inventory and Analysis Test, plus recreating the Depositor's software development environment, compiling source files and modules, linking libraries and recreating executable code, providing a pass/fail determination, and creation of comprehensive compilation documentation with a final report sent to the Paying Party regarding the Deposit Material.  The requesting Party and Iron Mountain will agree on a custom SOW prior to the start of fulfillment.  A completed escrow deposit questionnaire is required for execution of this test. | | |
| Level 3 Binary Comparison Test | Iron Mountain will fulfill a Statement of Work (SOW) to perform one Binary Comparison Test - Binary Comparison, which includes the outputs of the Level 2 test, a comparison of the executable files built from the Deposit Compile Test to the actual executable files in use by the Beneficiary to ensure a full binary-level match, with a final report sent to the Requesting Party regarding the Deposit Material. The Paying Party and Iron Mountain will agree on a custom SOW prior to the start of fulfillment. A completed escrow deposit questionnaire is required for execution of this test. | | |
| Level 4 Full Usability Test | Iron Mountain will fulfill a Statement of Work (SOW) to perform one Deposit Usability Test - Full Usability, which includes which includes the outputs of the Level 1 and Level 2 tests (if applicable).  Iron Mountain will confirm that the deposited application can be setup, installed and configured and, when installed, will execute functional tests, based on pre-determined test scripts provided by the Parties, and create comprehensive setup and installation documentation. A final report will be sent to the Paying Party regarding the Deposit Material. The Paying Party and Iron Mountain will agree on a custom SOW prior to the start of fulfillment. A completed escrow deposit questionnaire is required for execution of this test. | | |

(REMAINDER OF PAGE LEFT INTENTIONALLY BLANK – PAYING PARTY SIGNATURE PAGE FOLLOWS)

Pursuant to the Agreement, the undersigned hereby issues this Work Request for performance of the Service(s) selected above.

| Paying Party – For Future Work Request Use Only | |
|---|---|
| **Paying Party Name** | |
| **Signature** | |
| **Print Name** | |
| **Title** | |
| **Date** | |

**IRON MOUNTAIN INTELLECTUAL PROPERTY MANAGEMENT, INC.**

All Work Requests should be sent to ipmclientservices@ironmountain.com OR Iron Mountain Intellectual Property Management, Inc., Attn: Client Services, 6111 Live Oak Parkway, Norcross, Georgia, 30093, USA. Telephone: 800-875-5669.  Facsimile: 770-239-9201

# Exhibit B
## Deposit Material Description
(This document must accompany each submission of Deposit Material)

| Company Name | | Deposit Account Number | |
|---|---|---|---|
| Deposit Name | | Deposit Version | |

(Deposit Name will appear in account history reports)

**Deposit Media**
(Please Label All Media with the Deposit Name Provided Above)

| Media Type | Quantity | Media Type | Quantity |
|---|---|---|---|
| ☐ CD-ROM / DVD | | ☐ USB Drive | |
| ☐ DLT Tape | | ☐ Documentation | |
| ☐ DAT Tape(4mm/8mm) | | ☐ Hard Drive / CPU | |
| ☐ LTO Tape | | ☐ Circuit Board | |
| ☐ Other (please describe): | | | |
| | | | |
| | | | |

| | Total Size of Transmission (specify in bytes) | # of Files | # of Folders |
|---|---|---|---|
| ☐ Electronic Deposit | | | |

**Deposit Encryption**
(Please check either "Yes" or "No" below and complete as appropriate)
Is the media or are any of the files encrypted? ☐ Yes or ☐ No
If yes, please include any passwords and decryption tools description below.  Please also deposit all necessary encryption software with this deposit.  Depositor at its option may submit passwords on a separate Exhibit B.

| Encryption tool name | | Version | |
|---|---|---|---|
| Hardware required | | | |
| Software required | | | |
| Other required information | | | |

**Deposit Certification** (Please check the box below to certify and provide your contact information)

| ☐ I certify for Depositor that the above described Deposit Material has been transmitted electronically or sent via commercial express mail carrier to Iron Mountain at the address below. | | ☐ Iron Mountain has inspected and accepted the above described Deposit Material either electronically or physically.  Iron Mountain will notify Depositor of any discrepancies. | |
|---|---|---|---|
| Print Name | | Name | |
| Date | | Date | |
| Email Address | | | |
| Telephone Number | | | |

**<u>Note:  If Depositor is physically sending Deposit Material to Iron Mountain, please label all media and mail all Deposit Material with the appropriate Exhibit B via commercial express carrier to the following address:</u>**

Iron Mountain Intellectual Property Management, Inc.
Attn: Vault Administration
6111 Live Oak Parkway
Norcross, GA 30093
Telephone: 800-875-5669

Facsimile: 770-239-9201

# Exhibit C
## Release of Deposit Material

| Deposit Account Number | |
|---|---|

Iron Mountain will use the following procedures to process any Beneficiary Work Request to release Deposit Material.  All notices under this Exhibit C shall be sent pursuant to the terms of Section 13(g) Notices.

1. **Release Conditions.**
Depositor and Beneficiary agree that a Work Request for the release of the Deposit Material shall be based solely on one or more of the following conditions (defined as "**Release Conditions**"):
   (i)      Depositor's breach of the License Agreement or other agreement between the Depositor and Beneficiary regulating the use of the Deposit Material covered under this Agreement; or
   (ii)     Failure of the Depositor to function as a going concern or operate in the ordinary course; or
   (iii)    Depositor is subject to voluntary or involuntary bankruptcy.

2. **Release Work Request.**
A Beneficiary may submit a Work Request to Iron Mountain to release the Deposit Material covered under this Agreement.  To the extent that the Deposit Material is subject to applicable U.S. export control regulations and laws, including ITAR, the Beneficiary Work Request to release the Deposit Material must include Beneficiary's certification that such release would be compliant with the applicable U.S. export control regulations and laws, including ITAR.  Iron Mountain will send a written notice of this Beneficiary Work Request within five (5) business days to the Depositor's Authorized Person.

3. **Contrary Instructions.**
From the date Iron Mountain mails written notice of the Beneficiary Work Request to release Deposit Material covered under this Agreement, Depositor's Authorized Person shall have ten (10) business days to deliver to Iron Mountain contrary instructions.  Contrary instructions shall mean the written representation by Depositor that a Release Condition has not occurred or has been cured (**"Contrary Instructions"**).  Contrary Instructions shall be on company letterhead and signed by a Depositor Authorized Person.  Upon receipt of Contrary Instructions, Iron Mountain shall promptly send a copy to Beneficiary's Authorized Person.  Additionally, Iron Mountain shall notify both Depositor and Beneficiary Authorized Persons that there is a dispute to be resolved pursuant to the Disputes provisions of this Agreement.  Iron Mountain will continue to store Deposit Material without release pending (i) instructions from Depositor to release the Deposit Material to Beneficiary; or (ii) dispute resolution pursuant to the Disputes provisions of this Agreement; or (iii) withdrawal of Contrary Instructions from Depositor's Authorized Person or legal representative; or (iv) receipt of an order from a court of competent jurisdiction. The existence of a Release Condition dispute shall not relieve the Paying Party from payment of applicable Service Fees.

4. **Release of Deposit Material.**
If Iron Mountain does not receive timely Contrary Instructions from a Depositor Authorized Person or receives written instructions directly from Depositor's Authorized Person to release a copy of the Deposit Material to the Beneficiary, Iron Mountain is authorized to release Deposit Material to the Beneficiary.  Iron Mountain is entitled to receive any undisputed, unpaid Service Fees due Iron Mountain from the Parties before fulfilling the Work Request to release Deposit Material covered under this Agreement.  Any Party may cure a default of payment of Service Fees.

5. **Termination of Agreement Upon Release.**
This Agreement will terminate upon the release of Deposit Material held by Iron Mountain.

6. **Right to Use Following Release.**
Beneficiary has the right under this Agreement to use the Deposit Material for the sole purpose of continuing the benefits afforded to Beneficiary by the License Agreement.  Notwithstanding, the Beneficiary shall not have access to the Deposit Material unless there is a release of the Deposit Material in accordance with this Agreement.  Beneficiary shall be obligated to maintain the confidentiality of the released Deposit Material.

## **EXHIBIT B TO JOINDER AGREEMENT**

### **Critical Components List**

In accordance with Section 5(a) of this Agreement, any change by Chanje of the suppliers used to manufacture the following Critical Components shall necessitate an update of the Manufacturer Data:

1. Brake Linings
2. Glass
3. High Voltage Battery
4. High Voltage Charger
5. Traction Motors
6. Traction Motor Controllers
7. DC-DC Converter
8. Isolation Monitoring System
9. Body Control Module
10. Vehicle Monitoring System

# EXHIBIT G

Cata, Gladys E.

| | |
|---|---|
| From: | do_not_reply@psc.uscourts.gov |
| Sent: | Wednesday, March 17, 2021 7:00 PM |
| To: | Cata, Gladys E. |
| Subject: | Pay.gov Payment Confirmation: FLORIDA SOUTHERN DISTRICT COURT |

External Email: This email was sent from outside of your organization.

Your payment has been successfully processed and the details are below. If you have any questions or you wish to cancel this payment, please contact: Financial Section at 305-523-5050.

Account Number: 4067281
Court: FLORIDA SOUTHERN DISTRICT COURT
Amount: $402.00
Tracking Id: AFLSDC-14532498
Approval Code: 021084
Card Number: ************1055
Date/Time: 03/17/2021 07:00:26 ET

NOTE: This is an automated message. Please do not reply